Executive Summary
Introduction
Purpose
Background
Methodology
Results and Discussion
Conclusion
References
Bibliography
List of Acronyms and Abbreviations (optional)
Glossary (optional)
Appendices (if necessary)
Index (optional)

All photographs and line drawings should be integrated and numbered sequentially and should correspond to the figure legends as referenced. Identify tabulations with a separate sequential numbering system (e.g., Table 1, Table 2) that distinguishes the tables from other illustrations.

9. Quality of Originals. The report will be microfiched and may be printed by the photo-offset printing process; therefore, it is essential that good, clean, typed copy with no erasures, original line drawings, and good continuous-tone black-and-white glossy prints of photographs be provided.

10. Company Names and Logos. Company names, logos, or similar material may not be placed on camera-copy pages.

11. Report Cover. The title page of this report shall serve as the report cover. The title page must contain the following information:

Project Title
Type of Report (Quarterly, Annual, Final, etc.)
Reporting Period
Principal Author(s)
Date (Month and Year) Report was Issued
Award Number (DE-AC21-92MC28202)
For: U.S. Department of Energy
Office of Fossil Energy
Morgantown Energy Technology Center
Morgantown, West Virginia

By: Name and address of participant's organization (This section may also contain the name and address of significant contractors or subcontractors who participated in the production of the report)

ATTACHMENT C

LIST OF GOVERNMENT PROPERTY — CONTRACTOR ACQUIRED

## ATTACHMENT C

### LIST OF GOVERNMENT PROPERTY — CONTRACTOR ACQUIRED

The Contractor is authorized to acquire and/or fabricate the property listed below for use in the performance of this contract. The property shall be subject to the provisions of the clause entitled "Government Property".

### PHASE I

| Item Description | Estimated Acquisition Cost |
|---|---|
| **COAL GASIFICATION SUBSYSTEM** | $4,344,000 |
| Gasifier | |
| Gasifier Ash & NOx Development | |
| Coal Crushing & Drying | |
| Coal Pressure Lock | |
| Grate and Drive | |
| Air Injection | |
| Steam Injection | |
| Air Pressure Lock | |
| Ash Hydration | |
| **AIR COMPRESSOR GROUP** | 721,000 |
| 1st Stage Air Compressor | |
| 2nd Stage Air Compressor | |
| **COAL RECEIVING/STORAGE/RECLAIM** | 639,000 |
| Grizzley & Charge Hopper | |
| Gravimetric (Weigh) Feeder | |
| Pile Runoff Collection Sump | |
| Vent Fan | |
| Transfer (Folding) Conveyor | |
| Sample Cutter | |
| Sampling Lab Equipment | |
| Pile Tarpaulin | |
| Front End Loader | |
| **LIMESTONE RECEIVING/STORAGE/RECLAIM** | 75,000 |
| Grizzley & Charge Hopper | |
| Gravimetric Feeder | |
| Sample Cutter | |
| Pile Tarpaulin | |
| **COAL GAS HOT CYCLONE** | 139,000 |
| Cyclone | |
| Pressure Locks | |
| Solids Collection Hopper | |

| Item Description | Estimated Acquisition Cost |
|---|---|
| **COAL GAS COMBUSTION/HEAT RECOVERY** | ~~2,836,000~~ 2,344,000 |
| Forced Draft Fan & Drive | |
| Insulated Coal Gas Piping | |
| Coal Gas Burner Nozzle/Flame Safety System | |
| Water/Steam Injection System | |
| Packaged Coal Gas Fired Feedwater Heater | |
| Forced Circulation Steam Generation | |
| Heat Recovery Steam Generator | |
| Water Treatment System | |
| Induced Draft Fan | |
| Gas Monitoring Instrumentation | |
| Emergency Flare | |
| **WATER TREATMENT SYSTEM** | 107,000 ~~15,000~~ |
| Water Softener System | |
| **NITROGEN INERTING TANK FARM & SYSTEM** | 69,000 |
| Nitrogen Inerting Tank Farm | |
| Inerting Piping & Control System | |
| Gasifier Rupture Disc & Vent Stack | |
| **ASH HANDLING/SILO** | 560,000 |
| Ash Vacuum Air Blower | |
| Gasifier Ash Valve(2) & Piping | |
| Baghouse Ash Valves | |
| Ash Silo & Vent Baghouse | |
| Ash Silo Isolation Guillotine | |
| Ash Hopper Rotary Valve | |
| Ash Conditioner | |
| Ash Silo Access Ladder & Platforms | |
| **GASIFIER FEEDWATER HEATING/STEAM GENERATION SYSTEM** | 362,000 |
| Feedwater Heater | |
| Booster Pump & Drive | |
| Spray Water Pump & Drive | |
| Gasifier Water Jacket | |
| Hot Gas Bypass Damper | |
| Fan Bearing Cooling | |
| Forced Circulation Steam Generation Bank | |
| Pressure Reducing Valve | |
| Pyrolyzer Cooling | |
| Water Injection Spray | |
| Ash Conditioner Spray | |

| Item Description | Estimated Acquisition Cost |
|---|---|
| **PIPING**<br>Interconnecting Process & Potable Water Piping<br>Coal Gas from GPIF to Existing Ft. Martin Burner<br>Light Oil for Pyrolyzer Warmup Burner, Startup Steam Generation and Coal Dryer<br>Fire Protection<br>Flame Arrestor | ~~941,000~~<br>1,060,000 |
| **ELECTRICAL SYSTEM**<br>Electrical Substation<br>Gasifier Compressor Motor<br>FD & ID Fan Motor<br>Feed Water Pump Motor<br>Fire Protection Pumping Station<br>Coal Weigh Feeder<br>Pit Vent Fan Drive<br>Coal & Limestone Sample Cutter Drives<br>Limestone Weigh Feeder<br>Transfer Conveyor Drive<br>Rotary Coal Metering Drives<br>Goal Gasifier Feeders<br>Grate Drive<br>Coal Crusher Drive<br>Ash Handling System Vacuum Blower<br>Ash Silo Outlet Aeration Blower Pkg.<br>Ash Rotary Vane Feeder<br>Ash Conditioner Drive<br>Ash Pressure Lock Drives<br>Hot Cyclone Pressure Lock Drives<br>Coal Gas Burner Register Drives<br>Coal Gas Water Spray Valve Drive<br>Coal Gas Burner Ignitor Valve Drives | ~~2,409,000~~<br>1,779,000 |
| → INSTRUMENTS & CONTROLS | 1,970,000 |
| **CIVIL GROUP**<br>Site Run-off Control<br>Foundations and Underground Support<br>Pump & Tank Type Lavatory Facilities<br>Paved Roads | ~~813,000~~<br>1,229,000 |
| **BUILDING/HVAC**<br>Building, Exterior & Interior, 4,000 sq ft<br>Steel, Stairwells (2), Platforms and Support<br>HVAC<br>Meeting, Control & Testing Rooms<br>Compressed Air Dryers/Filtering | ~~274,000~~<br>454,000 |
| **TOTAL PROPERTY PHASE I** | $ 16,180,000<br>~~$14,197,000~~ |

**PHASE II**

The Contractor is not authorized to acquire and/or fabricate the property listed below for use in the performance of this contract until written autorization to proceed to Phase II is received from the DOE Contracting Officer.

| Item Description | Estimated Acquisition Cost |
|---|---|
| **HOT GAS CLEANUP UNIT (HGCU)**<br>Zinc Ferrite Storage Tote Bins<br>Zinc Ferrite Fdr. & Denseveyor System<br>Absorber Vessel<br>Regenerator Vessel<br>Hot Cyclone<br>Makeup Sorbent Lock Hopper<br>Spent Sorbent Lock Hopper<br>Interconn. Piping & Regen Heat Exchange<br>Recirculation Gas Compressor<br>Misc. Parts | ~~$1,792,000~~ 1,789,000 |
| **SULFUR RECOVERY UNIT**<br>Direct Sulfur Recovery Process<br>ReSox Elemental Sulfur Recovery<br>Sulfuric Acid Recovery<br>Sulfur Dioxide Recovery<br>Misc. | ~~642,000~~ 638,000 |
| **INSTRUMENTS & CONTROLS**<br>HGCU/Sulfur Recovery<br>Distributed Control System<br>Control Panel<br>c/w Instruments<br>Misc. Instruments | ~~546,000~~ 540,000 |
| **SPARE PARTS** | 30,000 |
| **TOTAL PROPERTY PHASE II** | 2,997,000 |

# ATTACHMENT D

## SMALL AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN

**Small Business and Small Disadvantaged Business Subcontracting Plan Submitted In Accordance With FAR 52.219-9**

| | |
|---|---|
| Date: | September 30, 1992 |
| Contractor: | CRS Sirrine Engineers, Inc. |
| Address: | Post Office Box 5456<br>Greenville, South Carolina 29606 |
| Contract Number: | DE-AC21-92MC28202 |

Item / Service Provided

1. Goals

(a) Total dollars planned to be subcontracted to all types of business concerns under this contract — $16,180,217

(b) Total dollars planned to be subcontracted to Small Business — $1,618,022 — 10%

(c) Total dollars planned to be subcontracted to Small Disadvantaged Business (SDB) — $323,604 — 2%

(d) Principal products and services to be subcontracted under this contract and the types of businesses supplying them are:

| List of Products and Services | Type of Business to be Utilized: Sm. Bus. | SDB |
|---|---|---|
| Pipe and Fittings | (X) | (X) |
| Concrete | (X) | ( ) |
| Misc. Parts and Supplies | (X) | (X) |
| Equipment | (X) | (X) |
| Security | ( ) | (X) |
| Excavation | ( ) | (X) |
| Steel | (X) | ( ) |
| Electrical Supplies and Services | (X) | (X) |
| Misc. Instruments | (X) | (X) |

(e) Methods used to develop subcontracting goals for Small Business and Small Disadvantaged Business (i.e., explain how the product and services areas to be subcontracted were established, include source lists used and organization contacted to obtain SB or SDB sources).

JApp 00162

CRS Sirrine Engineers, Inc. analyzed the following in developing the subcontracting goals: historical data for type of construction, number of SB's and SDB's geographically located, type of work to be subcontracted and the materials list. Due to the high level of expertise required to perform the Scope of Work it is impossible to plan for subcontracting opportunities in more detail at this time.

Each potential contracting opportunity is reviewed with regard to its potential challenges and the particular expertise needed to undertake that particular opportunity. CRS Sirrine Engineers, Inc. evaluates each contractual opportunity in that context and after reviewing the capabilities, experience, location, and present workload of our in-house staff, we make a determination on the supplementing of our staff in order to formulate the best possible team.

(f) Indirect and overhead costs have not been included in the goals stated above.

2. The following individual will administer the subcontracting program:

Name: William Craig
Title: Project Manager
Address: Post Office Box 5456
Greenville, South Carolina 20606
Telephone: 803 676-6033

Name: Ed Moore
Title: Corporate Small Business Administrator
Address: 1177 West Loop South
Houston, Texas 77027
Telephone: 713 552-2000

This individual's specific duties, as they relate to the firm's subcontracting program, are as follows: General overall responsibility for review, monitoring, and execution of the plan, including but not limited to,

(a) Obtaining small and small disadvantaged business sources from all applicable agencies such as SBA and MBDA.

(b) Assuring inclusion of SB and SDB firms in all solicitations where applicable.

(c) Attending or arranging for attendance at Business Opportunity Workshops, Minority Business Enterprise Seminars, Trade Fairs, etc.

(d) Conducting or arranging for the conduct of motivational training for purchasing personnel pursuant to the intent of Pub. L. 95-507.

(e) Monitoring attainment of proposed goals.

(f) Reviewing solicitations to delete statements, clauses, and other provisions which may tend to prohibit SB and SDB participation.

3. CRS Sirrine Engineers, Inc. agrees to initiate the following actions to assure that small and small disadvantaged business concerns will have an equitable opportunity to compete for subcontracts.

(a) Outreach efforts shall be established as follows:

(i) Contacts with minority and small business trade associations. Name at least three (3).

1) Small Business Administration
2) Bluebook Building Construction
3) On in-house Database of Minority Firms used by CRSS

(ii) Contacts with business development organizations. Name at lease two (2).

1) Economic Development Councils
2) Chamber of Commerce

(iii) Attendance at small and minority business procurement conferences and trade fairs. Provide examples.

1) Conference: "Business Market Place"
2) Trade Fair: "Carolina Trade Fair"

(b) The following internal efforts shall be conducted so as to guide and encourage buyers:

(i) Periodic workshops, seminars, and training programs

(ii) Activities shall be monitored so as to evaluate compliance with this subcontracting plan.

(c) Small and disadvantaged business source lists, guides, and other relevant data identifying small and disadvantaged business vendors shall be maintained and utilized by their buyer in soliciting subcontracts.

(d) Additions to the above listed efforts are as follows:

4. CRS Sirrine Engineers, Inc. agrees that the clause entitled Utilization of Small Business Concerns and Small Disadvantaged Business Concerns will be included in all subcontracts which offer further subcontracting opportunities, and all subcontractors, except small business concerns, which receive subcontracts in excess of $500,000 or in the case of a contract for the construction of any public facility, $1,000,000, will be required to adopt and comply with a subcontracting plan similar to this one. Such plans will be reviewed by comparing them with the provisions of Pub. L. 95-507, and assuring that all minimum requirements of an acceptable subcontracting plan shall be determined on a case-by-case basis depending on the supplies/services involved, the availability of potential small and disadvantaged subcontractors, and prior experience. Once approved and implemented, plans will be monitored through the submission of periodic reports, and/or, as time and availability of funds permit, periodic visits to the subcontractor facilities or reviews of applicable records and subcontracting program progress.

5. CRS Sirrine Engineers, Inc. agrees to cooperate in any studies or surveys as may be required by the contracting agency or the Small Business Administration in order to determine the extent of compliance by CRS Sirrine Engineers, Inc. with the subcontracting plan.

CRS Sirrine agrees to submit SF294 and SF295 in accordance with the instructions on the forms.

Additionally, CRS Sirrine Engineers, Inc. agrees to assure that its subcontractors agree to submit Standard Form 294 "Subcontracting Reports for Individual Contracts" and Standard Form 295 "Summary Subcontract Report", in accordance with the instructions on the forms.

6. CRS Sirrine Engineers, Inc. agrees to maintain at least the following types of records to document compliance with this subcontracting plan:

(a) Small and disadvantaged business source lists, guides and other data identifying SB and SDB vendors.

(b) Organizations contacted for small and disadvantaged business sources.

(c) On a contract-by-contract basis, records on all subcontract solicitations over $100,000, indicating on each solicitation (1) whether small businesses were solicitated, and if not, why not; (2) whether small disadvantaged businesses were solicitated, and if not, why not; and (3) reasons for the failure of solicited small businesses or small disadvantaged businesses to receive the subcontract award.

(d) Records to support other outreach efforts: contacts with Minority and Small Business Trade Associations, Business Development Organizations, and attendance at small and minority business procurement conferences and trade fairs.

(e) Records to support internal activities to guide and encourage buyers: workshops, seminars, training programs, and monitoring activities to evaluate compliance.

(f) On a contract-by-contract basis, records to support award data submitted to the Government to include name, address and business size of each subcontractor.

7. CRS Sirrine Engineers, Inc. agrees to:

(a) Assist small and small disadvantaged business concerns by arranging solicitations, time for the preparation of bids, quantities, specifications, and delivery schedules so as to facilitate the particiption by such concerns. Where CRS Sirrine Engineers, Inc. lists of potential small business and small disadvantaged subcontractors are excessively longer, reasonable effort shall be made to give all such concerns an opportunity to compete over a period of time.

(b) Provide adequate and timely consideration of the potentialities of small and small disadvantaged business concerns in all "make or buy" decisions.

JApp 00165

Subcontracting Plan submitted by:

Signature: [signature]

Typed Name: Richard Sadowski

Title: Director, Advanced Technology

Reviewed by:

Signature: [signature]

Typed Name Ed Moore

Title: Manager of Government Accounting and Compliance

Approved by:

Signature [signature]

Typed Name H. Grady Hart

Title: Vice President of Engineering

JApp 00166

*U.S. Department of Energy*

*National Energy Technology Laboratory*

NETL

September 13, 2002

Jacobs Engineering Group, Inc.
Attn: Mr. Gustav R. Hubert
1111 South Arroyo Parkway 91105
P. O. Box 7084
Pasadena, CA 91109-7084

Dear Mr. Hubert:

Attached is the Contracting Officer's Final Decision for Contract No. DE-AC21-92MC-28202.

Should you have any questions, you may contact me at the numbers below.

Sincerely,

Joseph S. Maury
Contract Administrator
Acquisition and Assistance Division

Attachment

JApp 00167

3610 Collins Ferry Road, P.O. Box 880, Morgantown, WV 26507-0880 • 626 Cochrans Mill Road, P.O. Box 10940, Pittsburgh, PA 15236-0940
REPLY TO: Morgantown Office • jmaury@netl.doe.gov • Voice (304)285-4220 • Fax (304)285-4683 • www.netl.doe.gov

08-13-2002 14:46 From-DOE/NETL +13042854683 T-327 P.002/008 F-623

**CONTRACTING OFFICER'S FINAL DECISION**
**TERMINATION SETTLEMENT PROPOSAL**
**CONTRACT NUMBER DE-AC21-92MC-28202**

**DESCRIPTION OF THE CLAIM**

Jacob's Engineering Group, (JEG) as successor in interest to CRS Sirrine Engineers, Inc., (CRS) seeks payment of $1,542,197.59, claimed to be the result of the Department of Energy's (DOE) partial termination of Contract No. DE-AC21-92MC-28202 (the contract), for the convenience of the Government. JEG contends that the DOE's termination action prior to completion of the project entitles JEG to reimbursement of costs shared by CRS during performance of the contract since the contractor did not obtain the benefit anticipated to be received by CRS from the contract. JEG believes that it is entitled to reimbursement of: (a) the cost shared portion of the work completed; (b) the work completed under the contract but not yet billed; (c) reasonable termination costs; and (d) fee in accordance with the cost-sharing provision and the termination for convenience clause of the contract. The stated claimed costs are in accordance with the "Settlement Proposal for Cost Reimbursement Type Contracts" dated 7/31/96.

**STATEMENT OF UNDISPUTED FACTS**

1. On September 30, 1992, DOE awarded Cost-Sharing Contract No. DE-AC21-92MC-28202 (the contract) to "CRS Sirrine Engineers, Inc., of Greenville, South Carolina" at a total estimated cost of $28,750,374. The DOE share of the contract was estimated at $23,000,299 or 80% of the total allowable project cost. CRS agreed to share 20% ($5,750,075) of the total allowable project costs.

2. The contract called for CRS to "develop, design, fabricate, construct and install an Innovative, air-blown, dry-bottom, pressurized fixed-bed coal gasifier subsystem and the gasification product improvement facility infrastructure".

3. The contract period of performance, established at the time of award, was September 30, 1992 through March 29, 1996.

4. CRS was acquired by JEG in August 1994.

5. The total funds obligated to the contract at the time of termination was $7,062,727.

6. The contract includes Clause B.007(S) Cost Sharing Arrangement (APR 1984), which reads in full:

   A. Estimated Cost. The total estimated cost for the work to be accomplished under this contract is $28,750,374. (See the clause entitled "Cost Sharing Contract--No Fee" or "Cost Sharing Contract--No Fee--Alternate 1").

B. Cost Sharing. The Contractor and the Government agree to share the cost of the effort for Phase 1 and Phase II as follows:

| | Government (80%) | Contractor (20%) | Total (100%) |
|---|---|---|---|
| Phase I | $19,850,784 | $4,962,696 | $24,813,480 |
| Phase II | 3,149,515 | 787,379 | 3,936,894 |
| Total | $23,000,299 | $5,750,075* | $28,750,374 |

*includes foregone fee in the amount of $1,181,594 for Phase I and $169,531 for Phase II.

C. Cost Sharing--Overruns. If the Contracting Officer approves a cost overrun under this contract, the Contractor agrees that its share of the overrun will be at the following percentage share: 20%

D. Cost Sharing--Changes. In the event that there is a change in the contract in accordance with the Contract Clause No. 61, FAR 52-243-2, "Changes (Cost Reimbursement) Alternates I and V" the parties will negotiate an appropriate cost-sharing ratio for the work.

7. The contract included Clause I.020a entitled Cost-Sharing Contract--No Fee (APR 1984) which reads in full:

A. The Government shall not pay to the Contractor a fee for performing this contract.

B. After paying 80 percent of the Government's share of the total estimated costs of performance shown in the Schedule, the Contracting Officer shall withhold further payment of allowable cost until a reserve is set aside in the amount that the Contracting Officer considers necessary to protect the Government's interest. This reserve shall not exceed one percent of the Government's share of the total estimated cost shown in the Schedule or $100,000, whichever is less.

8 The contract included Clause 73, FAR 52.249-6, Termination (Cost Reimbursement) (May 1986).

9. Modification M003 to the contract replaced the Patent Rights--Long Form clause with the Advanced Waiver of Patent Rights clause as a result of DOE's grant of a patent waiver.

10. On August 2, 1995, the Contracting Officer issued a letter partially terminating the contract for the convenience of the Government. CRS was directed to immediately stop all work, terminate subcontracts, and place no further orders except as necessary to complete Revision 1 process design of Task 5. CRS was further instructed to telegraph similar instructions to all subcontractors & suppliers, continue to report contract performance in accordance with the Reporting Requirements and begin preparation of a brief final report. The letter explained that the partial termination was necessitated by lack of funds for construction of the PyGas pilot-scale demonstration due to significant DOE funding reduction for coal research and development.

11. On August 1, 1996, DOE received a termination settlement proposal from JEG for $1,542,197.57.

12. On August 5, 1996, DOE requested a termination audit by the Defense Contract Audit Agency (DCAA).

13. On November 20, 1996, DCAA issued the Audit of Termination Settlement Proposal, Subcontract (Physical Sciences-PSI) to Jacobs Engineering Group, Inc., Audit Report No. 2161-97A17100063.

14. On November 20, 1996, DCAA issued the Report on Audit of Partial Termination Settlement Proposal, Subcontract (D.B. Riley) to Jacobs-Sirrine Engineers. Audit Report No. 2181-96J17100001.

15. On December 15, 1999, DCAA issued the "Report on the Audit of Termination for Convenience Proposal, Jacobs Engineering Group". Audit Report No. 4901-1999N17100012.

16. On January 29, 1999, DCAA issued the "Report on Audit of Revised Partial Termination Proposal, Subcontract (D.B.Riley) to Jacobs-Sirrene Engineers. Audit Report No. 4901-99N17100012 (98-839).

17. On April 29, 2002, Jacobs Engineering Group requested a Final Decision of the Contracting Officer.

STATEMENT OF DISPUTED FACTS

1. JEG believes it has been paid $5,579,582.60 to date by the DOE. DOE records indicate payments to date in the amount of $5,579,600.60.

2. JEG's claims project costs for the period of May 1, 1996 through June 30, 1996 in the amount of $14,358.04. These costs were incurred after the contract period of performance expired on March 29, 1996. DOE contends the costs are not allowable.

3. JEG claims $20,667 for preparation of a commercialization plan included in subcontractor D.B. Riley's settlement costs. DOE contends that a commercialization plan was not authorized under the contract statement of work and therefore the costs are not allowable.

4. JEG claims $20,000 for patent litigation costs included in subcontractor D.B. Riley's settlement costs. DOE contends that patent litigation costs are not allowable pursuant to the federal cost principles.

5. JEG claims that due to the termination and non-completion of the gasification plant, it did not receive the benefits of the contract and therefore is entitled to reimbursement of (a) JEG's cost sharing portion of the work completed; (b) the work completed under the contract but not yet billed; (c) reasonable termination costs; and (d) fee in accordance with the cost-sharing provision and the termination for convenience clause of the contract. DOE contends that a termination for convenience does not supersede cost sharing and no-fee provisions of the contract. Accordingly, DOE believes JEG's claim for reimbursement of cost-sharing, including foregone fee, in the amount of $1,498,443.29 is not allowable.

## ANALYSIS OF CLAIM/FINDINGS OF FACT

Cost Incurred After Period of Performance

The contract period of performance was September 30, 1992 to March 29, 1996. No modifications were issued to extend the period of performance nor did DOE authorize JEG to incur project cost beyond the expiration date of the contract. JEG appears to have incurred project costs, not related to the termination, after the expiration date of the contract including $14,358.04 for the period May 1, 1996 through June 30, 1996. Without authorization from the Contracting Officer, these costs are unallowable.

Commercialization Plan

Subcontractor D.B. Riley's settlement proposal includes charges in the amount of $20,667 for preparation of a commercialization plan for the PyGas GPIF technology. JEG's memorandum of Termination Settlement with D.B. Riley, states that the commercialization plan was directly tasked by the Contracting Officer's Representative (COR) and was not discussed with a Jacobs representative. The memorandum also indicates that the commercialization plan does not fit with the basic statement of work. Contrary to the memorandum, D.B. Riley's representative informed DCAA that JEG required D.B. Riley to prepare the commercialization plan for presentation to DOE.

DOE has examined the contract and found no requirements for the commercialization plan. DOE therefore has no basis to recognize the cost regardless of any direction that may or may not have been provided by the COR. Contract clause H.002 Technical Direction clearly provides that the COR does not have authority to issue any technical direction which constitutes an assignment of additional work outside the statement of work or constitutes a change as defined in the changes clause.

Patent Costs

Subcontractor D.B. Riley's settlement proposal includes charges in the amount of $20,000 for outside counsel hired to defend challenges to the PyGas patents in Europe. FAR 31.205-30(c) provides that other than those for general counseling services, patent costs not required by the contract are unallowable. "General counseling services" are defined in FAR 31.205-30(b) to include services such as advice on patent laws, regulations, clauses, and employee agreements. Similarly, FAR 31.205-47(f)(6) provides that cost incurred in connection with patent infringement litigation are not allowable unless otherwise provided for in the contract.

The patent litigation costs incurred by D.B.Riley are not within the definition of general counseling services addressed in FAR 31.205-30(b). Therefore, for the costs to be allowable the activity resulting in the cost must be required by the contract, or otherwise provided for in the contract. Since the contract does not contain authorization to incur patent litigation costs, the costs are not allowable under the applicable cost principles.

Cost Sharing and Fee

JEG seeks recovery of $1,498,443 for shared costs including foregone fee from JEG and cost sharing from subcontractors Physical Sciences, Inc., and D.B. Riley. JEG contends that its predecessor, CRS, agreed to the cost sharing and no-fee provisions on the assumption it would complete the contract and receive the full benefit of the bargain. Therefore, JEG believes it is entitled to reimbursement of (a) JEG's cost sharing portion of the work completed; (b) the work completed under the contract but not yet billed; (c) reasonable termination costs; and (d) fee in accordance with the cost sharing provision and the termination for convenience clause of the contract. DOE does not dispute JEG's right to costs for work completed on the contract but not billed at the time of termination, subject to cost sharing and allowable cost provisions of the contract. Neither does DOE dispute JEG's right to reasonable termination cost. However, JEG's claims for reimbursement of its cost share including the foregone fee are inconsistent with the intent and terms of the contract.

The negotiated contract contains Clause B.007(S) Cost Sharing Arrangement and FAR 52.249-6, Termination (Cost Reimbursement). Clause B.007(S) establishes a minimum 20 percent cost share requirement for the contractor. FAR 52.249-6 provides DOE the right to terminate the contract at any time upon a determination by the contracting officer that a termination is in the Government's interest. Neither clause provides relief from the cost sharing requirement in the event of termination, nor can it be construed from any other provision of the contract that relief is warranted. Had CRS objected to the cost sharing arrangement, CRS could have, and should have, negotiated qualifying language prior to execution of the contract. Furthermore, cost sharing was one factor in approval of CRS's request for an advanced waiver in patent rights. Typically, DOE requires at least 20 percent cost sharing to grant a waiver. Accordingly, DOE's waiver of patent rights was additional consideration for the cost sharing commitment.

Clause I.020a, Cost Sharing-No Fee clearly states that the Government shall not pay a fee to the contractor for performing this contract. Consistent with DOE practice, CRS was allowed to consider foregone fee as part of its cost share. Therefore, foregone fee was included in the total project cost and was part of the basis against which the cost sharing formula was applied. FAR 52.249-6 generally provides the contractor an allowance for fee on fee bearing contracts in the event of termination. However, contrary to JEG assertion, FAR 52.249-6 (m) specifically provides that the provision of the termination clause relating to fee are inapplicable if the contract does not include a fee. Here, the contract did not contain a fee. Therefore, in accordance with Clause I.020a and FAR 52.249-6(m), JEG is not entitled to reimbursement of fee on contract or termination costs, however, foregone fee is included in the total project cost for cost sharing purposes.

## CONTRACTING OFFICER'S FINAL DECISION

Based on audited costs and my findings set forth above, it is my decision that the total allowable contract and termination cost is $7,064,721.79, that DOE's share of the cost is $5,651,777.43, and that JEG's share of the cost is $1,412,944.36. My decision is illustrated in the table set forth below.

| COST ELEMENTS | JEG ACTUALS | TERMINATION | TOTAL COSTS |
|---|---|---|---|
| Direct Labor | 1,603,312.30 | 173,902.93 | 1,777,215.23 |
| Fringe Benefits | 260,059.32 | 43,475.73 | 303,535.05 |
| Overhead | 920,649.46 | -0- | 920,649.46 |
| Other Costs-PC/CAD | 35,036.72 | 3,833.56 | 38,870.28 |
| Other Direct Costs | 207,385.84 | 11,447.55 | 218,833.39 |
| Subcont-PSIT | 646,722.59 | 163,894.48 | 810,617.07 |
| Subcont-Riley | 1,476,571.02 | 482,276.76 | 1,958,847.78 |
| Subcont-Other | 2,074.00 | 51,800.00 | 53,874.00 |
| Total Direct Costs | $5,151,811.25 | $ 930,631.01 | $6,082,442.26 |
| G&A Expenses | 569,736.61 | 60,824.72 | 630,561.33 |
| JEG FCCOM | 14,534.63 | 1,533.39 | 16,068.02 |
| JEG Fee | 286,077.39 | 49,572.79 | 335,650.18 |
| Total All Costs | $6,022,159.88 | $1,042,561.91 | $7,064,721.79 |
| DOE Share (80%) | | | 5,651,777.43 |
| JEG Share (20%) | | | 1,412,944.36 |

The DOE has paid $5,579,600.60 to date for costs incurred under the contract. Accordingly, JEG is entitled to a payment of $72,176.83 based on my decision.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regards to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or in accelerated procedures for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

13 Sep 02

Randolph R. Cooper
Contracting Officer

JApp 00173

JE JACOBS ENGINEERING GROUP INC.

31 July 1996

U. S. Department of Energy
Morgantown Energy Technology Center
Mr. Joseph S. Maury
Contract Administrator
Acquisition and Assistance Division
3610 Collins Ferry Road
Morgantown, WV 26507-0880

Subject: Termination Settlement Proposal
Contract No. DE-AC21-92MC28202
Gasification Product Improvment Facility Contract
Termination for Convenience

Enclosures:
(1) Termination Settlement Proposal SF1437
(2) Schedule of Accounting Information SF1439
(3) Cost Detail Schedules
(4) Discussions of JEG accounting practices
(5) Memorandum of Termination Settlement of Subcontractors' Proposals
(6) Supporting Documentation and Certifications

Dear Mr. Maury:

Enclosed herewith is Jacobs Engineering Group Inc.'s Termination Settlement Proposal and supporting documentation as enclosures (1) through (6) to this letter. The proposed settlement is in the amount of $1,542,197.57.

Contract No. DE-AC21-92MC28202 was awarded to CRS Sirrine Engineers (now a division of Jacobs) by the Department of Energy (DOE) on September 30, 1992 and was terminated for convenience on August 2, 1995. The purpose of the contract was to design and build a "Gasification Product Improvement Facility (GPIF)" based upon technology already owned by Jacobs and its subcontractors.

As a vehicle for this project the DOE set up a "Cost Sharing" agreement under which the DOE would be responsible for 80% of the cost and the Jacobs team would be responsible for 20%. Jacobs agreed to accept this cost-sharing arrangement because we were interested in proving that our gasification technology worked and would be a viable, marketable product for other commercial entities. It was Jacobs' intent that this contract serve as the model for the marketing effort with the final product of the contract, a fully operational gasification plant, serving as both an example of commercial viability and efficiency of our gasification technology. It is Jacobs' position

that due to the termination and non-completion of the gasification plant itself, that Jacobs did not receive the benefits it contracted for. Jacobs believes that it is entitled to reimbursement of: (a) our cost sharing portion of the work completed; (b) the work completed under the contract but not yet billed; (c) reasonable termination costs; and (d) fee in accordance with the cost sharing provision and the termination for convenience clauses of the contract. (20% of unallocated fee & cost)

In accordance with FAR 52.249-6 Jacobs has negotiated settlement agreements with its subcontractors, segregated costs for the work up to the point of the termination and identified the cost associated with termination. Documentation supporting these items is provided herewith on an SF1437 and an SF1439. Additionaly, the required Close-out Certifications and Releases are enclosed.

Jacobs looks forward to final settlement and close-out of the subject contract. Should you have any questions, please contact Mr. Forrest Schweitzer, Contract Manager, at (423) 220-4917.

Very truly yours,

Roger L. Williams
Group Vice President, Southern Region
Jacobs Engineering Group Inc.

**Department of Energy**
Morgantown Energy Technology Center
P.O. Box 880
3610 Collins Ferry Road
Morgantown, West Virginia 26507-0880

August 2, 1995

Mr. Don Carson
CRS Sirrine Engineers, Inc.
1041 East Butler Road
Post Office Box 5456
Greenville, SC 29606-5456

Dear Mr. Carson:

Due to significant DOE funding reductions for coal research and development, funds for construction of a PyGas pilot-scale demonstration plant are not available. Therefore, you are hereby notified that effective immediately, Contract No. DE-AC21-91MC28202, entitled "Gasification Product Improvement Facility (GPIF)", is partially terminated for the Government's convenience in accordance with FAR 52.249-6 Termination (Cost Reimbursement) May 1986 .

Immediately stop all work, terminate subcontracts, and place no further orders except as necessary to complete Revision 1 process design of Task 5. Telegraph similar instructions to all subcontractors and suppliers. You should continue to report contract performance in accordance with the Reporting Requirements Checklist and begin preparation of a brief final report. Detailed instructions will follow.

Sincerely,

Randolph L. Kesling
Contracting Officer
Acquisition and Assistance Division

cc
L. Brandt
K. Mahajan

# TERMINATION SETTLEMENT PROPOSAL SF 1437

## SETTLEMENT PROPOSAL FOR COST-REIMBURSEMENT TYPE CONTRACTS

FORM APPROVED OMB NO. 9000-0012

Public reporting burden for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition and Regulatory Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0012), Washington, D.C. 20503.

To be used by prime contractors submitting settlement proposals on cost-reimbursement type contracts under Part 49 of the Federal Acquisition Regulation. Also suitable for use in connection with terminated cost-reimbursement type subcontracts.

COMPANY: Jacobs-Sirrine Engineers, Inc.
STREET ADDRESS: 1041 East Butler Road
CITY AND STATE (Include ZIP Code): Greenville, SC 29606-5456

PROPOSAL NUMBER: DE-RP21-91MC28202
CHECK ONE: ☐ PARTIAL ☒ FINAL
GOVERNMENT PRIME CONTRACT NO.: DEAC21-92MC28202
REFERENCE NO.:
EFFECTIVE DATE OF TERMINATION: August 2, 1995

| ITEM (a) | TOTAL PREVIOUSLY SUBMITTED (b) | INCREASE OR DECREASE BY THIS PROPOSAL (c) | TOTAL SUBMITTED TO DATE (d) |
|---|---|---|---|
| 1. DIRECT MATERIAL | $ 0.00 | $ 0.00 | $ 0.00 |
| 2. DIRECT LABOR | 1,603,312.30 | 0.00 | 1,603,312.30 |
| 3. INDIRECT FACTORY EXPENSE Ohd. + Fringes | 2,582,731.74 | (1,402,022.96) | 1,180,708.78 |
| 4. SPECIAL TOOLING AND SPECIAL TEST EQUIPMENT | 0.00 | 0.00 | 0.00 |
| 5. OTHER COSTS (incl. SUBK) | 2,929,091.56 | (561,301.39) | 2,367,790.17 |
| 6. GENERAL AND ADMINISTRATIVE EXPENSE | 0.00 | 569,736.61 | 569,736.61 |
| 7. TOTAL COSTS (Items 1 thru 6) | $7,115,135.60 | $(1,393,587.74) | $ 5,721,547.86 |
| 8. FEE (Incl. FCCOM) | 377,080.84 | (22,598.22) | 354,482.62 |
| 9. SETTLEMENT EXPENSES | 0.00 | 358,911.47 | 358,911.47 |
| 10. SETTLEMENTS WITH SUBCONTRACTORS | 0.00 | 686,838.24 | 686,838.24 |
| 11. GROSS PROPOSED SETTLEMENT (Items 7 thru 10) | 7,492,216.44 | (370,436.25) | 7,121,780.19 |
| 12. DISPOSAL AND OTHER CREDITS (Cost Share) | (1,498,443.29) | 1,498,443.29 | 0.00 |
| 13. NET PROPOSED SETTLEMENT (Item 11 less 12) | $5,993,773.15 | $ 1,128,007.04 | $ 7,121,780.19 |
| 14. PRIOR PAYMENTS TO CONTRACTOR | $(5,579,582.60) | $ 0.00 | $ (5,579,582.60) |
| 15. NET PAYMENT REQUESTED (Item 13 less 14) | $ 414,190.55 | $ 1,128,007.04 | $ 1,542,197.59 |

### CERTIFICATE

This is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this terminatio settlement proposal and that, to the best knowledge and belief of the undersigned:

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 10) and supporti schedules and explanations have been prepared from the books of account and records of the Contractor in accordance wi recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; th have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a terminatio settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent considered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (exclusive of propos filed against these immediate subcontractors by their subcontractors); (2) The settlements on account of immediate subcontractors' ov charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the settlements we negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor would make reimbursement by the Government were not involved; (3) The Contractor has received from all its immediate subcontractors appropri certificates with respect to their termination settlement proposals, which certificates are substantially in the form of this certificate; (4) The Contractor has no information leading it to doubt (i) the reasonableness of the settlements with more remote subcontractors (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of amounts covering settlements with immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so received, to the extent that it has previously done so. The term "subcontractors," as used above, includes suppliers.

NOTE: The Contractor shall, under conditions stated in FAR 15.804-2, be required to submit a Certificate of Current Cost or Pric Data (see FAR 15.804-2(a) and 15.804-6).

NAME OF CONTRACTOR: Jacobs-Sirrine Engineers, Inc.

BY (Signature of authorized official): [signature] Roger L. Williams

TITLE: Group VP, Southern Region DATE: 7/31/96

NAME OF SUPERVISORY ACCOUNTING OFFICIAL: For Louise Burns [signature]

TITLE: Manager, Office of Federal Contract Compliance

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is usable EXPIRATION DATE: 4-30-92 1437-102 STANDARD FORM 1437 (REV. 7-) Prescribed by GSA - FAR (48 CFR) 53.249(

# SCHEDULE OF ACCOUNTING INFORMATION SF 1439

# SCHEDULE OF ACCOUNTING INFORMATION

FORM APPROVED OMB NO. 9000-0012

Public reporting burden for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition and Regulatory Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0012), Washington, D.C. 20503.

To be used by prime contractors submitting termination proposals under Part 49 of the Federal Acquisition Regulation. Also suitable for use by subcontractor in effecting subcontract settlements with prime contractor or immediate subcontractor.

THIS PROPOSAL APPLIES TO (Check one)

[X] A PRIME CONTRACT WITH THE GOVERNMENT [ ] SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NO(S)

COMPANY (Prime or Subcontractor): Jacobs Sirrine Engineers Inc.

STREET ADDRESS: 1041 East Butler Road

CITY AND STATE (Include ZIP Code): Greenville, SC 29606-5456

CONTRACTOR WHO SENT NOTICE OF TERMINATION

NAME AND ADDRESS (Include ZIP Code)

NAME OF GOVERNMENT AGENCY: U.S.Department of Energy

| GOVERNMENT PRIME CONTRACT NO. | CONTRACTOR'S REFERENCE NO. | EFFECTIVE DATE OF TERMINATION |
|---|---|---|
| DE-AC21-92MC 28202 | 16N25706 | August 2, 1995 |

1. INDIVIDUAL IN YOUR ORGANIZATION FROM WHOM ADDITIONAL INFORMATION MAY BE REQUESTED ON QUESTIONS RELATING TO:

| | ACCOUNTING MATTERS | PROPERTY DISPOSAL |
|---|---|---|
| NAME | Louise Burns | NA |
| TITLE | Manager, Office of Federal Contract Compliance | |
| TELEPHONE NO. | (818) 449-2171 | |
| ADDRESS (Include ZIP Code) | 251 South Lake Avenue<br>Pasadena, CA 91101 | |

2. ARE THE ACCOUNTS OF THE CONTRACTOR SUBJECT TO REGULAR PERIODIC EXAMINATION BY INDEPENDENT PUBLIC ACCOUNTANTS?

[X] YES [ ] NO (Name and address of accountants)

Jacobs Sirrine Engineers Inc.
Ernst & Young (Attn: Michael Lucki)
2049 Century Park East, Los Angeles, CA 90067

CRS Sirrine Engineers
KMPG Peat Marwick
700 Louisiana
Houston, TX 77002

3. INDEPENDENT ACCOUNTANTS, IF ANY, WHO HAVE REVIEWED OR ASSISTED IN THE PREPARATION OF THE ATTACHED PROPOSAL

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| None | |

4. GOVERNMENTAL AGENCY(IES) WHICH HAVE REVIEWED YOUR ACCOUNTS IN CONNECTION WITH PRIOR SETTLEMENT PROPOSALS DURING THE CURRENT AND PRECEDING FISCAL YEAR

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| Defense Contract Audit Agency | 1000 East Garvey Avenue South<br>Suite 300<br>West Covina, CA 91790-2900 |

5. HAVE THERE BEEN ANY SIGNIFICANT DEVIATIONS FROM YOUR REGULAR ACCOUNTING PROCEDURES AND POLICIES IN ARRIVING AT THE COSTS SET FORTH IN THE ATTACHED PROPOSAL? (If "Yes," explain briefly)

[ ] YES [X] NO

6. WERE THE DETAILED COST RECORDS USED IN PREPARING THE PROPOSAL CONTROLLED BY AND IN AGREEMENT WITH YOUR GENERAL BOOKS OF ACCOUNT?

[X] YES [ ] NO

7. STATE METHOD OF ACCOUNTING FOR TRADE AND CASH DISCOUNTS EARNED, REBATES, ALLOWANCES, AND VOLUME PRICE ADJUSTMENTS. ARE SUCH ITEMS EXCLUDED FROM COSTS PROPOSED?

[ ] YES [X] NO

(Where the space provided for any information is insufficient, continue on a separate sheet.)

17. WERE INVENTORY QUANTITIES BASED ON A PHYSICAL COUNT AS OF THE DATE OF TERMINATION? (If "NO," explain exceptions.)

☐ YES ☐ NO

N/A - no material

18. DESCRIBE BRIEFLY THE NATURE OF INDIRECT EXPENSE ITEMS INCLUDED IN INVENTORY COSTS (See Schedule A, SF 1435) AND EXPLAIN YOUR METHOD OF ALLOCATION USED IN PREPARING THIS PROPOSAL, INCLUDING IF PRACTICABLE, THE RATES USED AND THE PERIOD OF TIME UPON WHICH THEY ARE BASED.

See attached

19. STATE GENERAL POLICIES RELATING TO DEPRECIATION AND AMORTIZATION OF FIXED ASSETS, BASES, UNDERLYING POLICIES.

Depreciation and amortization are provided using the straight-line method over the U.S. Treasury Department "guideline lives", in the case of leasehold improvements, over the remaining term of the lease if shorter.

20. DO THE COSTS SET FORTH IN THE ATTACHED PROPOSAL INCLUDE PROVISIONS FOR ANY RESERVES OTHER THAN DEPRECIATION RESERVES? (If "Yes," list such reserves)

☐ YES ☒ NO

21. STATE POLICY OR PROCEDURE FOR RECORDING AND WRITING OFF STARTING LOAD.

Not applicable

22. STATE POLICIES FOR DISTINGUISHING BETWEEN CHARGES TO CAPITAL (FIXED) ASSET ACCOUNTS AND TO REPAIR AND MAINTENANCE ACCOUNTS.

Expenditures for tangible assets in amounts greater than $300 which will have an economic benefit in excess of one year are capitalized and depreciated over the life of the assets. All other costs and expenses incurred in connection with the routine repair and maintenance of assets and that do not extend the life of said assets are expensed.

23. ARE PERISHABLE TOOLS AND MANUFACTURING SUPPLIES CHARGED DIRECTLY TO CONTRACT COSTS OR INCLUDED IN INDIRECT EXPENSES?

Tools and supplies have been charged to contract costs where identified to this specific contract, if not indentifiable, they have been charged to indirect expense.

(Where the space provided for any information is insufficient, continue on a separate sheet.)

# COST DETAIL SCHEDULES

TAB A - SUMMARY OF TERMINATION COSTS
TAB B - SUMMARY OF CLAIMED COSTS
TAB C - SUMMARY OF ACTUAL COSTS BY FISCAL YEAR
TAB D - PUBLIC VOUCHER RECAP SCHEDULE
TAB E - SUMMARY OF ODC'S BY FISCAL YEAR

Jacobs-Sirrine Engineers, Inc.
Gasification Product Improvement Facility
Contract No. DE-AC21-92MC28202

Summary of Termination Costs
Total Costs plus Fee

| | | | TERMINATION COSTS | | | | PROPOSED SETTLEMENT WITH SUBCONTRACTORS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cost Element | Indirect Rate Used | JEG's Actuals Claimed Inception thru 4/30/96 | JEG's Actuals Incurred from 5/01/96 thru 6/30/96 | JEG's Estimated Costs Remaining thru Negotiation | PSIT's Termination Costs | Riley's Termination Costs | PSIT | D.B. Riley | Total JEG Costs Incl. SubK $ | Comments |
| 1. Direct Material | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 2. Direct Labor | | $1,603,312.30 | $5,638.77 | $173,902.93 | $0.00 | $0.00 | $0.00 | $0.00 | $1,782,854.00 | See Note 1 |
| 3.a. Fringe Benefit Expense | 25.000% | $260,059.32 | $1,409.69 | $43,475.73 | $0.00 | $0.00 | $0.00 | $0.00 | $304,944.74 | |
| 3.b. Overhead Expense | | $920,649.46 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $920,649.46 | |
| 4. Special Tooling/STE | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 5.a. Other Costs -- PC/CAD | $9.25 | $35,036.72 | $1,307.13 | $3,833.56 | $0.00 | $0.00 | $0.00 | $0.00 | $40,177.41 | |
| 5.b. Other Direct Costs | | $207,385.84 | $970.15 | $11,447.55 | $0.00 | $0.00 | $0.00 | $0.00 | $219,803.54 | |
| 5.c.1. Other Costs - PSIT | | $646,722.59 | $0.00 | $0.00 | $2,213.83 | $0.00 | $161,680.65 | $0.00 | $810,617.07 | |
| 5.c.2. Other Costs - Riley | | $1,476,571.02 | $0.00 | $0.00 | $0.00 | $153,801.00 | $0.00 | $369,142.76 | $1,999,514.78 | |
| 5.c.3. Other Costs - Other SubKs | | $2,074.00 | $2,329.00 | $51,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $56,203.00 | |
| 6. Gen. & Admin. Expense | 27.981% | $569,736.61 | $1,972.23 | $60,824.72 | $0.00 | $0.00 | $0.00 | $0.00 | $632,533.56 | |
| 7. Total Costs (Items 1 - 6) | | **$5,721,547.85** | **$13,626.97** | **$345,284.50** | **$2,213.83** | **$153,801.00** | **$161,680.65** | **$369,142.76** | **$6,767,297.55** | |
| 8. JEG FCCOM | 0.705% | $14,534.63 | $49.72 | $1,533.39 | $0.00 | $0.00 | $0.00 | $0.00 | $16,117.74 | |
| 9. JEG FEE on Costs (Item 7) | 5.000% | $286,077.39 | $681.35 | $17,264.22 | $110.69 | $7,690.05 | $8,084.03 | $18,457.14 | $338,364.88 | |
| 10. JEG Total Costs Plus Fee | | **$6,022,159.88** | **$14,358.04** | **$364,082.11** | **$2,324.52** | **$161,491.05** | **$169,764.68** | **$387,599.89** | **$7,121,780.17** | |

NOTE 1: Includes buy-out of Sadowski's employment contract -- $153,295 plus fringe benefits.

**Less:**
**Amount Already Paid** **($5,579,582.60)**
**Equals:**
**Amount Now Due** **$1,542,197.57**