JE JACOBS

1111 South Arroyo Parkway 91105
P.O. Box 7084
Pasadena, California 91109-7084 U.S.A.
1.626.578.3500 Fax 1.626.578.6946

April 29, 2002

Randolph R. Cooper, Contracting Officer
Acquisition and Assistance Division
U.S. Department of Energy
Morgantown Energy Technology Center
3610 Collins Ferry Road
Morgantown, WV 26507-0880

Re: Termination Settlement Proposal, Contract No. DE-A21-92MC28202
Gasification Product Improvement Facility Contract

Subj: Request for Final Decision of the Contracting Officer

Dear Mr. Cooper:

On July 31, 1996, Jacobs Engineering Group, Inc. ("JEG") submitted its Termination Settlement Proposal and supporting documentation in the amount of $1,542,197.59 under the above-referenced contract.

Subsequently, DCAA conducted an audit. Thereafter, the parties attempted on numerous occasions to negotiate a settlement of outstanding issues. But to date, those efforts have been unsuccessful – principally because DOE seeks JEG's agreement to absorb 20% of the costs of this contract. Because the government elected to terminate the contract for its convenience *and* because JEG received no commercial benefit from its services, JEG will not agree to this provision. Therefore, JEG believes the parties are at an impasse.

Accordingly, JEG requests that the Contracting Officer issue a final decision with respect to its Termination Settlement Proposal within sixty (60) days of receipt of this letter. Below is my certification of the claim as required by the Disputes Clause:

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

If you have any questions in the interim, please call.

JACOBS ENGINEERING GROUP INC.

Gustav R. Hubert
Director, Contracts Management Group

cc: Robert J. Symon, Esq. ← w/encls.

JApp 00262

h\docs\Misc\MgntnReqFinalDecision to COCooper\jp

# BABCOCK BORSIG POWER

April 23, 2002

Gustav R. Hubert
Director, Contracts Management Group
Jacobs Engineering Group, Inc.
1111 South Arroyo Parkway 91105
Pasadena, CA 91109-7084

RE: Contract No. DE-A21-92MC28202
Gasification Product Improvement Facility Contract

Dear Mr. Hubert:

DB Riley, Inc. (renamed Babcock Borsig Power, Inc. and hereinafter referred to as "BBPI") submitted a claim regarding the above referenced project that Jacobs was performing for the Department of Energy.

With respect to BBPI's portion of Jacobs' claim:

I certify that the BBPI claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which BBPI believes the Government is liable; and that I am duly authorized to certify the claim on behalf of BBPI.

If you have any other requests, please advise. Thank you.

Very truly yours,
Babcock Borsig Power Inc.

James S. Brantl
Vice President

/dbr

JApp 00263

**Babcock Borsig Power, Inc.**

Mailing Address:
Post Office Box 15040
Worcester, MA 01615-0040

Shipping Address:
5 Neponset Street
Worcester, MA 01606

Telephone: (508) 852-7100
Fax: (508) 852-7548
www.bbpwr.com

PSI

PHYSICAL SCIENCES INC.

08 April 2002

Jacobs Engineering Group, Inc.
1111 South Arroyo Parkway 91105
P.O. Box 7084
Pasadena, CA 91109-7084

Attention: Mr. Gustav Hubert, Director Contracts Management

Subject: Termination for Convenience, Subcontract 16N25706

Reference: Jacobs letter of April 5, 2002
Contract DE-A21-92MC28202

Dear Mr. Hubert:

As requested in the referenced letter, Physical Sciences Inc. has once again reviewed the information provided in our termination claim. Based upon this review we certify as follows:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which Physical Sciences inc. believes the Government is liable; and that I am duly authorized to certify the claim on behalf of Physical Sciences Inc.

Sincerely,
Physical Sciences Inc.

Richard A. Sasso

Richard A. Sasso
Contract Manager

JApp 00264



recd 4-15-02 CMG

# In the United States Court of Federal Claims

No. 02-1500 C
Filed January 12, 2005
TO BE PUBLISHED

RECEIVED
JAN 13 2005

| | | |
|---|---|---|
| JACOBS ENGINEERING GROUP, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | Motion for Summary Judgment, cost-sharing, termination for convenience, contract interpretation, unambiguous language |

Robert J. Symon, Counsel of Record, Claire E. Kresse, Of Counsel, Spriggs & Hollingsworth, Washington, DC, for plaintiff.

Michael Fellman Bahler, Trial Attorney, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, DC, Thomas J. Russial, Chief Counsel, Department of Energy, Pittsburgh, PA, for defendant.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff, Jacobs Engineering Group ("Jacobs") filed a Motion for Partial Summary Judgment. Defendant, the United States ("Government"), filed an Opposition to Plaintiff's Motion for Partial Summary Judgment and a Cross-Motion for Summary Judgment. Jacobs filed an Opposition to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment; the Government thereafter filed its Reply. Following oral argument on the cross-motions, the parties filed supplemental briefs at the Court's request. For the following reasons, defendant's motion is GRANTED, and plaintiff's motion is DENIED.

## *BACKGROUND*[1]

### I. Contract Formation and Performance

The United States Department of Energy ("DOE") has long been interested in gasification, a means of converting coal to electricity and fuel, as an alternative source of energy. Report of the National Energy Policy Development Group, May 2001, D.App. 4-7; United States Department of Energy Report to Congress: Gasification Product Improvement Facility, February 1991, D.App. 12. Once a promising technology like gasification is identified, the DOE often enters into cost-shared research and development contracts with contractors in the private sector for the purpose of advancing the technology to the market. Declaration of Dale K. Schmidt ¶ 5, D.App. 1. In 1990, the DOE became interested in testing Integrated Gasification Combined Cycle ("IGCC") technology through the construction of a small-scale pilot facility in Morgantown, West Virginia. Congress authorized funding for the project, but required the DOE to obtain private sector commitment to share at least 20 percent of the cost of the facility. H.R. REPORT NO. 101-971, at 62 (October 27, 1990).

Contractors who enter into cost-shared research and development contracts generally bear at least 20 percent of project costs. Contractors also bear the risk that the contracts may fail in the development stage. Schmidt Dec. ¶ 5, D.App. 1. In return, the contractors receive financial support in developing new technologies, and the opportunity to derive substantial benefit when those technologies are introduced to the market. *Id.* ¶ 2. Pursuant to 42 U.S.C. § 5908(a), the United States takes title to "subject inventions," which are any inventions conceived or first actually reduced to practice under research and development contracts, unless the DOE waives its rights in such inventions. A contractor must apply for, and be granted, a patent waiver in order to retain title to a subject invention; such waiver may be granted at the time of contracting. 42 U.S.C. § 5908(c), (d).

On May 24, 1991, the DOE issued a solicitation inviting proposals for the development, design and construction of a gasifier. The solicitation also provided that the successful offeror would acquire a first right of refusal to enter into a cooperative research and development agreement with DOE to further develop gasification technology at the facility. Government's Proposed Findings of Uncontroverted Facts at 4. CRS Sirrine Engineers, Inc. ("CRSS") submitted a proposal and commenced negotiations with the DOE. During negotiations, CRSS indicated that it was not willing to commit to bear 20 percent of the costs of the project until it found subcontractors to help absorb the costs. Declaration of Lisa A. Jarr ¶¶ 3-6, D.App. 40-41. The DOE, in turn, was not willing to grant CRSS a patent waiver on the technology it planned to develop during the project unless CRSS committed to bear 20 percent of project costs. The issue

[1] The facts set forth in this portion do not constitute findings of fact by the court. Rather, they are presented only to provide a basis for analysis of the parties' positions. These facts are drawn mainly from documents contained in appendices to Plaintiff's Motion for Partial Summary Judgment, "J.App.," and Defendant's Cross-Motion for Summary Judgment, "D.App."

was resolved through Clause H.099, a Project Continuance clause, which gave CRSS the right to withdraw through Task 4 of the Contract if the DOE did not grant it a patent waiver, or if CRSS could not obtain a cost sharing partner. The Project Continuance clause stated that:

> The parties hereto agree that upon completion and delivery of the Conceptual Design in Task 4 of the Statement of Work, continuance of the project is contingent upon the contractor obtaining adequate cost-sharing [partnering with subcontractors to help pay the 20 percent of the costs] and upon the Contractor being granted an advance patent waiver, satisfactory to Contractor by the DOE Patent Counsel.
>
> In the event that the Contractor elects to discontinue the project, the Contractor will be liable for 20% of the costs incurred during the performance period.

J.App. at 26.

On September 30, 1992, the DOE awarded Contract No. DE-AC21-92MC-28202 ("Contract") to CRSS to develop, design, fabricate and construct a gasification facility in Morgantown. Compl. ¶ 4. On August 1, 1994, Jacobs purchased CRSS and all of its rights and obligations under the Contract. Compl. ¶ 7.

Contract clause I.020a, Cost Sharing Contract – No Fee, expressly incorporating Federal Acquisition Regulation ("FAR") § 52.216-12, provided that "[t]he Government shall not pay to the Contractor a fee for performing this contract." 48 C.F.R. § 52.216-12. Jacobs, therefore, did not collect a fee during the project. Instead, as allowed by DOE regulations, the amount of fee foregone was "considered in establishing the degree of cost participation." Department of Energy Acquisition Regulation ("DEAR") § 917.7003(h), D.App. 99. Thus, the Government's share of the Contract costs included an element of "foregone fee" attributable to Jacobs and its key subcontractors. For billing and payment purposes, all costs incurred by Jacobs and its subcontractors, together with the foregone fee, were submitted to the DOE for payment, and the DOE paid 80 percent of the invoiced amount. Pl. Opp. at 12; "Representative Jacobs Invoice," D.App. 101-07.

As provided for by the Project Continuance clause, Jacobs obtained adequate cost-sharing and was granted an advance patent waiver by the DOE. Transcript of Proceedings, *Jacobs Engineering Group, Inc. v. United States*, No. 02-1500C at 56 (Fed. Cl. May 17, 2004). During the design and engineering stage of Phase I of the Contract, it became apparent that the costs to complete the project were going to be substantially greater than originally estimated. The DOE and Jacobs tried to reduce the scope of the project but the design changes needed to bring the project within budget were too significant and would have resulted in a facility that did not meet project objectives. Faced with a cost overrun that could not be funded within the DOE's projected gasification budget, the DOE terminated the contract for convenience. Gov't Prop. Facts at 12.

## II. Cost-Sharing Arrangement Clause

The Contract included a Cost-Sharing Arrangement clause, which specified:

The Contractor and the Government agree to share the cost of the effort for Phase I and Phase II as follows:

| | Government (80%) | Contractor (20%) | Total (100%) |
|---|---|---|---|
| Phase I | $19,850,784 | $4,962,696 | $24,813,480 |
| Phase II | $3,149,515 | $787,379 | $3,936,894 |
| Total | $23,000,299 | $5,750,075* | $28,750,374 |
| | * Includes foregone fee in the amount of $1,181,549 for Phase I and $169,531 for Phase II. | | |

B.007(S), J.App. 3.

## III. Termination Clause, FAR § 52.249-6 Termination (Cost-Reimbursement)

The Contract also included a Termination clause, FAR § 52.249-6, which stated that "the Government may terminate performance of work under this contract in whole or, from time to time, in part, if the Contracting Officer determines that a termination is in the Government's interest . . . ." 48 C.F.R. § 52.249-6(a). "After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer[.]" 48 C.F.R. § 52.249-6(e). "The Contractor and the Contracting Officer may agree on the whole or any part of the amount to be paid[.]" 48 C.F.R. § 52.249-6(f). The Termination clause also provided:

> If the Contractor and the Contracting Officer fail to agree in whole or in part on the amount of costs and/or fee to be paid because of the termination of work, the Contracting Officer shall determine . . . (1) All costs reimbursable under this contract, not previously paid, for the performance of this contract before the effective date of the termination[.]

48 C.F.R. § 52.249-6(g). The Termination clause specified that "the cost principles and procedures in Part 31 of the [FAR] . . . shall govern all costs claimed, agreed to, or determined under this clause." 48 C.F.R. § 52.249-6(h). Lastly, the Termination clause stated that "provisions of this clause relating to fee are inapplicable if this contract does not include a fee." 48 C.F.R. § 52.249-6(m).

## IV. Claim to the Contracting Officer

After the Government terminated the Contract for convenience, Jacobs, in accordance with the Termination clause of the Contract, negotiated settlement agreements with its subcontractors, segregated costs for the work up to the point of the termination and identified costs associated with termination. Letter of July 31, 1996 from Jacobs to Joseph Maury, Contract Administrator, J.App. 174. Jacobs then submitted to the DOE Contract Administrator a termination settlement proposal for reimbursement of all costs it incurred in performance of the contract in the amount of $7,121,780.19. Termination Settlement Proposal SF 1437, J.App. 178. Deducting $5,579,582.60 already paid by the DOE, Jacobs requested a net payment of $1,542,197.59. *Id.* After the Defense Contract Audit Agency conducted a termination audit, the parties attempted and failed to negotiate a settlement. Letter of April 29, 2002 from Jacobs to Randolph Cooper, Contracting Officer, J.App. 262.

On April 19, 2002, Jacobs submitted a certified claim for final decision of the Contracting Officer ("CO"). *Id.* On September 13, 2002, the CO issued a final decision denying most of Jacobs's claimed costs. Contracting Officer's Final Decision, J.App. 167-73. The CO calculated that all of the costs under the Contract, including Jacobs's fees, equaled $7,064,721.79. The CO concluded that the DOE's 80 percent share of the costs was $5,651,777.43, and Jacobs's 20 percent share was $1,412,944.36. J.App. 173. The CO held that because the DOE had already paid Jacobs $5,579,600.60 for costs, all that was due to Jacobs was $72,176.83, which the CO awarded. *Id.*

## V. Proceedings in the Court of Federal Claims

On November 1, 2002, Jacobs filed a complaint in the United States Court of Federal Claims, claiming $1,542,197 plus interest. Compl. ¶ 14.

Jacobs, in its Motion for Partial Summary Judgment, argued that the Contract unambiguously specified that the Cost-Sharing Arrangement clause did not apply in the event of a termination for convenience by the Government. Therefore, Jacobs claimed it was entitled to recover 100 percent of the allowable costs incurred in performing the Contract. Pl. Mot. for Partial Summ. J. at 1. Jacobs stated that the amount of allowable costs was $922,386, noting that "the only other issues that remain in the case, after resolution of this issue, is Jacobs's entitlement to certain costs incurred on the project and fee on costs incurred." *Id.* at 2 n.2. Jacobs argued in the alternative that the Contract language was, at best, ambiguous, and that under the doctrine of *contra proferentem*, the ambiguity should be resolved against the Government, which drafted the Contract. Pl. Mot for Partial Summ. J. at 5 (citing *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993)). The Government, in its opposition to Jacobs's motion, argued that the Contract was unambiguous and that it required cost-sharing to apply even in the event of a termination for convenience.

In its Opposition to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, Jacobs requested that the Court grant it judgment in the amount of $1,485,121.00. Pl. Opp. at 1. The additional $562,735 Jacobs requested represented foregone fees that Jacobs believed were due and owing from the Government. Pl. Opp. at 13 ("Also at issue for resolution by the Court, but less significant in terms of damages, is Plaintiff's entitlement to fee in addition to its reimbursable costs. The contract expressly states that the contractor is not entitled to fee. However, Jacobs contends this provision was waived by the government."). Jacobs stated in its opposition and reply that it "moves this Court for summary judgment in its favor," and "requests that this Court summarily enter judgment in favor of Plaintiff . . . for costs *and fee* incurred by Plaintiff under its contract[.]" Pl. Opp. at 1 (emphasis added). Because Jacobs, in its opposition and reply, included a claim for foregone fee and requested that the Court grant summary judgment in its favor, the Court concludes that Jacobs converted its Motion for Partial Summary Judgment to a Motion for Summary Judgment. This Opinion, therefore, disposes of the entirety of Jacobs's claim.

## *DISCUSSION*

### I. Standard of Review of Motions for Summary Judgment

Under Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"), a party will prevail on a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

"When making a summary judgment determination, a court must consider the existence of a genuine issue as to any material fact." *Nicholson v. United States*, 29 Fed. Cl. 180, 186 (1993) (citing *Celotex*, 477 U.S. at 322-23.) "'An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, while the materiality of the fact is determined by reference to applicable legal standards.'" *Id.* (quoting *Webster University v. United States*, 20 Cl. Ct. 429, 432 (1990) (citing *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562, 1567 (Fed. Cir. 1987))).

If both parties move for summary judgment and allege an absence of genuine issues of material fact

> "the court is not relieved of its responsibility to determine the appropriateness of summary disposition." Rather, the court evaluates each motion on its own merits, applying the same standard for summary judgment to each motion. Simply because each party asserts a contradictory claim, it does not follow that "if one is rejected the other necessarily is justified."

*General Electric Company v. United States*, 60 Fed. Cl. 782, 789 (2004) (quoting *J. Cooper &*

*Assocs., Inc. v. United States*, 53 Fed. Cl. 8, 15 (2002)).

## II. Interpretation of Government Contracts

Interpretation of the terms of a government contract is a matter of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985). "The interpretation of a contract 'begins with the language of the written agreement.'" *S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)). It is a well-established principle of contract interpretation that "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388, 351 F.2d 972, 975 (1965). Furthermore, "an interpretation [that] gives a reasonable meaning to all parts [of a contract] will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 459 (2001) (quoting *Arizona v. United States*, 216 Ct. Cl. 221, 235, 575 F.2d 855, 863 (1978)).

"When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation." *Flink/Vulcan v. United States*, No. 99-1005C, 2004 LEXIS 340 at *22 (Fed. Cl. Dec. 14, 2004) (citing *Sea-Land Serv., Inv. v. United States*, 213 Ct. Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012 (1978)). "Construction of an unambiguous writing, therefore, is an appropriate matter for summary judgment." *Id.* (citing *Martin v. United States*, 20 Cl. Ct. 738, 745 (1990); *Kelley v. United States*, 19 Cl. Ct. 155, 161 (1989)). "'A contract provision is only ambiguous if susceptible to more than one reasonable meaning.'" *Barron Bancshares v. United States*, 366 F.3d 1360, 1375-76 (Fed. Cir. 2004) (quoting *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)). However, "'[t]o show an ambiguity, it is not enough that the parties differ in their respective interpretations of a contract term.'" *General Electric Co. v. United States*, 60 Fed. Cl. 782, 791 (2004) (quoting *King Fisher v. United States*, 51 Fed. Cl. 94, 99 (2001)).

## III. Cost-Sharing Provision Survives Termination for Convenience by the Government

The Government has the unique right to terminate a contract for convenience: "the Government may terminate performance of work under this contract in whole or, from time to time, in part, if the Contracting Officer determines that a termination is in the Government's interest . . . ." 48 C.F.R. § 52.249-6(a). Under a termination for convenience, "the contractor, instead of receiving compensation for governmental breach of contract based on classical measures of damages, is limited to recovery of 'costs incurred, profit on work done and the costs of preparing the termination settlement proposal.'" *Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir. 1988) (citing R. NASH & J. CIBINIC, FEDERAL PROCUREMENT LAW 1104 (3d ed. 1980)).

As discussed above, the Contract includes the Termination clause, found at FAR § 52.248-6 (Cost-Reimbursement). J.App. 96. That clause provides for the payment of "all costs *reimbursable under this contract*, not previously paid, for the performance of this contract, before the effective date of the termination." 48 C.F.R. § 52.249-6(g) (emphasis added). The Termination clause does not invalidate the cost-sharing provision of the Contract. Rather, it clearly seeks to fashion a remedy for the contractor *in conjunction with* the cost-sharing provisions. Thus, only those costs that would be reimbursed under the Contract will be paid to the contractor in the event of a termination for convenience. Here 80 percent of Jacobs's costs were reimbursable under the cost-sharing provision, B.007(S), J.App. 3, and therefore, under the termination for convenience clause, Jacobs is entitled to only 80 percent of its costs not previously paid.

Jacobs cites to the reference in the Termination clause to FAR Part 31 in support of its argument that the Court should apply equitable principles in determining the remedies for a termination for convenience. Pl. Mot. for Partial Summ. J. at 13 (citing 48 C.F.R. § 52.249-6(h) ("the cost principles and procedures in Part 31 of the [FAR] . . . shall govern all costs claimed, agreed to, or determined under this clause")). The Termination clause's reference to FAR Part 31, however, bolsters the conclusion that remedies available to contractors under a termination for convenience clause are constrained by the terms of the contract. "Which costs are allowed is determined by the cost principles set forth in FAR part 31, 'subject to the general principle that the contractor should be compensated fairly for the work terminated.'" *White Buffalo Construction, Inc. v. United States*, 52 Fed. Cl. 1, 4 (2002) (quoting *Best Foam Fabricators, Inc. v. United States*, 38 Fed. Cl. 627, 638 (1997)). As a threshold matter, "[t]he factors to be considered in determining whether a cost is allowable include the following: (1) Reasonableness, (2) Allocability, (3) Standards promulgated by the CAS board if applicable, otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances, (4) *Terms of the contract*, (5) Any limitations set forth in this subpart." 48 C.F.R. § 31.201-2(a) (emphasis added). Again, the FAR contemplates that costs are recoverable only if the contract allows them. FAR Part 31, like the Termination clause itself, recognizes that a contractor cannot recover costs not contemplated by the contract.

Jacobs argues that interpreting the Cost-Sharing Arrangement clause to apply following a termination for convenience would render the Project Continuance clause superfluous. Jacobs reasons that if the Cost-Sharing Arrangement clause were to apply at any time, even after a termination for convenience, the Project Continuance clause would not be necessary. The Project Continuance clause, however, operated to establish that "continuance of the project is contingent upon the Contractor obtaining adequate cost sharing and upon the Contractor being granted an advanced patent waiver, satisfactory to the Contractor, by the DOE patent counsel." H.099(S), Project Continuance, J.App. 26. The Project Continuance clause goes on the establish that "[i]n the event that the Contractor elects to discontinue the project, the Contractor will be liable for 20 percent of the costs incurred during the performance period." *Id.* The Project Continuance clause was meant to govern the result of a termination of the Contract by Jacobs at a certain time during performance. Because that contingency never occurred does not mean the

clause was superfluous. It is also clear that the clause does not contradict the Cost-Sharing Arrangement clause. If anything, it reinforces the fact that Jacobs bears 20 percent of the project costs.

Jacobs also argues that the Government Property and Data clause contradicts the Termination clause because it illustrates that the application of the cost-sharing provision was contingent upon the completion of the Contract. Jacobs contends that the clause provides that Jacobs waived its right to be reimbursed for costs under the Contract and committed to the cost-sharing arrangement only upon Contract completion. Pl. Mot. for Partial Summ J. at 7. The Government Property and Data clause specifies that

> Upon completion of the contract, title to all the property acquired and/or furnished under the contract shall vest with the Government. The Contractor agrees to waive its right for reimbursement of their allowable percentage of cost participation for property acquired under this contract. In return, the Government releases the Contractor from all expenses relating to final disposition of the property, including dismantling and decommissioning and relieves the contractor from all environmental liabilities resulting from the transfer of the property to the Government . . . .

H.004b(1)(S), Government Property and Data (Jul 1985), J.App. at 13, 15.

Jacobs's inference is mistaken. The clause reinforces the fact that title to all the described property would vest with the Government upon completion of the project, and in return DOE would relieve Jacobs from disposition expenses and environmental liabilities associated with the property. Without the Government Property and Data clause, other provisions of the Contract, calling for an equitable distribution of project property if the Contract is terminated,[2] would create a cloud on the DOE's title. Simply because the Government Property and Data clause governs vesting of title upon project completion does not mean that it contradicts the terms of the Termination clause and that the cost-sharing provision applies only if the Contract is completed.

Jacobs's arguments that equitable principles demand some other interpretation of the Contract have been considered and the Court has found those arguments to be unpersuasive.

---

[2] The other provisions include the Limitation of Funds clause, FAR § 52.232-22(k), D.App. 93 ("If this contract is terminated, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each"), and the Limitation of Cost clause, FAR 52.232-20(h), D.App. 63 ("If this contract is terminated or the estimated cost is not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each").

## IV. Jacobs Is Not Entitled to Recover Fees Under the Termination Clause

As noted above, the Termination clause specified that the "provisions of this clause relating to fee are inapplicable if this contract does not include a fee." 48 C.F.R. § 52.249-6(m), J.App. 99. Clause I.020a, FAR § 52.216-12 Cost-Sharing Contract – No Fee, established that "[t]he Government shall not pay to the Contractor a fee for performing this contract." 48 C.F.R. § 52.216-12, D.App. 87. Jacobs argues that it is entitled to fees upon termination because the Government waived the no-fee provisions of the Contract by reimbursing Jacobs for 80 percent of its foregone fee. Pl. Opp at 12. The course of performance belies Jacobs's contention that the Government waived the no-fee provision.

DOE regulations specified that "fee or profit will not be paid the performer under a cost participation contract," but provided that "foregone fee or profit will be considered in establishing the degree of cost participation." DEAR § 917.7003(h), D.App. 99. As illustrated by the Statement of Cost in Jacobs's October 5, 1994 invoice to the DOE, D.App. 101-02, Jacobs included in the Government's 80 percent share of Contract costs its foregone fee, which the DOE approved for payment. The fees that Jacobs elected to forego were included in the costs charged to the DOE and, like all of the other Contract costs, the Government bore its 80 percent share.

Had the DOE elected to waive the no-fee provisions of the Contract, it would have paid Jacobs 100 percent of the amount it claimed as a fee. Instead, the DOE simply paid its share of the Contract costs in accordance with the Cost-Sharing Arrangement clause, which included a portion of the fee foregone by Jacobs. There was no waiver of the no-fee provisions of the Contract and, to the extent Jacobs was allowed to collect fees that it had foregone in order to participate in the Contract, it has already collected them from the Government. *See* Contracting Officer's Final Decision, J.App. 167.

## *CONCLUSION*

For the reasons set forth above, Jacobs's Motion for Summary Judgment is DENIED and the Government's Cross-Motion for Summary Judgment is GRANTED.

The Clerk of the Court is directed to enter judgment for defendant pursuant to RCFC 56(a).

IT IS SO ORDERED.

George W. Miller

GEORGE W. MILLER
Judge

# United States Court of Appeals for the Federal Circuit

05-5052

JACOBS ENGINEERING GROUP, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

---

DECIDED: January 19, 2006

---

Before MAYER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

A development and construction contract required the government to reimburse the contractor for 80 percent of its cost of performing the contract. The contract's termination-for-the-convenience-of-the-government clause ("termination clause") required the government upon such termination to pay the contractor "[a]ll costs reimbursable" under the contract. See 48 C.F.R. § 52.249-6(g); Jacobs Eng'g Group, Inc. v. United States, 63 Fed. Cl. 451, 455 (2005) (trial court decision). The question is whether, when the government so terminated the contract, it was required to reimburse the contractor for all of the costs the contractor incurred up to that point or only for 80 percent of them. Reversing the United States Court of Federal Claims, we hold that the contractor may recover all of its cost, rather than 80 percent.

I

The government entered into a contract with Jacobs Engineering Group, Inc. ("Jacobs")' predecessor (whose contract Jacobs took over when it acquired the predecessor) to develop, design, fabricate, construct, and install a gasification improvement facility. No fee was payable to the contractor, but the contract contained the following cost sharing provision covering the "total estimated cost for the work" of $28,750,375:

> Cost Sharing. The Contractor and the Government agree to share the cost of the effort for Phase I and Phase II as follows:

| | Government (80%) | Contractor (20%) | Total (100%) |
|---|---|---|---|
| Phase I | $19,850,784 | $4,962,696 | $24,813,480 |
| Phase II | 3,149,515 | 787,379 | 3,936,894 |
| Total | $23,000,299 | $5,750,075* | $28,750,374 |

> *Includes foregone fee in the amount of $1,181,594 for Phase I and $169,531 for Phase II.

The contract further provided that if the contracting officer approved a cost overrun, the contractor's share would be 20 percent.

The contract also contained a standard termination for convenience clause, Federal Acquisition Regulation ("FAR") § 52.249-6 (May 1986), which authorized the government to "terminate performance of work [if] [t]he Contracting Officer determines that a termination is in the Government's interest." If that occurred, the government was required to pay the contractor "[a]ll costs reimbursable under this contract, not previously paid, for the performance of this contract before the effective date of the termination, and part of those costs that may continue for a reasonable time with the

approval of or as directed by the Contracting Officer." FAR § 52.249-6(g)(1) (May 1986).

The contract also authorized the contractor to discontinue the project after Phase I was completed unless it received what it deemed "adequate cost sharing and . . . an advanced patent waiver." If the contractor did so, it would "be liable for 20% of the costs incurred during the performance period."

During performance, the government terminated the contract for its convenience (because it did not have funds to complete performance). Jacobs submitted a termination settlement proposal which sought reimbursement of 100 percent of its costs, which the government rejected. The contracting officer then rejected Jacobs' claim for recovery of all of its costs, limiting recovery to 80 percent. Jacobs challenged that decision in the United States Court of Federal Claims.

On cross-motion for summary judgment, the court granted the government's motion and entered a judgment on its behalf. 63 Fed. Cl. at 459. The court stated:

> The termination clause does not invalidate the cost-sharing provision of the Contract. Rather, it clearly seeks to fashion a remedy for the contractor <u>in conjunction with</u> the cost-sharing provisions. Thus, only those costs that would be reimbursed under the Contract will be paid to the contractor in the event of a termination for convenience. Here 80 percent of Jacobs's costs were reimbursable under the cost-sharing provision and therefore, under the termination for convenience clause, Jacobs is entitled to only 80 percent of its costs not previously paid.

<u>Id.</u> At 457 (emphasis in original) (citations omitted).

II

The termination clause required the government, upon terminating the contract, to pay the contractor "[a]ll costs reimbursable under this contract." The government

contends, as the Court of Federal Claims held, that since the contract required it to reimburse the contractor for only 80 percent of the costs, its payment under the termination clause is limited to 80 percent of the costs. We conclude, however, that the term "all costs reimbursable" defines the type or kind of costs for which the contract provides reimbursement and not the amount of such costs.

The contract specifies a substantial number of costs that are reimbursable and some that are not. Reimbursable costs include "fabricated or unfabricated, parts, work in process, completed work, supplies, and other materials procured or acquired for the work terminated, . . . completed or partially completed plans, drawings, information, and other property that . . . would be required to be furnished to the Government, . . . and the jigs, dies, fixtures, and other special tools and tooling acquired or manufactured for this contract." FAR § 52.249-6(c)(6) (May 1986). They also include costs allowable under FAR § 31.2 (see FAR § 52.249-6(h) (May 2004)), such as labor relations costs (FAR § 31.205-21), plant protection costs (FAR § 31.205-29), and help-wanted advertising costs for jobs specific to the project (FAR § 31.205-34(a)(1)). On the other hand, entertainment costs (FAR § 31.205-14), fines and penalties (FAR § 31.205-15), and general help-wanted advertisement costs (FAR § 31.205-34(b)) are not reimbursable. The termination clause's reference to "all costs reimbursable" under the contract appears designed to incorporate the contract's division between reimbursable and non-reimbursable costs.

Throughout the contract, when the parties intended the 80 percent – 20 percent division of costs to cover particular situations, they explicitly so provided. The table shown above specified the amount of the costs for each phase of the contract that each

party would bear. If the contractor terminated performance after Phase I was completed, it would "be liable for 20% of the costs incurred during the performance period." If there was an approved cost overrun, the contractor was required to absorb 20 percent of it.

In these circumstances, it seems most unlikely that if the parties had intended the termination clause to limit the contractor to 80 percent of the termination costs, they would not have said so instead of providing that the government would pay "[a]ll costs reimbursable" under the contract. We cannot read the latter phrase covering "all" reimbursable costs to mean 80 percent of such costs. In any event, to the extent there is an ambiguity on the point, it must be resolved in favor of Jacobs, the non-drafter of the contract.

Our conclusion also accords with the basic financial situation underlying the contract. FAR § 16.303(b) states that "[a] cost-sharing contract may be used when the contractor agrees to absorb a portion of the costs, in the expectation of substantial compensating benefits." If the contract had been completely performed at an estimated cost of more than $28 million, the government's reimbursement of only 80 percent of that amount presumably would have resulted in a substantial loss to the contractor. Jacobs tells us in its brief that the reason the contractor entered into such a seemingly unattractive venture was the anticipation that as a result of its performance, it would obtain valuable patent rights, to which the contract referred.

As a result of the government's termination of the contract, Jacobs was denied the opportunity to obtain such patent rights. In these circumstances, it seems unfair to Jacobs to deny it full reimbursement for the costs of its performance up to the

government's contract termination, which thwarted its possibility of obtaining the patent rights. "A contractor is not supposed to suffer as the result of a termination for convenience of the Government, nor to underwrite the Government's decision to terminate. If he has actually incurred costs . . . , it is proper that he be reimbursed those costs when the Government terminates for convenience and thereby custs [sic] off his ability to amortize those costs completely." In re Kasler Elec. Co., DOTCAB 1425, 84-2 BCA ¶ 17374 (May 21, 1984).

CONCLUSION

The judgment of the Court of Federal Claims is reversed and the case is remanded to that court to award damages.

REVERSED AND REMANDED.

**DEPARTMENT OF ENERGY**
**BOARD OF CONTRACT APPEALS**

**JACOBS ENGINEERING GROUP, INC.** ) **EBCA No. C-0510394**
**(Contract No. DE-AC21-92MC-28202)** )

**Representing Appellant:**

**Thomas J. Russial, Esq.**
**Nancy Toppetta, Esq.**
**U.S. Department of Energy**
**National Energy Technology Laboratory**
**P.O. Box 10940**
**Pittsburgh, PA 15236-0940**

**Representing Respondent:**

**Robert J. Symon, Esq.**
**Christyne K. Brennan, Esq.**
**Bradley Arant Rose & White LLP**
**1133 Connecticut Avenue, N.W.**
**12th Floor**
**Washington, D.C. 20036**

RECEIVED FEB - 7 2006

**Ruling on Appellant's Motion for Summary Judgment and Respondent's Motion to Dismiss**

**January 31, 2006**

In his final decision, the Contracting Officer awarded Jacobs Engineering Group, Inc. ("Jacobs") 80% of its costs incurred, and awarded it $72,176.83 to bring payments up to 80%. Jacobs appealed to the Court of Federal Claims claiming that it was entitled to 100% of its costs incurred. The Court denied Jacobs' Appeal and found for the Department of Energy ("DOE"). Jacobs then appealed to the Court of Appeals for the Federal Circuit where the case currently resides. Meanwhile, DOE has refused to pay Jacobs the $72,176.83 awarded to it by the Contracting Officer to bring payments up to 80%. Jacobs has filed a Motion for Summary Judgment and the DOE has filed a Motion to Dismiss.

**Facts**

On September 30, 1992, DOE Awarded Contract No. DE-AC21-92MC-28202 (the "Contract") to CRS Sirrine Engineers, Inc. ("CRS"). The Contract required CRS to develop, design, fabricate and construct a gasification facility in Morgantown, West Virginia. Jacobs purchased CRS and all of its rights and obligations under the Contract on August 1, 1994.

The Contract contained a cost sharing provision whereby the DOE was to absorb 80% of the cost of performance and Jacobs was to absorb 20%. Under the Contract Jacobs was not to receive a fee. Ultimately, the Contract was terminated for the

convenience of the Government. Jacobs submitted a claim to the Contracting Officer for 100% of its costs incurred. Jacobs believed that it had already been paid $5,579,582 out of the total cost of performance of $7,121,780. Accordingly, it claimed the amount of $1,542,197. ($7,121,780 - $5,579,582 = $1,542,197)[1] In his final decision, the Contracting Officer found that Jacobs was only entitled to reimbursement for 80% of the costs. He found that the total allowable cost of performance was $7,064,721.79, and that Jacobs had been paid $5,579,600.60. Therefore, he found that Jacobs was entitled to be paid $72,176.83 to bring payments up to 80% of allowable costs.

Jacobs appealed the final decision to the Court of Federal Claims. It claimed that the cost sharing provision of the Contract did not apply when the Contract was terminated for convenience. It claimed that it was entitled to receive $1,542,197 to bring payments up to 100% of the costs incurred. This $1,542,197 figure included the $72,176.83 to which the Contracting Officer had already determined Jacobs was entitled. The parties submitted Cross Motions for Summary Judgment and on January 12, 2005, the Court of Federal Claims ruled in favor of the DOE. Jacobs appealed to the Court of Appeals for the Federal Circuit. That appeal is now pending.

On May 9, 2005, Jacobs submitted an invoice to the DOE requesting payment of the $72,176.83 pursuant to the Contracting Officer's Final Decision. The DOE has refused to pay on the grounds that this amount is part of the claim that was brought to the Court of Federal Claims, and is now pending before the Court of Appeals for the Federal Circuit. The DOE asserts that it has no authority to pay this amount.

**Opinion**

The issue to be decided here is whether the claimed $72,176.83 is part of the claim that was appealed to the Court of Federal Claims and is now on appeal to the Federal Circuit, or is an independent claim, not associated with the claim now pending before the Federal Circuit. We find that the claim for $72,176.83 is not part of that claim.

The only issue, relevant here,[2] that was decided by the Court of Federal Claims in *Jacobs Engineering Group, Inc. v. United States*, 63 Fed Cl. 451 (2005), was that the cost sharing provision of the Contract applied and that Jacobs was entitled to only 80% of the costs incurred. In its decision, the Court stated:

> The CO concluded that the DOE's 80 percent share of the costs was $5,651,777.43, and Jacobs's 20 percent share was $1,412,944.36. J.App.173. The CO held that because the DOE had already paid Jacobs $5,579,600.60 for costs, all that was due to Jacobs was $72,176.83, which the CO awarded. *Id.*

*Id.* at 455.

---

[1] Jacobs' calculation seems to be off by one dollar. ($7,121,780-$5,579,582 = $1,542,198)
[2] Obviously, the Court addressed other issues in its decision that are not relevant here.

It is clear from a reading of the Court's decision that the issue of Jacobs' entitlement to the $72,176.83 was not before it. In relevant part, it upheld the Contracting Officer's Final Decision that Jacobs was not entitled to 100% of its costs incurred, but was entitled to 80% of its costs incurred. It indicated that the Contracting Officer awarded Jacobs $72,176.83 as part of the 80% to which it was entitled. Clearly, the Court believed and understood that Jacobs would receive the $72,176.83 regardless of the outcome of the case before it.

The DOE's arguments to the contrary are not well founded. The fact that Jacobs submitted a claim to the Court in the amount of $1,542,197, which included the $72,176.83, is not determinative of whether the $72,176.83 was in issue before the Court. Jacobs simply submitted a claim to the Court for 100% of what it perceived to be its costs incurred. Since it had not yet been paid the $72,176.83, that amount was included in its claim. Perhaps it should not have included this amount in its claim. That fact, however, is really not significant. It is clear from a reading of the Court's decision that the $72,176.83 was not in issue before it, and that the Court believed that Jacobs would be paid that amount independent of its decision. Furthermore, the inclusion can not be considered a waiver of its right to be promptly paid that amount by the DOE.

The DOE's reliance on the *Wilner*[3] case, likewise, is not well founded. While it is true that decisions appealed to the Court are reviewed *de novo,* that does not mean that the final decision automatically becomes a nullity the moment that an appeal is made. In his decision, the Contracting Officer determined that Jacobs was entitled to only 80%, and was to be paid $72,176.83 to bring payments up to 80%. Contrary to the DOE's assertion, this determination was appealed to the Court of Federal Claims only to the extent that Jacobs was claiming entitlement to more than 80%. That it was entitled to at least the 80% was not in dispute. Jacobs is entitled to be promptly paid $72,176.83, plus any appropriate interest.

**Decision**

Appellant's Motion for Summary Judgment is granted. Respondent's Motion to Dismiss is denied.

R. Anthony McCann
R. Anthony McCann
Administrative Judge

I concur:

Beryl S. Gilmore
Beryl S. Gilmore
Acting Chief Administrative Judge

[3] *Wilner v. United States,* 24 F.3d 1397 (Fed. Cir. 1994).