NO. 02-1500C

(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

---

JACOBS ENGINEERING GROUP, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S SUPPLEMENTAL APPENDIX

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JAMES W. POIRIER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St, N.W
Washington, D.C. 20530
Tele: (202) 307-6289
Fax: (202) 514-7969

October 2, 2006

Attorneys for Defendant

# INDEX TO THE SUPPLEMENTAL APPENDIX

**PAGE**

Declaration of Mr. Russial, dated September 26, 2006 . . . . . . . . . . . . . . . . . 284

Complaint filed by Jacobs at the Energy Board of Contract Appeals, dated December 2, 2005 . . . . . . . . . . . . . . . . . . 286

Sub-contract, between Jacobs and Riley Stoker Corporation, dated June 28, 1994 . . . . . . . . . . . . . . . . . . . 291

Sub-contract, between Jacobs and PSI Powerserve, dated November 22, 1992 . . . . . . . . . . . . . . . . . 380

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JACOBS ENGINEERING GROUP, INC., Plaintiff, | |
| v. | No. 02-1500C |
| THE UNITED STATES, Defendant. | (Judge George W. Miller) |

**DECLARATION OF THOMAS J. RUSSIAL**

I, Thomas J. Russial, do declare and affirm as follows:

1. I am currently employed as Chief Counsel for the U.S. Department of Energy (DOE) National Energy Technology Laboratory.

2. The document appended hereto, at pages 286 - 290, is a true and correct copy of the Complaint, filed by Jacobs Engineering Group, Inc., at the DOE Board of Contract Appeals, docketed at EBCA No. C-0510394.

3. The document appended hereto, at pages 291-379, entitled "Cost-Sharing Subcontract Between CRS Sirrine Engineers, Inc., and Riley Stoker Corporation" is a true and correct copy of the subcontract document produced by Jacobs Engineering Group, Inc., in response to the Government's Request for Production of Documents.

4. The document appended hereto, at pages 380-442, entitled "Cost-Sharing Subcontract Between CRS Sirrine Engineers, Inc., and PSI Powerserve" is a true and correct copy of the subcontract document provided to DOE by CRS Sirrine Engineers, Inc, and contained in DOE's official contract files.

I declare under penalty of perjury that the statements I have made in this declaration are true and correct to the best of my knowledge.

Thomas J. Russial          9-26-06
Date

BEFORE THE DEPARTMENT OF ENERGY
BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| In the Appeal of | ) | |
| JACOBS ENGINEERING GROUP INC | ) | EBCA No. C-0510394 |
| Under Contract No. DE-AC21-92MC-28202 | ) | |

## COMPLAINT

Appellant, Jacobs Engineering Group Inc ("Jacobs"), by the undersigned counsel, hereby files its Complaint in the above captioned appeal, and states and shows as follows:

1. On or about September 30, 1992, the United States Department of Energy (hereinafter "DOE" or "Government") awarded Contract No. DE-AC21-92MC-28202 (the "Contract") to CRS Sirrine Engineers, Inc. ("CRS" or "Contractor") to develop, design, fabricate and construct a gasification improvement facility in Morgantown, West Virginia. Thereafter, on August 1, 1994, Jacobs purchased CRS and all of CRS's rights and obligations under the Contract.

2. Pursuant to Part I, Section B.007(S) of the Contract, Jacobs and the Government agreed to share the cost of the effort required by the Contract as follows: Government (80%) and Contractor (20%). Jacobs agreed to share the cost of performance in consideration for rights to patents resulting from completion of the Contract. The total estimated cost for the work to be accomplished under the contract was $28,750,374.

3. The Contract incorporated by reference various standard clauses, including "Termination (Cost-Reimbursement) (May 1986)" in the form prescribed in FAR 52.249-6.

4. On or about August 2, 1995, the government terminated the Contract for the convenience of the Government.



286

5. On or about July 31, 1996, Jacobs submitted a termination settlement proposal to the government for reimbursement of all costs (100%) incurred to perform the contract. This amount totaled $7,121,780. Deducting $5,579,582 for payments made by the Government, Jacobs requested a net payment of $1,542,197.

6. In response to Jacobs' termination settlement proposal, the Government refused to pay the costs for certain elements of work In addition, the Government asserted that it was only required to pay 80% of the total approved costs pursuant to the cost sharing provision set forth at Section B 007(S) of the Contract.

7. After several years of meeting to discuss the proposal, on or about April 19, 2002, Jacobs submitted a certified claim and request for final decision of the Contracting Officer for its remaining unpaid performance costs in the amount of $1,542,197.

8. By letter dated September 13, 2002, the Contracting Officer issued a final decision denying, for the most part, Jacobs' claim associated with the termination for convenience. The Contracting Officer rejected costs claimed for certain elements of work and concluded that the total allowable cost for the project was $7,064,721.79. The Contracting Officer then determined, after application of the cost share provision, that Jacobs' total allowable cost was $5,651,777 43. Deducting amounts paid Jacobs in the amount of $5,579,600.60, the Contracting Officer concluded that Jacobs was entitled to a payment in the amount of $72,176.83.

9. On or about November 1, 2002, Jacobs filed a Complaint against the Government in the United States Court of Federal Claims related to its termination for convenience claim styled *Jacobs Engineering Group Inc. v United States*, No 02-1500C Thereafter, Jacobs and the Government filed cross-motions for summary judgment The sole issue for resolution by the



287

Court in these motions was whether the cost sharing provision applied because of the Government's termination for convenience.

10. On or about January 12, 2005, the United States Court of Federal Claims ruled that the cost-sharing clause did apply even though the Contract was terminated for the convenience of the Government and entered an order granting the Government's Motion for Summary Judgment.

11 On May 9, 2005, Jacobs submitted an invoice to the Government in the amount of $71,976 83 for payment of the undisputed amounts due Jacobs under the Contract as concluded by the Contracting Officer in his final decision dated September 13, 2002 Jacobs reserved $200.00 from the total amount due in order to avoid any waiver of claims resulting from what could have been construed as final payment. However, the Government refused to make any payment against Jacobs' invoice.

12. On August 9, 2005, Jacobs submitted a certified claim and requested the Contracting Officer to issue a final decision related to Jacobs' invoice in the amount of $71,976.83 for amounts due Jacobs as determined by the Contracting Officer's final decision dated September 13, 2002.

13. To date, the Contracting Officer has failed to issue a decision on Jacobs' claim for $71,976.83, and therefore, Jacobs deems this decision denied. By letter dated October 24, 2005, Jacobs timely filed a notice of appeal with this Board

WHEREFORE, Appellant Jacobs prays that this Board find that Appellant is entitled to payment in the amount of $71,976.83, plus interest in accordance with the Contract Disputes Act, and such further relief as the Board deems appropriate.

Respectfully submitted,

Robert J. Symon
Christyne K. Brennan
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW
12th Floor
Washington, DC 20036

Counsel for Appellant
Jacobs Engineering Group Inc.

December 2, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of December, 2005, a copy of the foregoing Complaint was forwarded via facsimile and first class mail to the following:

Thomas J Russial, Esq.
Nancy Toppetta, Esq.
U S. Department of Energy
National Energy Technology Laboratory
P.O. Box 10940
Pittsburgh, PA 15236-0940
Fax (412) 386-5949

Christyne K. Brennan

Christyne K. Brennan

# COST SHARING SUBCONTRACT

Under U.S. Department of Energy Prime Contract No. DE-AC21-92MC28202

THIS AGREEMENT MADE AS OF THE 28TH DAY OF JUNE, 1994

Between

**CRS SIRRINE ENGINEERS, INC.**

a South Carolina Corporation

having a place of business at

1041 East Butler Road
Greenville, SC 29606

hereinafter referred to as "Buyer"

And

**RILEY STOKER CORPORATION**

a Massachusetts Corporation

having a place of business at

45 McKeon Road
Worcester, MA 01610

hereinafter referred to as "Seller" or "Riley"

WITNESSETH THAT:

IN CONSIDERATION OF the promises, mutual covenants and agreements herein contained, the parties hereto agree as follows:

291

**TABLE OF CONTENTS**


| Article | | Page |
|---|---|---|
| 1 | Superseding Effect | 1 |
| 2 | Statement of Work | 1 |
| 3 | Payment and Cost Sharing Arrangement | 1 |
| 4 | Delivery | 4 |
| 5 | Transportation Data and Shipping Instructions | 4 |
| 6 | Inspection and Acceptance | 4 |
| 7 | Quality Control Requirements | 5 |
| 8 | Limitation of Funds | 5 |
| 9 | Incorporation of Subcontracting Plan | 8 |
| 10 | Overtime Premiums | 8 |
| 11 | Patent Rights | 8 |
| 12 | Documents Incorporated by Reference | 10 |
| 13 | Order of Precedence | 10 |
| 14 | Notices and Correspondence | 10 |
| 15 | Limitation of Liability | 11 |
| 16 | Warranty | 12 |
| | Signatures | 12 |

Exhibit "A" Scope of Work

Exhibit "B" General Conditions

Exhibit "C" Prime Contract Clauses Incorporated by Reference

Exhibit "D" Contract Modification No. 003 to the Prime Contract (Incorporated for Information Purposes Only)

Exhibit "E" Scope of Supply and Responsibility Matrix


Riley2
6/28/94

292

# COST SHARING SUBCONTRACT

1. SUPERSEDING EFFECT

A. This Subcontract supersedes all written or oral agreements, if any, and constitutes the entire agreement between the parties hereto with respect to this Subcontract.

B. All work performed by the Seller, actions taken, and payments made, if any, under any other prior written or oral agreements, with respect to this Subcontract, shall be deemed to have been work performed, actions taken, or payments made under this Subcontract.

2. STATEMENT OF WORK

The Seller shall furnish all the services and materials necessary to support the design, construction, and pre-operational testing of a Gasifier Product Improvement Facility ("GPIF") as specifically described in Exhibit "A", Scope of Work ("SOW") attached hereto, and further described in Exhibit "E", Scope of Supply and Cost Responsibility Matrix attached hereto, regarding Phase I of Prime Contract No. DE-AC21-92MC28202 between Buyer and the U.S. Department of Energy (the "Prime Contract"). Phase I includes the performance of seven (7) tasks as described in Exhibit "A". Should the Project proceed to Phase II, a contract modification to cover the Phase II effort will be negotiated if mutually agreeable to the Buyer and the Seller.

3. PAYMENT AND COST SHARING ARRANGEMENT

(52.216-7)

A. The total estimated cost for the work to be accomplished by the Seller under this Contract (inclusive of foregone fee) is $20,207,520.



Riley2
6/28/94

293

B. The Seller and Buyer agree to share the cost of the effort for Phase I as follows:

| Buyer Share | Seller Share | Total Estimated Costs |
|---|---|---|
| (80%) | (20%) | (100%) |
| $16,266,016 | $3,941,504 (1) | $20,207,520 |

(1) Includes foregone fee in the amount of $2,376,812.

Seller's indirect costs will be the currently effective rates as accepted by the DOE. These rates, as listed below, are provisional and the actual indirect cost rates as audited by DOE will be paid under this Subcontract.

| | | |
|---|---|---|
| (1) | Overhead on Seller's Research and Development Labor | 210% |
| (2) | Overhead on RCI Riley Construction Incorporated Erection Services | 3.6% |
| (3) | General and Administrative Costs | 10% |
| (4) | Overhead on Seller's Engineering Labor | 112% |
| (5) | Overhead on Seller's Erie Manufacturing Labor | 200% |

The Seller's cost share includes its foregone fee of $2,376,812 that the Seller would usually earn on its commercial sale of products and services similar to those supplied under this Subcontract.

It is Seller's intention that Seller's affiliate, Riley Construction Incorporated (RCI), will perform construction services under this Agreement.

The Seller's cost share dollar amounts are based on the parties' estimated total cost for this Subcontract (inclusive of foregone fee) of $20,207,520. If the actual cost of this

Subcontract should underrun the total estimated costs of $20,207,520, the Seller agrees to maintain its cost share at 20% of the actual Subcontract cost (inclusive of foregone fee). If the actual cost of this Subcontract should overrun the total estimated cost of $20,207,520, the Seller agrees that its share of such overrun cost will be 20% of the overrun cost (inclusive of foregone fee), subject to the following paragraph.

In the event that the actual cost of this Subcontract (inclusive of foregone fee) exceeds $20,207,520, the cost sharing arrangement shall be adjusted as follows:

(1) To the extent that the actual cost exceeding $20,207,520 is attributable to the actual cost for the gasifier and its attachments and the HRSG and its burner and attachments exceeding the estimated value of $4,004,180, the Seller agrees that its share of such overrun cost will continue at 20% of such overruns.

(2) To the extent that the actual cost exceeding $20,207,520 is not attributable to the actual cost for the gasifer and its attachments and the HRSG and its burner and attachments exceeding the estimated value of $4,004,180, the Seller and Buyer agree that the Seller's share of such overrun shall be 15% and the Buyer's share of such overrun shall be 85%; provided that, if the total amount of cost sharing absorbed by Buyer as a result of this additional 5% share (85% as compared to 80%) should reach a value of $200,000, the cost sharing arrangement shall thereafter revert to the basic cost sharing arrangements of 20% for Seller and 80% for Buyer, as provided in the previous paragraphs.

C. In the event that there is a change in the Subcontract work in accordance with Article 7, Changes, Exhibit B, the parties will negotiate an appropriate cost-share ratio for the work and negotiate appropriate fees to include in the change. Any changes in the Subcontract work shall be accounted for separately and not accumulated with actual cost for purposes of the cost sharing arrangements.

4. DELIVERY

The items, services and deliverable data required by this Subcontract shall be delivered in accordance with the respective dates specified in the SOW or per the mutually agreed upon dates required to support the Project Schedule.

5. TRANSPORTATION DATA AND SHIPPING INSTRUCTIONS.

All items furnished under this Subcontract shall be delivered F.O.B. Job Site. All shipments shall be made in accordance with the Prime Contract.

6. INSPECTION AND ACCEPTANCE

A. All work delivered under this Subcontract shall be inspected and accepted by the Buyer. Notwithstanding anything in this Subcontract or any prior inspection, acceptance under this Subcontract cannot occur prior to final inspection by the Government. Final inspection and acceptance by Buyer will be at the jobsite.

B. A copy of this Subcontract shall be furnished by Seller to the Government Quality Assurance Representative who normally services Seller's plant or to the nearest cognizant Government Inspection Office.

In the event the Inspection Office or Representative cannot be located, the Buyer's cognizant Subcontract Administrator must be notified immediately by Seller.

C. In the event Government source inspection and/or acceptance is required, the Seller shall notify the designated Government representative who normally services Seller's plant concurrent with the advance notification to Buyer.

D. Approvals by Buyer under this Subcontract shall not release the Seller from responsibility to meet all the requirements of this Subcontract.

E. The above paragraphs are not to be construed as a limitation of the rights of Buyer and the obligations of the Seller as provided for in this Subcontract.

7. QUALITY CONTROL REQUIREMENTS

The Seller shall provide and maintain a quality control system in accordance with the Prime Contract.

8. LIMITATION OF FUNDS (52.232-22)

A. It is estimated that the cost to the Buyer for the performance of this Subcontract will not exceed the estimated cost of Twenty Million Two Hundred Seven Thousand Five Hundred Twenty Dollars ($20,207,520) as set forth in Article 3.A. The Seller shall use its best efforts to perform the work specified in the SOW and all obligations under this Subcontract within such estimated cost.

B. The amount presently available for payment (based on DOE obligated funds) and allotted to this Subcontract and the period of performance which it is estimated the allotted amount will cover are as follows:

| | | |
|---|---|---|
| 1. | Allotted Amount | $4,500,000 |
| 2. | Period of Performance | March 31, 1994 |

2597

It is contemplated that from time to time additional funds will be allotted to Buyer by the DOE on the Prime Contract and Buyer agrees to allot an applicable amount of such additional funds to this Subcontract up to the full estimated cost set forth in Article 3.a. The Seller shall perform or have performed work on this Subcontract up to the point at which the total amount paid and payable by the Buyer pursuant to the terms of this Subcontract approximates but does not exceed the total amount actually allotted to this Subcontract.

C. If at any time the Seller has reason to believe that the costs which he expects to incur in the performance of this Subcontract in the next succeeding sixty (60) days, when added to all costs previously incurred, will exceed seventy-five percent (75%) of the total amount then allotted to the Subcontract the Seller shall notify the Buyer in writing to that effect. The notice shall state the estimated amount of additional funds required to continue performance for the period set forth in 8.B.2. above. Sixty (60) days prior to the end of the period specified in 8.B.2. the Seller will advise the Buyer in writing as to the estimated amount of additional funds, if any, that will be required for the timely performance of the work under the Subcontract or for such further period as may be specified in this Subcontract or otherwise agreed to by the parties. If, after such notification, additional funds are not allotted by the end of the period set forth in 8.B.2. or an agreed date substituted therefor, the Buyer will, upon written request by the Seller, terminate this Subcontract pursuant to the provisions of the Termination clause, Section (a)(i), FAR 52.249-6 (as incorporated in this Subcontract) on such date. If the Seller in the exercise of his reasonable judgment, estimates that the funds available will allow him to continue to discharge his obligations hereunder for a period extending beyond such

date, he shall specify the later date in his request and the Buyer in his discretion, may terminate this Subcontract on that later date.

D. Except as required by other provisions of the Subcontract specifically citing and stated to be an exception from this clause, the Buyer shall not be obligated to reimburse the Seller for costs incurred in excess of the total amount from time to time allotted to the Subcontract and the Seller shall not be obligated to continue performance under the Subcontract (including actions under the Termination clause) or otherwise to incur costs in excess of the amount allotted to the Subcontract, unless and until the Buyer has notified the Seller in writing that such allotted amount has been increased and has specified in such notice an increased amount constituting the total amount then allotted to the Subcontract. To the extent the amount allotted exceeds the estimated cost set forth in 3.A, such estimated cost shall be correspondingly increased. No notice, communication or representation in any other form or from any person other than the Buyer's Project Director shall affect the amount allotted to this Subcontract. In the absence of the specified notice, the Buyer shall not be obligated to reimburse the Seller for any costs in excess of the total amount then allotted to the Subcontract whether those excess costs were incurred during the course of the Subcontract or as a result of termination. When and to the extent that the amount allotted to the Subcontract has been increased, any costs incurred by the Seller in excess of the amount previously allotted shall be allowable to the same extent as if such costs had been incurred after such increase in the amount allotted; unless the Buyer issues a termination or other notice and directs that the increase is solely for the purpose of covering termination or other specified expenses.

E. Change orders issued pursuant to the "Changes" clause of this Subcontract shall not be considered an authorization to the Seller to exceed the amount allotted in paragraph B.1. of this clause in the absence of a statement in the change order, or other Subcontract modification, increasing the amount allotted.

F. Nothing in this clause shall affect the right of the Buyer to terminate this Subcontract. In the event this Subcontract is terminated, Seller shall deliver to the Buyer all property which has been paid for by the Buyer and not previously delivered.

9. INCORPORATION OF SUBCONTRACTING PLAN

The Seller's subcontracting plan for this Subcontract, submitted in accordance with FAR 52.219-9, is hereby incorporated by reference.

10. OVERTIME PREMIUMS (52.222-2)

Insert in the blank space in paragraph (a) of FAR 52.222-2: "None".

11. PATENT RIGHTS

In accordance with a Letter of Intent of May 17, 1993, executed by officers of both Parties (hereby incorporated by reference), the parties shall provide the following exchange of patent rights to inventions made by the Buyer under the Prime Contract, or the Seller under this Subcontract:

(a) Buyer's Inventions. To the extent that Buyer has the right to elect to retain patent rights to inventions made by the Buyer under the Prime Contract pursuant to a waiver of patent rights granted to the Buyer by the Department of Energy with respect to the Prime Contract, the Buyer shall assign to the Seller its

rights to any such invention (subject to the terms and conditions of the waiver granted to the Buyer by the Department of Energy and subject to rights reserved under other subcontracts under the Prime Contract, provided such rights reserved are of the same nature as the rights reserved under this Subcontract) related to improvements to technology supplied by the Seller in the performance of this Subcontract;

(b) Seller's Inventions. (i) To the extent that Seller has the right to elect to retain patent rights to inventions made by the Seller under this Subcontract under a waiver of patent rights to the Seller by the Department of Energy with respect to this Subcontract, the Seller shall assign to the Buyer its rights to any such invention (subject to the terms and conditions of any waiver granted to the Seller by the Department of Energy and subject to rights reserved under other subcontracts under the Prime Contract) related to improvements to the PyGas technology supplied by the Buyer in the performance of the Prime Contract,

(ii) Seller agrees to request the Department of Energy to grant the Seller a waiver of patent rights to the invention that may be made by the Seller in the performance of work under this Subcontract.

For purposes of this Section, the term "invention" shall encompass any patentable technology developed by the Buyer or Seller during the term of this Subcontract, as applicable, and does not encompass any patent or intellectual property owned by either party before the commencement of the Prime Contract or Subcontract, as applicable.

12. <u>DOCUMENTS INCORPORATED BY REFERENCE</u>

The following documents are hereby incorporated by reference:

A. Exhibit "A" entitled "Scope of Work Riley Stoker Corporation".

B. Exhibit "B" entitled "General Conditions".

C. Exhibit "C" entitled "Prime Contract Clauses Incorporated by Reference".

D. Exhibit "D" entitled "Contract Modification No. 003 to the Prime Contract" (incorporated for information purposes only).

E. Exhibit "E" entitled "Scope of Supply and Responsibility Matrix".

13. <u>ORDER OF PRECEDENCE</u>

The following order of precedence shall govern in the event of a conflict between the documents of this Subcontract.

A. Articles 1 through 16 of this Subcontract

B. Exhibit "B" - General Conditions

C. Exhibit "C" - Prime Contract Clauses Incorporated by Reference

D. Exhibit "A" - Scope of Work

E. Exhibit "E" - Scope of Supply and Responsibility Matrix

14. <u>NOTICES AND CORRESPONDENCE</u>

All notices and correspondence shall be sent by either party to the other in all matters dealing with this Subcontract to the following addresses:

A. To the Buyer: CRS Sirrine Engineers, Inc.
P.O. Box 5456
1041 East Butler Road
Greenville, SC 29606-5456
Attention: Robert D. Carson

B. To the Seller: Riley Stoker Corporation
45 McKeon Road
Worcester, MA 01610
Attention: Vijay Dixit

15. <u>LIMITATION OF LIABILITY</u>

Seller's liability on all claims of any kind (excluding death or bodily injury), whether based on contract, indemnity, warranty, tort (including negligence), Strict Liability or otherwise, for all losses or damages arising out of, connected with, or resulting from this Subcontract, or from the performance or breach thereof, or from any equipment or services covered by or furnished under this order or any extension or expansion thereof (including remedial warranty efforts), shall in no case exceed the contract price unless and except to the extent Buyer is liable to the Government for such claims, in which case Seller shall be liable to the same extent Buyer is liable to the Government for such types of damages caused by Seller under the Prime Contract.

In no event, whether based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, shall Seller, its employees, subcontractors and suppliers be liable for special, incidental, indirect, exemplary or consequential damages including, but not limited to, loss of use of the equipment or any associated equipment, cost of capital, cost of purchased or replacement power, cost of substitute equipment, facilities or services, loss of anticipated profit or revenue, downtime costs, cost of refuse disposal, unless and except to the extent Buyer is liable to the Government for such claims, in which case Seller shall be liable to the same extent Buyer is liable to the Government

for such types of damages caused by Seller under the Prime Contract.

This limitation of Liability shall prevail over any conflicting or inconsistent provision contained in any item or document which comprises the contract.

Seller shall be liable to Buyer and the Government in accordance with FAR 52.246-25 "Limitation of Liability - Services".

16. <u>WARRANTY</u>

A. <u>Materials and Workmanship</u>

The Seller warrants to the Buyer its material and workmanship against detrimental defects to the extent Buyer has warranted such materials and workmanship to the Government under the Prime Contract.

FURTHER, IT IS AGREED THAT THE SELLER MAKES NO OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED.

B. <u>Performance</u>

No performance guarantees are applicable regarding the materials and workmanship provided hereunder.

IN WITNESS WHEREOF, the parties hereto have executed this Subcontract as of the day and year first above written.

CRS SIRRINE ENGINEERS, INC.

Attest:

William J. Gardini

Secretary

RILEY STOKER CORPORATION

Attest: J. S. Pratt

Secretary

VICE PRESIDENT



Riley2
6/28/94

304

TABLE OF CONTENTS

EXHIBIT "B"

GENERAL CONDITIONS


| Article | | Page |
|---|---|---|
| 1 | Applicable Law and Disputes | 1 |
| 2 | Assignment of Claims | 4 |
| 3 | Bankruptcy | 4 |
| 4 | Buyer Furnished Property | 5 |
| 5 | Confidentiality | 5 |
| 6 | Calendar Dates | 6 |
| 7 | Changes | 6 |
| 8 | Clause Headings | 7 |
| 9 | Compliance with Federal, State and Local Laws | 7 |
| 10 | [Not Used] | |
| 11 | False Claims and Indemnity | 7 |
| 12 | Government Visits | 8 |
| 13 | Gratuities | 8 |
| 14 | Identification of Data | 9 |
| 15 | Industrial Laws | 11 |
| 16 | Invoicing and Payment | 12 |
| 17 | Modification of Subcontract | 13 |
| 18 | No Waiver of Conditions | 13 |
| 19 | Packaging | 13 |
| 20 | [Not Used] | |
| 21 | Seller's Certification of Cost or Pricing Data | 14 |
| 22 | Subcontract Administration | 15 |


305

1. <u>APPLICABLE LAW AND DISPUTES</u>

A. Any disputes arising under this Subcontract solely between the Buyer and Seller shall be governed by the law of the State of South Carolina. However, if the issue in dispute relates to a Subcontract provision specified by the FAR and made applicable to this Subcontract by this Subcontract (including Exhibit C), Federal law applicable to government contracts shall apply. Any litigation under this Subcontract, if commenced by Seller, shall be brought in a Court of competent jurisdiction in the State of South Carolina. Any litigation under this Subcontract, if commenced by Buyer, shall be brought in a Court of competent jurisdiction in the Commonwealth of Massachusetts.

B. 1. If a decision on a question of fact is issued by the Contracting Officer under the Prime Contract "Disputes" clause and the decision relates to this Subcontract, said decision, if binding upon the Buyer, under the Prime Contract, shall also be binding upon Buyer and Seller with respect to this Subcontract provided Seller is notified and able to participate in any matter relating to such decision. However, if Seller is affected by such decision, and if Buyer elects not to appeal such decision under the "Disputes" clause of the Prime Contract, Buyer shall notify the Seller promptly. After receipt of such notice by Seller, if Seller submits a timely request to Buyer to appeal such decision, Buyer shall file an appeal. If Buyer appeals such decision, whether at its election or at Seller's request, any decision upon such appeal, if binding upon the Buyer under the Prime Contract, shall be binding upon the Buyer and Seller as it relates to this Subcontract. Appeals under the "Disputes" clause of the Prime Contract do not preclude consideration of questions of law in connection with decision(s) referenced above.

2. For any claims to be submitted under B.1. above in excess of $50,000, the Seller shall certify to the Buyer, as to its portion of the claim that: (a) the claim is made in good faith, (b) the supporting data are accurate to the best of the Seller's knowledge and belief, and (c) the amount requested accurately reflects the Subcontract adjustment for which the Seller believes the Government is liable.

3. If any such appeal is denied or otherwise decided adversely to Seller's interest, or if Seller is otherwise adversely affected by any decision made by any representative of the Government on any question of fact and/or law arising under the Prime Contract which is also related to this Subcontract, from which an appeal under the "Disputes" clause in the Prime Contract is not available, said decision, if binding upon Buyer under the Prime Contract, shall in turn be binding upon Buyer and Seller with respect to such question as it relates to this Subcontract; provided, however, if Seller is adversely affected by any such decision, and if Buyer elects not to bring suit against the Government with respect to such decision, Buyer shall notify Seller promptly. If Seller submits a timely request to Buyer to bring suit against the Government, Buyer shall start such suit. If Buyer brings suit against the Government with respect to any such decision, whether at its election or at Seller's request, a final judgment in any such suit, if binding upon Buyer under the Prime Contract shall in turn be binding upon Seller and Buyer under this Subcontract with respect to the question decided as it relates to this Subcontract.

4. If any such appeal or suit is taken or brought by Buyer, whether at its election or at Seller's request, Seller shall assist Buyer in its prosecution thereof in every

reasonable manner and Seller shall be afforded reasonable opportunity to participate in the prosecution thereof to the extent Seller's interest may be affected. To the extent requested by Buyer, Seller shall prosecute for Buyer any appeal or suit taken or brought at Seller's request and, in such event, Buyer shall assist Seller in every reasonable manner. All reasonable and approved costs and expenses incurred by Seller and Buyer in prosecuting any appeal or suit taken or brought solely at Seller's request shall be paid by Seller. Where possible, Buyer shall in good faith consult with Seller concerning the presentation to the Contracting Officer or other cognizant representatives of the Government of the questions referred to in paragraphs 1. and 3. above to the extent they may affect Seller's Interest.

5. If as a result of any decision or judgment which is binding upon Seller and Buyer, Buyer is unable to obtain reimbursement from the Government under the Prime Contract for, or is required to refund or credit to the Government any amount with respect to any item of cost or fee for which Buyer has reimbursed Seller, Seller shall, on demand, promptly repay such amount to Buyer.

6. The rights and obligations herein shall survive completion of and final payment under this Subcontract.

C. Provided, however, the Seller shall not be bound by any such Contracting Officer's decision, Appeal Board's decision, or judgment if such is not determinative of an obligation imposed upon the Seller under this Subcontract, or any amendment hereto.

D. Pending the resolution of any dispute, the Seller shall proceed as directed by Buyer in writing.

E. Buyer agrees to provide reasonable notice and assistance to Seller in any matter related to any claims and disputes under Article 1.

2. <u>ASSIGNMENT OF CLAIMS</u> (52.232-23)

A. The Seller shall not assign this Subcontract in whole or in part. Any monies due or to become due hereunder may be assigned, provided that such assignment shall not be binding upon Buyer until receipt of a copy of the assignment agreement is acknowledged and approved by the Buyer in writing.

B. Copies of this Subcontract or of any plans, specifications, or other similar documents relating to work under this Subcontract, if marked "Top Secret," "Secret" or "Confidential," shall not be furnished to any assignee of any claim arising under this Subcontract or to any other person not entitled to receive the same. However, a copy of any part or all of this Subcontract so marked may be furnished, or any information contained therein may be disclosed, to such assignee upon the prior written authorization of the Buyer.

3. <u>BANKRUPTCY</u>

In addition to the rights set forth in FAR 52.249-6, as incorporated into this Subcontract by Exhibit C, Buyer may terminate this Subcontract for default, in whole or in part, by written or telegraphic notice to Seller if:

(1) the Seller shall become insolvent or make a general assignment for the benefit of creditors; or

(2) a petition under any bankruptcy act or similar statute is filed by or against the Seller and not vacated within ten (10) days after it is filed.

4. <u>BUYER FURNISHED PROPERTY</u>

The rights and obligations of the Seller with respect to Buyer Furnished Property shall be the same as those which the Seller has with respect to Government Property under FAR 52.245-2, excluding Alternate I.

5. <u>CONFIDENTIALITY</u>

Buyer and Seller mutually agree that confidential information will be exchanged between Buyer and Seller. Confidential information includes, but is not limited to, proprietary technology, technical information and know-how. Buyer agrees to receive all such Seller's confidential information in confidence, not to use for its own benefit or for the benefit of a third party, without Seller's prior written consent. It is further understood that any information provided hereunder by Seller, remains the property of Seller, and on demand, any and all documents marked by Seller as "confidential" or "proprietary information", or with like captions indicating confidentiality of the information, shall be returned to Seller. Seller likewise agrees to receive such information in confidence from Buyer and not to use the information for its own benefit or for the benefit of any third party without Buyer's prior written consent. Seller further understands that all the information provided hereunder by Buyer, remains the property of Buyer, and on demand, any and all documents marked by Buyer as "confidential" or "proprietary information" or other caption indicating confidentiality of the information shall be returned to Buyer.

The parties understand that disclosure of confidential information does not carry with it any right or license to use or practice confidential information of the other party without written consent.

The foregoing obligations regarding confidentiality and non-use shall not apply to any information which:

(a) was previously known by a party, before receipt of the information from the other party;

(b) was independently developed by a third party, which a party reasonably believes, after inquiry, has the lawful right to disclose this information;

(c) is already available in the public domain, through no fault, action, or inaction of any of the parties; or

(d) was acquired at any time from a third party, expressly authorized by the party, to disclose the information.

This obligation of confidentiality shall remain in effect for fifteen (15) years. The government's acquisition and rights in technical data and computer software is as specified in Section 14 hereof.

6. <u>CALENDAR DATES</u>

All periods of days referred to in this Subcontract shall be measured in calendar days.

7. <u>CHANGES</u> (FAR 52.243-2)

Buyer's Engineering and Technical Personnel may, from time to time, render assistance or give technical advice to, or effect an exchange of information with Seller's personnel in a liaison effort concerning the items to be furnished hereunder. However, such exchange of information or advice shall not vest Seller with authority to change the items hereunder or the provisions of this Subcontract, nor shall any change in the items or provisions of this Subcontract be binding on Buyer unless specified as a change by the Buyer in accordance with procedures and requirements of FAR 52.243-2 entitled "Changes-Cost-Reimbursement," as modified and

incorporated by reference in Exhibit "C" into this Subcontract.

8. CLAUSE HEADINGS

The headings and subheadings of clauses contained herein are used for convenience and ease of reference and do not limit the scope or intent of the clause.

9. COMPLIANCE WITH FEDERAL, STATE AND LOCAL LAWS

Seller, as a contractor, will comply with all Federal, State, Municipal and local laws, rules and regulations that may be applicable to this Subcontract and, at the request of Buyer or the Government, Seller will furnish certificates to the effect that it has complied with said laws and regulations. Seller represents that it has complied and will continue to comply during the performance of this Subcontract with the provisions of the "Fair Labor Standards Act" of 1938, as amended, and the "Occupational Safety and Health Act" of 1970, and with the regulations and standards issued pursuant thereto.

10. [NOT USED]

11. FALSE CLAIMS AND INDEMNITY

The Seller shall indemnify the Buyer for any cost incurred and any payments made by the Buyer resulting from false claims submitted by the Seller under this Subcontract, or as a result of a Seller's misrepresentation of fact or fraud under appeals made by the Buyer or Seller under Article 1 entitled "Applicable Law and Disputes". The Buyer shall notify the Seller, in writing, of any allegations of a false claim, misrepresentation of fact or fraud to which this indemnity applies.

12. <u>GOVERNMENT VISITS</u>

The Government and/or its designated representative(s) shall be permitted to visit the Seller with respect to this Subcontract only after arrangements have been made with the Buyer's Project Director. Visits of a routine nature, e.g., audit and inspection are not covered by this article.

13. <u>GRATUITIES</u> (FAR 52.203-3)

A. The Buyer may, by written notice to the Seller, terminate the right of the Seller to proceed under this Subcontract if it is found that gratuities, (in the form of entertainment, gifts, or otherwise), were offered or given by the Seller, or any agent or representative of the Seller to any officer or employee of the Government or the Buyer with a view toward securing this Subcontract or securing favorable treatment with respect to the awarding or amending, or the making of any determinations with respect to the performing of this Subcontract; provided, that the existence of the facts upon which the Buyer makes such findings shall be in issue and may be reviewed in any competent court.

B In the event this Subcontract is terminated as provided in paragraph A. hereof, the Buyer shall be entitled to pursue the same remedies against the Seller as it could pursue in the event of a breach of the Subcontract by the Seller.

C. The rights and remedies of the Buyer provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Subcontract.

14. <u>IDENTIFICATION OF DATA</u> (FAR 52.227-14)

Technical Data, as defined in the "Rights in Technical Data and Computer Software" clause of the Prime Contract, delivered under this Subcontract shall be marked with the

Prime contract Number, this Subcontract Number, the Buyer's name, the Seller's name, and, if applicable, the name of the subcontractor who generated the data.

Seller restricted computer software subject to Paragraph (g)(i) of FAR 52.227-14 are listed below and as being restricted computer software:

- ABHITZEKESSEL (HRSG thermal design)
- ATTACH (design and analysis of structural steel attachments)
- BACKPASS (Convective heat transfer in Circofluid boilers)
- BASEPLT ()design and analysis of column base plates)
- BASICS (combustion system calculations)
- BEAMGRID (design and analysis of beam/floor platform systems)
- BPHT (convective heat transfer
- CREEP (analysis of creep in pressure parts)
- DRUDUR (pressure drop in headers)
- DRUMTHICK (design and analysis of boiler drums)
- FASTFIRE (furnace radiative heat transfer)
- FATIGUE (analysis of fatigue in pressure parts)
- FWHEATER (design and analysis of feedwater heaters)
- GASSER (fixed bed gasifier performance)
- GASVIBRA (gas-flow induced vibration analysis)
- GIRDER (design and analysis of built-up plate girders)
- HTBUNDLE (heat transfer water and evaporating steam duty bundles)
- KEDI (boiler diagnostics & design/analysis)
- LUG (design and analysis of structural steel lugs)
- METLTHICK (design and analysis of headers and other small pressure vessels)
- METSEL (metal selection for convective sections)
- NATCIR (natural circulation)
- Riley CAD system subroutines
- Riley $NO_x$ Prediction Computer program
- STACK (design and analysis of steel chimneys and stacks)
- TRD301A1 (cycling ability of pressure parts)
- VESLTHICK (design and analysis of pressure vessels)



314

Buyer shall provide the DOE Contracting Officer with advance written notification of Seller's designation of the above listed items as restricted computer software upon the execution of this Subcontract pursuant to Clause H.041C of the Prime Contract. The above listed restricted computer software shall not be subject to call-up by the DOE Contracting Officer, or an authorized representative of such Contracting Officer, or the Buyer pursuant to subsection (g)(3) of Clause FAR 52.227-14 or I.118 of the Prime Contract. The above listed restricted computer software may be inspected by the DOE Contracting Officer, or an authorized representative of such Contracting Officer, under subsection (j) of such Clause and such inspection shall be subject to appropriate provisions for confidentiality.

Seller limited rights data subject to Paragraph (g)(i) of FAR 52.227-14 are listed below as being limited rights data.

- Seller and its affiliates Gasifier design data not disclosed in U.S. Patents or published literature
- Heat Recovery Steam Generator (HRSG) design data not disclosed in U.S. Patents or published literature
- Hot Gas Filtration design data not disclosed in U.S. Patents or Published literature
- All Seller burner design data not disclosed in U.S. Patents or Published literature
- Seller Engineering and Drafting Standards
- Seller Construction Standards

Buyer shall provide the DOE Contracting Officer with advance written notification of Seller's designation of the above listed items as Limited rights data upon the execution of this Subcontract pursuant to Clause H.040A3 of the Prime Contract. The Buyer shall obtain the DOE Contracting Officer's agreement that the above limited rights data shall be listed as "Technical data not required to be delivered" pursuant to Clause H.040C of the Prime Contract and shall not be subject to call-up by the DOE Contracting Officer or the Buyer pursuant to subsection (g)(2) of the Clause, FAR 52.227-14 or Clause H.039A of the Prime Contract. The above listed limited rights data may be inspected by the DOE Contracting Officer, or an authorized representative of such Contracting Officer under subsection (j) of such Clause.

15. <u>INDUSTRIAL LAWS</u>

The Seller, in all matters relating to this Subcontract, shall be acting as an independent contractor. Neither the Seller nor any of the persons furnishing materials or performing work or services which are required by this Subcontract are employees of the Buyer within the meaning of or the application of any Federal or State Unemployment Insurance Law or other Social Security or any Workmen's Compensation, Industrial Accident Law or other Industrial or Labor Law. The Seller, at its own expense, shall comply with such laws, and assume all obligations imposed by any one or more of such laws with respect to this Subcontract.

16. <u>INVOICING AND PAYMENT</u>

A. Seller shall comply with the terms of Paragraph G.003c of the Prime Contract in preparing its invoices to Buyer.

B. All invoices shall be forwarded to Buyer at:

1041 E. Butler Road
P.O. Box 5456
Greenville, SC 20606-5456
Attention: Accounts Payable.

C. With the final invoice there shall be submitted the following:

1. A certification that invoices of all suppliers and subcontractors have been paid.

2. If applicable, three (3) completed copies of Royalty Report (DD Form 783) and Final Patent Report (DD Form 882) or equivalent forms.

3. A release discharging Buyer and the Government of and from any liabilities, obligations and claims arising out of or under this Subcontract.

Buyer agrees to pay all invoices within forty-five (45) days after submittal by Seller. Interest in accordance with FAR 52.232-25 "Prompt Payment" shall be applicable for late invoices. The Seller shall show the amount of foregone fee on his invoices on a percentage completion basis. No fee will be paid the Seller. Buyer is primarily liable for payment and payment is not contingent upon Buyer payment by DOE.

In the event a payment has not been made within sixty (60) days after an invoice has been submitted by Buyer, Seller has the right to suspend its work hereunder or terminate this agreement after ten (10) days' notice.

17. <u>MODIFICATION OF SUBCONTRACT</u>

This Subcontract contains all the agreements between the parties and no course of dealing or usage of the trade shall be applicable unless expressly incorporated in this Subcontract. The terms and conditions contained in this Subcontract may not be added to, modified, superseded or otherwise altered except by a written modification signed by an authorized representative of the Buyer's Procurement

Department and delivered by Buyer to Seller. Each shipment received by Buyer from Seller shall be deemed to be only upon the terms and conditions contained in this Subcontract notwithstanding any terms and conditions that may be contained in any invoice or other form of Seller, and notwithstanding Buyer's act of accepting or paying for any shipment or similar act of Buyer.

18. <u>NO WAIVER OF CONDITIONS</u>

Failure of Buyer to insist on strict performance shall not constitute a waiver of any of the provisions of this Subcontract or waiver of any other default of Seller.

19. <u>PACKAGING</u>

Unless otherwise specified in this Subcontract, the items required by the SOW shall be packed, pursuant to the Prime Contract, so as to assure safe arrival at destination in an undamaged condition under proper handling. Interior and exterior containers shall be marked with the Subcontract number.

20. [NOT USED]

21. <u>SELLER'S CERTIFICATION OF COST OR PRICING DATA AND KEY PERSONNEL AND PLACE OF PERFORMANCE</u>

A. If the amount of this Subcontract was expected to exceed $100,000 when entered into, the Seller has submitted, actually or by specific identification in writing, cost or pricing data.

B. Prior to the pricing of any Subcontract modification which involves aggregate increases and/or decreases in costs plus applicable profits expected to exceed $100,000, the Seller shall submit, actually or by specific identification in writing, cost or pricing data.

C. The submissions referenced in A. and B. above are not required where the price is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, or prices set by law or regulations.

D. With respect to A. above, the Seller has certified, and with respect to B. above, the Seller shall certify, in substantially the same form prescribed in Subsection 15.804--4 of , that to the best of Seller's knowledge and belief, the cost and pricing data submitted under A. and B. above is accurate, complete and current as of the date of agreement on the negotiated price of this Subcontract or Subcontract change or modification.

E. Sections F.005 and H.005 shall be modified to be the following:

F.0005 PRINCIPAL PLACE OF PERFORMANCE (APR 1984)

The principal place of performance shall be at Riley's research facility located in Worcester, Massachusetts and the Fort Martin Power Station located near Morgantown, West Virginia.

H.005 KEY PERSONNEL (APR 1986)

The Seller's key personnel are as follows:

| NAME | TITLE |
|---|---|
| Vijay Dixit | Project Manager |
| William Place | Manager, Advanced Technologies |
| Robert Lisauskas | Director, Research & Development |
| Charles Longfellow | Construction Manager |

The clause entitled "Key Personnel" contains a requirement for notification to the Project Director reasonably in advance of diverting of, or substitution for,

any of these individuals. That period of time shall not be less than thirty (30) days.

22. <u>SUBCONTRACT ADMINISTRATION</u>

Notwithstanding any other provisions of this Subcontract or any document referenced herein, the Buyer's Project Director is the only individual authorized to make the changes in or redirect the work required by this Subcontract. Where Buyer's approval is required under the terms of this Subcontract, it shall be construed to mean the approval of the Buyer's Project Director. In the event the Seller effects any change at the direction of any other person, the change will be considered as having been made without authority and an adjustment will not be made in the Subcontract estimated cost or fee or delivery schedule as a result thereof. No agreement or understanding will be binding on Buyer unless made in writing and signed by the Buyer's Project Director.

The Buyer's initial Project Director is Don Carson.

## EXHIBIT "C"

## PRIME CONTRACT CLAUSES INCORPORATED BY REFERENCE

PRIME CONTRACT CLAUSES INCORPORATED BY REFERENCE

(A) Part I, Section H, Articles H.034 (Safety and Health - November 1991), H.035(S) (Permits and Licenses - November 1991), H.036 (Environmental Protection - November 1991) and H.037 (Quality Assurance / Quality Control Program - November 1991) and the clauses of the Federal Acquisition Regulations (FAR) and of the Department of Energy FAR Supplement set forth in Part II - Section I of the Prime Contract are hereby incorporated by reference in this Subcontract. Contract Modification No. 003 to the Prime Contract is also hereby incorporated by reference in this Subcontract and is included as Exhibit "D". The obligations of the Contractor to the Government as provided in said clauses shall be deemed to be the obligations of the Seller to the Buyer only to the extent such obligations relate to the performance of the SOW in this Subcontract by the Seller. However, whenever said clauses include a requirement for the settlement of disputes between the parties in accordance with the "Disputes" clause, the dispute shall be disposed of in accordance with Article 1 entitled "Applicable Law and Disputes" of the General Conditions, Exhibit "B".

(B) Wherever necessary to make the context of the clauses set forth in this Exhibit "C" applicable to this Subcontract, the term "Contractor" shall mean Seller, the term "Contract" shall mean this Subcontract, and the term "Government", "Contracting Officer" and equivalent phrases shall mean Buyer, except the terms "Government" and "Contracting Officer" do not change: (1) In the phrases "Government Property", "Government-Furnished Property", "Government-Owned Property", "Government Equipment" and "Government-Owned Equipment", (2) When a right, act, authorization or

obligation can be granted or performed only by the Government or the Prime Contract Contracting Officer or his duly authorized representative, (3) When access to proprietary financial information, limited rights technical data, restricted rights computer software, or other proprietary data is required, (4) When title to property is to be transferred directly to the Government, (5) when the clause deals with the exercise of a right of the Government or the DOE Contracting Officer to terminate for convenience, disallows costs, or allocate patent or data rights. Buyer agrees not to issue consecutive stop orders or more than two stop orders.

# EXHIBIT A: SCOPE OF WORK
# RILEY STOKER CORPORATION

Riley Stoker Corporation, as subcontractor to CRSS on DOE Contract No. DE-AC21-92MC28202, shall furnish all of the services, equipment, and materials required to implement the following Scope of Work:

Task 3 Permit Information

1. Obtain permits required to perform the role of General Contractor for the project and provide assistance with preparation of permit information reports. Riley has no responsibility for obtaining environmental permits.

Task 4 Conceptual Design

1. Review and comment on the project scope and overall conceptual design.
2. Working with CRSS and PSIT provide a conceptual design for the Gasifier in detail sufficient for cost estimating and provide a cost estimate.
3. Provide a conceptual design for the HRSG in detail sufficient for cost estimating and provide a cost estimate.
4. Obtain equipment costs and other equipment information as required for this Task.
5. Assist with Value Engineering activities.
6. Assist with development of a detailed Project Schedule.
7. Review the CRSS Project Estimate.
8. Work with CRSS and PSIT on development of a Project Control Philosophy and Concept.
9. Support required modifications to the Work Plan.

Task 5 Bench Scale Studies

1. Provide suggestions for bench scale studies.
2. Analyze and provide comments on results.
3. Support required modifications to the Work Plan.

Task 6 Detail Design

1. Provide input to the Project Quality Assurance Plan for construction and procurement relation sections.

2. Provide constructability review for detail design documents.

3. Provide Project Schedule input.

4. Provide procurement activities and associated information required to support detail design.

5. Provide detail design for the Gasifier and the HRSG with input from CRSS.

6. Support required modifications to the Work Plan.

7. Provide detail design for combustion controls.

Task 7 Site Preparation/Construction

1. Perform general contractor responsibilities as follows required to construct the GPIF facility in accordance with the detail design documents, the Project Estimate and Project Schedule.

   a. Procurement/Expediting
   b. Safety
   c. Material
   d. Equipment Supply
   e. Equipment Erection
   f. Construction Contracts
   g. Subcontracts

2. Contract and supply the gasifier and HRSG in accordance with the detailed design developed in Task 6.

3. Perform the remaining Procurement responsibilities.

4. Support required modifications to the Work Plan.

5. Perform pre-commissioning and commissioning activities required to ready the facility for testing status.

Task 8 Pre-Operational Test Plan

1. Provide support for development of the Pre-Operational Test Plan.

2. Provide support for training and in the preparation of manuals.

Task 9 Pre-Operational Testing

1. Provide support for pre-operational testing as defined in the Test Plan. It is understood that support will not include supply of utilities, fuel, and other typical Owner supplied services.

2. Provide support for preparation of the Final Report.

# TABLE OF CONTENTS
## EXHIBIT "B"
## GENERAL CONDITIONS


| Article | | Page |
|---|---|---|
| 1 | Applicable Law and Disputes | 1 |
| 2 | Assignment of Claims | 4 |
| 3 | Bankruptcy | 4 |
| 4 | Buyer Furnished Property | 5 |
| 5 | Confidentiality | 5 |
| 6 | Calendar Dates | 6 |
| 7 | Changes | 6 |
| 8 | Clause Headings | 7 |
| 9 | Compliance with Federal, State and Local Laws | 7 |
| 10 | [Not Used] | |
| 11 | False Claims and Indemnity | 7 |
| 12 | Government Visits | 8 |
| 13 | Gratuities | 8 |
| 14 | Identification of Data | 9 |
| 15 | Industrial Laws | 11 |
| 16 | Invoicing and Payment | 12 |
| 17 | Modification of Subcontract | 13 |
| 18 | No Waiver of Conditions | 13 |
| 19 | Packaging | 13 |
| 20 | [Not Used] | |
| 21 | Seller's Certification of Cost or Pricing Data | 14 |
| 22 | Subcontract Administration | 15 |

1. APPLICABLE LAW AND DISPUTES

A. Any disputes arising under this Subcontract solely between the Buyer and Seller shall be governed by the law of the State of South Carolina. However, if the issue in dispute relates to a Subcontract provision specified by the FAR and made applicable to this Subcontract by this Subcontract (including Exhibit C), Federal law applicable to government contracts shall apply. Any litigation under this Subcontract, if commenced by Seller, shall be brought in a Court of competent jurisdiction in the State of South Carolina. Any litigation under this Subcontract, if commenced by Buyer, shall be brought in a Court of competent jurisdiction in the Commonwealth of Massachusetts.

B. 1. If a decision on a question of fact is issued by the Contracting Officer under the Prime Contract "Disputes" clause and the decision relates to this Subcontract, said decision, if binding upon the Buyer, under the Prime Contract, shall also be binding upon Buyer and Seller with respect to this Subcontract provided Seller is notified and able to participate in any matter relating to such decision. However, if Seller is affected by such decision, and if Buyer elects not to appeal such decision under the "Disputes" clause of the Prime Contract, Buyer shall notify the Seller promptly. After receipt of such notice by Seller, if Seller submits a timely request to Buyer to appeal such decision, Buyer shall file an appeal. If Buyer appeals such decision, whether at its election or at Seller's request, any decision upon such appeal, if binding upon the Buyer under the Prime Contract, shall be binding upon the Buyer and Seller as it relates to this Subcontract. Appeals under the "Disputes" clause of the Prime Contract do not preclude consideration of questions of law in connection with decision(s) referenced above.

2. For any claims to be submitted under B.1. above in excess of $50,000, the Seller shall certify to the Buyer, as to its portion of the claim that: (a) the claim is made in good faith, (b) the supporting data are accurate to the best of the Seller's knowledge and belief, and (c) the amount requested accurately reflects the Subcontract adjustment for which the Seller believes the Government is liable.

3. If any such appeal is denied or otherwise decided adversely to Seller's interest, or if Seller is otherwise adversely affected by any decision made by any representative of the Government on any question of fact and/or law arising under the Prime Contract which is also related to this Subcontract, from which an appeal under the "Disputes" clause in the Prime Contract is not available, said decision, if binding upon Buyer under the Prime Contract, shall in turn be binding upon Buyer and Seller with respect to such question as it relates to this Subcontract; provided, however, if Seller is adversely affected by any such decision, and if Buyer elects not to bring suit against the Government with respect to such decision, Buyer shall notify Seller promptly. If Seller submits a timely request to Buyer to bring suit against the Government, Buyer shall start such suit. If Buyer brings suit against the Government with respect to any such decision, whether at its election or at Seller's request, a final judgment in any such suit, if binding upon Buyer under the Prime Contract shall in turn be binding upon Seller and Buyer under this Subcontract with respect to the question decided as it relates to this Subcontract.

4. If any such appeal or suit is taken or brought by Buyer, whether at its election or at Seller's request, Seller shall assist Buyer in its prosecution thereof in every

reasonable manner and Seller shall be afforded reasonable opportunity to participate in the prosecution thereof to the extent Seller's interest may be affected. To the extent requested by Buyer, Seller shall prosecute for Buyer any appeal or suit taken or brought at Seller's request and, in such event, Buyer shall assist Seller in every reasonable manner. All reasonable and approved costs and expenses incurred by Seller and Buyer in prosecuting any appeal or suit taken or brought solely at Seller's request shall be paid by Seller. Where possible, Buyer shall in good faith consult with Seller concerning the presentation to the Contracting Officer or other cognizant representatives of the Government of the questions referred to in paragraphs 1. and 3. above to the extent they may affect Seller's Interest.

5. If as a result of any decision or judgment which is binding upon Seller and Buyer, Buyer is unable to obtain reimbursement from the Government under the Prime Contract for, or is required to refund or credit to the Government any amount with respect to any item of cost or fee for which Buyer has reimbursed Seller, Seller shall, on demand, promptly repay such amount to Buyer.

6. The rights and obligations herein shall survive completion of and final payment under this Subcontract.

C. Provided, however, the Seller shall not be bound by any such Contracting Officer's decision, Appeal Board's decision, or judgment if such is not determinative of an obligation imposed upon the Seller under this Subcontract, or any amendment hereto.

D. Pending the resolution of any dispute, the Seller shall proceed as directed by Buyer in writing.

E. Buyer agrees to provide reasonable notice and assistance to Seller in any matter related to any claims and disputes under Article 1.

2. <u>ASSIGNMENT OF CLAIMS</u> (52.232-23)

A. The Seller shall not assign this Subcontract in whole or in part. Any monies due or to become due hereunder may be assigned, provided that such assignment shall not be binding upon Buyer until receipt of a copy of the assignment agreement is acknowledged and approved by the Buyer in writing.

B. Copies of this Subcontract or of any plans, specifications, or other similar documents relating to work under this Subcontract, if marked "Top Secret," "Secret" or "Confidential," shall not be furnished to any assignee of any claim arising under this Subcontract or to any other person not entitled to receive the same. However, a copy of any part or all of this Subcontract so marked may be furnished, or any information contained therein may be disclosed, to such assignee upon the prior written authorization of the Buyer.

3. <u>BANKRUPTCY</u>

In addition to the rights set forth in FAR 52.249-6, as incorporated into this Subcontract by Exhibit C, Buyer may terminate this Subcontract for default, in whole or in part, by written or telegraphic notice to Seller if:

(1) the Seller shall become insolvent or make a general assignment for the benefit of creditors; or

(2) a petition under any bankruptcy act or similar statute is filed by or against the Seller and not vacated within ten (10) days after it is filed.

4. BUYER FURNISHED PROPERTY

The rights and obligations of the Seller with respect to Buyer Furnished Property shall be the same as those which the Seller has with respect to Government Property under FAR 52.245-2, excluding Alternate I.

5. CONFIDENTIALITY

Buyer and Seller mutually agree that confidential information will be exchanged between Buyer and Seller. Confidential information includes, but is not limited to, proprietary technology, technical information and know-how. Buyer agrees to receive all such Seller's confidential information in confidence, not to use for its own benefit or for the benefit of a third party, without Seller's prior written consent. It is further understood that any information provided hereunder by Seller, remains the property of Seller, and on demand, any and all documents marked by Seller as "confidential" or "proprietary information", or with like captions indicating confidentiality of the information, shall be returned to Seller. Seller likewise agrees to receive such information in confidence from Buyer and not to use the information for its own benefit or for the benefit of any third party without Buyer's prior written consent. Seller further understands that all the information provided hereunder by Buyer, remains the property of Buyer, and on demand, any and all documents marked by Buyer as "confidential" or "proprietary information" or other caption indicating confidentiality of the information shall be returned to Buyer.

The parties understand that disclosure of confidential information does not carry with it any right or license to use or practice confidential information of the other party without written consent.

The foregoing obligations regarding confidentiality and non-use shall not apply to any information which:

(a) was previously known by a party, before receipt of the information from the other party;

(b) was independently developed by a third party, which a party reasonably believes, after inquiry, has the lawful right to disclose this information;

(c) is already available in the public domain, through no fault, action, or inaction of any of the parties; or

(d) was acquired at any time from a third party, expressly authorized by the party, to disclose the information.

This obligation of confidentiality shall remain in effect for fifteen (15) years. The government's acquisition and rights in technical data and computer software is as specified in Section 14 hereof.

6. CALENDAR DATES

All periods of days referred to in this Subcontract shall be measured in calendar days.

7. CHANGES (FAR 52.243-2)

Buyer's Engineering and Technical Personnel may, from time to time, render assistance or give technical advice to, or effect an exchange of information with Seller's personnel in a liaison effort concerning the items to be furnished hereunder. However, such exchange of information or advice shall not vest Seller with authority to change the items hereunder or the provisions of this Subcontract, nor shall any change in the items or provisions of this Subcontract be binding on Buyer unless specified as a change by the Buyer in accordance with procedures and requirements of FAR 52.243-2 entitled "Changes-Cost-Reimbursement," as modified and

incorporated by reference in Exhibit "C" into this Subcontract.

8. <u>CLAUSE HEADINGS</u>

The headings and subheadings of clauses contained herein are used for convenience and ease of reference and do not limit the scope or intent of the clause.

9. <u>COMPLIANCE WITH FEDERAL, STATE AND LOCAL LAWS</u>

Seller, as a contractor, will comply with all Federal, State, Municipal and local laws, rules and regulations that may be applicable to this Subcontract and, at the request of Buyer or the Government, Seller will furnish certificates to the effect that it has complied with said laws and regulations. Seller represents that it has complied and will continue to comply during the performance of this Subcontract with the provisions of the "Fair Labor Standards Act" of 1938, as amended, and the "Occupational Safety and Health Act" of 1970, and with the regulations and standards issued pursuant thereto.

10. [NOT USED]

11. <u>FALSE CLAIMS AND INDEMNITY</u>

The Seller shall indemnify the Buyer for any cost incurred and any payments made by the Buyer resulting from false claims submitted by the Seller under this Subcontract, or as a result of a Seller's misrepresentation of fact or fraud under appeals made by the Buyer or Seller under Article 1 entitled "Applicable Law and Disputes". The Buyer shall notify the Seller, in writing, of any allegations of a false claim, misrepresentation of fact or fraud to which this indemnity applies.

12. GOVERNMENT VISITS

The Government and/or its designated representative(s) shall be permitted to visit the Seller with respect to this Subcontract only after arrangements have been made with the Buyer's Project Director. Visits of a routine nature, e.g., audit and inspection are not covered by this article.

13. GRATUITIES (FAR 52.203-3)

A. The Buyer may, by written notice to the Seller, terminate the right of the Seller to proceed under this Subcontract if it is found that gratuities, (in the form of entertainment, gifts, or otherwise), were offered or given by the Seller, or any agent or representative of the Seller to any officer or employee of the Government or the Buyer with a view toward securing this Subcontract or securing favorable treatment with respect to the awarding or amending, or the making of any determinations with respect to the performing of this Subcontract; provided, that the existence of the facts upon which the Buyer makes such findings shall be in issue and may be reviewed in any competent court.

B In the event this Subcontract is terminated as provided in paragraph A. hereof, the Buyer shall be entitled to pursue the same remedies against the Seller as it could pursue in the event of a breach of the Subcontract by the Seller.

C. The rights and remedies of the Buyer provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Subcontract.

14. IDENTIFICATION OF DATA (FAR 52.227-14)

Technical Data, as defined in the "Rights in Technical Data and Computer Software" clause of the Prime Contract, delivered under this Subcontract shall be marked with the

Prime contract Number, this Subcontract Number, the Buyer's name, the Seller's name, and, if applicable, the name of the subcontractor who generated the data.

Seller restricted computer software subject to Paragraph (g)(i) of FAR 52.227-14 are listed below and as being restricted computer software:

- ABHITZEKESSEL (HRSG thermal design)
- ATTACH (design and analysis of structural steel attachments)
- BACKPASS (Convective heat transfer in Circofluid boilers)
- BASEPLT ()design and analysis of column base plates)
- BASICS (combustion system calculations)
- BEAMGRID (design and analysis of beam/floor platform systems)
- BPHT (convective heat transfer
- CREEP (analysis of creep in pressure parts)
- DRUDUR (pressure drop in headers)
- DRUMTHICK (design and analysis of boiler drums)
- FASTFIRE (furnace radiative heat transfer)
- FATIGUE (analysis of fatigue in pressure parts)
- FWHEATER (design and analysis of feedwater heaters)
- GASSER (fixed bed gasifier performance)
- GASVIBRA (gas-flow induced vibration analysis)
- GIRDER (design and analysis of built-up plate girders)
- HTBUNDLE (heat transfer water and evaporating steam duty bundles)
- KEDI (boiler diagnostics & design/analysis)
- LUG (design and analysis of structural steel lugs)
- METLTHICK (design and analysis of headers and other small pressure vessels)
- METSEL (metal selection for convective sections)
- NATCIR (natural circulation)
- Riley CAD system subroutines
- Riley $NO_x$ Prediction Computer program
- STACK (design and analysis of steel chimneys and stacks)
- TRD301A1 (cycling ability of pressure parts)
- VESLTHICK (design and analysis of pressure vessels)

Buyer shall provide the DOE Contracting Officer with advance written notification of Seller's designation of the above listed items as restricted computer software upon the execution of this Subcontract pursuant to Clause H.041C of the Prime Contract. The above listed restricted computer software shall not be subject to call-up by the DOE Contracting Officer, or an authorized representative of such Contracting Officer, or the Buyer pursuant to subsection (g)(3) of Clause FAR 52.227-14 or I.118 of the Prime Contract. The above listed restricted computer software may be inspected by the DOE Contracting Officer, or an authorized representative of such Contracting Officer, under subsection (j) of such Clause and such inspection shall be subject to appropriate provisions for confidentiality.

Seller limited rights data subject to Paragraph (g)(i) of FAR 52.227-14 are listed below as being limited rights data.

- Seller and its affiliates Gasifier design data not disclosed in U.S. Patents or published literature
- Heat Recovery Steam Generator (HRSG) design data not disclosed in U.S. Patents or published literature
- Hot Gas Filtration design data not disclosed in U.S. Patents or Published literature
- All Seller burner design data not disclosed in U.S. Patents or Published literature
- Seller Engineering and Drafting Standards
- Seller Construction Standards

Buyer shall provide the DOE Contracting Officer with advance written notification of Seller's designation of the above listed items as Limited rights data upon the execution of this Subcontract pursuant to Clause H.040A3 of the Prime Contract. The Buyer shall obtain the DOE Contracting Officer's agreement that the above limited rights data shall be listed as "Technical data not required to be delivered" pursuant to Clause H.040C of the Prime Contract and shall not be subject to call-up by the DOE Contracting Officer or the Buyer pursuant to subsection (g)(2) of the Clause, FAR 52.227-14 or Clause H.039A of the Prime Contract. The above listed limited rights data may be inspected by the DOE Contracting Officer, or an authorized representative of such Contracting Officer under subsection (j) of such Clause.

15. <u>INDUSTRIAL LAWS</u>

The Seller, in all matters relating to this Subcontract, shall be acting as an independent contractor. Neither the Seller nor any of the persons furnishing materials or performing work or services which are required by this Subcontract are employees of the Buyer within the meaning of or the application of any Federal or State Unemployment Insurance Law or other Social Security or any Workmen's Compensation, Industrial Accident Law or other Industrial or Labor Law. The Seller, at its own expense, shall comply with such laws, and assume all obligations imposed by any one or more of such laws with respect to this Subcontract.

16. <u>INVOICING AND PAYMENT</u>

A. Seller shall comply with the terms of Paragraph G.003c of the Prime Contract in preparing its invoices to Buyer.

B. All invoices shall be forwarded to Buyer at:

1041 E. Butler Road
P.O. Box 5456
Greenville, SC 20606-5456
Attention: Accounts Payable.

C. With the final invoice there shall be submitted the following:

1. A certification that invoices of all suppliers and subcontractors have been paid.

2. If applicable, three (3) completed copies of Royalty Report (DD Form 783) and Final Patent Report (DD Form 882) or equivalent forms.

3. A release discharging Buyer and the Government of and from any liabilities, obligations and claims arising out of or under this Subcontract.

Buyer agrees to pay all invoices within forty-five (45) days after submittal by Seller. Interest in accordance with FAR 52.232-25 "Prompt Payment" shall be applicable for late invoices. The Seller shall show the amount of foregone fee on his invoices on a percentage completion basis. No fee will be paid the Seller. Buyer is primarily liable for payment and payment is not contingent upon Buyer payment by DOE.

In the event a payment has not been made within sixty (60) days after an invoice has been submitted by Buyer, Seller has the right to suspend its work hereunder or terminate this agreement after ten (10) days' notice.

17. <u>MODIFICATION OF SUBCONTRACT</u>

This Subcontract contains all the agreements between the parties and no course of dealing or usage of the trade shall be applicable unless expressly incorporated in this Subcontract. The terms and conditions contained in this Subcontract may not be added to, modified, superseded or otherwise altered except by a written modification signed by an authorized representative of the Buyer's Procurement

Department and delivered by Buyer to Seller. Each shipment received by Buyer from Seller shall be deemed to be only upon the terms and conditions contained in this Subcontract notwithstanding any terms and conditions that may be contained in any invoice or other form of Seller, and notwithstanding Buyer's act of accepting or paying for any shipment or similar act of Buyer.

18. <u>NO WAIVER OF CONDITIONS</u>

Failure of Buyer to insist on strict performance shall not constitute a waiver of any of the provisions of this Subcontract or waiver of any other default of Seller.

19. <u>PACKAGING</u>

Unless otherwise specified in this Subcontract, the items required by the SOW shall be packed, pursuant to the Prime Contract, so as to assure safe arrival at destination in an undamaged condition under proper handling. Interior and exterior containers shall be marked with the Subcontract number.

20. [NOT USED]

21. <u>SELLER'S CERTIFICATION OF COST OR PRICING DATA AND KEY PERSONNEL AND PLACE OF PERFORMANCE</u>

A. If the amount of this Subcontract was expected to exceed $100,000 when entered into, the Seller has submitted, actually or by specific identification in writing, cost or pricing data.

B. Prior to the pricing of any Subcontract modification which involves aggregate increases and/or decreases in costs plus applicable profits expected to exceed $100,000, the Seller shall submit, actually or by specific identification in writing, cost or pricing data.

C. The submissions referenced in A. and B. above are not required where the price is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, or prices set by law or regulations.

D. With respect to A. above, the Seller has certified, and with respect to B. above, the Seller shall certify, in substantially the same form prescribed in Subsection 15.804--4 of , that to the best of Seller's knowledge and belief, the cost and pricing data submitted under A. and B. above is accurate, complete and current as of the date of agreement on the negotiated price of this Subcontract or Subcontract change or modification.

E. Sections F.005 and H.005 shall be modified to be the following:

F.0005 PRINCIPAL PLACE OF PERFORMANCE (APR 1984)

The principal place of performance shall be at Riley's research facility located in Worcester, Massachusetts and the Fort Martin Power Station located near Morgantown, West Virginia.

H.005 KEY PERSONNEL (APR 1986)

The Seller's key personnel are as follows:

| NAME | TITLE |
|---|---|
| Vijay Dixit | Project Manager |
| William Place | Manager, Advanced Technologies |
| Robert Lisauskas | Director, Research & Development |
| Charles Longfellow | Construction Manager |

The clause entitled "Key Personnel" contains a requirement for notification to the Project Director reasonably in advance of diverting of, or substitution for,

any of these individuals. That period of time shall not be less than thirty (30) days.

22. <u>SUBCONTRACT ADMINISTRATION</u>

Notwithstanding any other provisions of this Subcontract or any document referenced herein, the Buyer's Project Director is the only individual authorized to make the changes in or redirect the work required by this Subcontract. Where Buyer's approval is required under the terms of this Subcontract, it shall be construed to mean the approval of the Buyer's Project Director. In the event the Seller effects any change at the direction of any other person, the change will be considered as having been made without authority and an adjustment will not be made in the Subcontract estimated cost or fee or delivery schedule as a result thereof. No agreement or understanding will be binding on Buyer unless made in writing and signed by the Buyer's Project Director.

The Buyer's initial Project Director is Don Carson.

# EXHIBIT "C"

## PRIME CONTRACT CLAUSES INCORPORATED BY REFERENCE

PRIME CONTRACT CLAUSES INCORPORATED BY REFERENCE

(A) Part I, Section H, Articles H.034 (Safety and Health - November 1991), H.035(S) (Permits and Licenses - November 1991), H.036 (Environmental Protection - November 1991) and H.037 (Quality Assurance / Quality Control Program - November 1991) and the clauses of the Federal Acquisition Regulations (FAR) and of the Department of Energy FAR Supplement set forth in Part II - Section I of the Prime Contract are hereby incorporated by reference in this Subcontract. Contract Modification No. 003 to the Prime Contract is also hereby incorporated by reference in this Subcontract and is included as Exhibit "D". The obligations of the Contractor to the Government as provided in said clauses shall be deemed to be the obligations of the Seller to the Buyer only to the extent such obligations relate to the performance of the SOW in this Subcontract by the Seller. However, whenever said clauses include a requirement for the settlement of disputes between the parties in accordance with the "Disputes" clause, the dispute shall be disposed of in accordance with Article 1 entitled "Applicable Law and Disputes" of the General Conditions, Exhibit "B".

(B) Wherever necessary to make the context of the clauses set forth in this Exhibit "C" applicable to this Subcontract, the term "Contractor" shall mean Seller, the term "Contract" shall mean this Subcontract, and the term "Government", "Contracting Officer" and equivalent phrases shall mean Buyer, except the terms "Government" and "Contracting Officer" do not change: (1) In the phrases "Government Property", "Government-Furnished Property", "Government-Owned Property", "Government Equipment" and "Government-Owned Equipment", (2) When a right, act, authorization or

obligation can be granted or performed only by the Government or the Prime Contract Contracting Officer or his duly authorized representative, (3) When access to proprietary financial information, limited rights technical data, restricted rights computer software, or other proprietary data is required, (4) When title to property is to be transferred directly to the Government, (5) when the clause deals with the exercise of a right of the Government or the DOE Contracting Officer to terminate for convenience, disallows costs, or allocate patent or data rights. Buyer agrees not to issue consecutive stop orders or more than two stop orders.

# EXHIBIT "D"

## CONTRACT MODIFICATION NO. 003

## TO THE PRIME CONTRACT

Riley2
6/28/94

343

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE | OF PAGES

2. AMENDMENT/MODIFICATION NO: [illegible] 03
3. EFFECTIVE DATE: See Block 16C
4. REQUISITION/PURCHASE REQ NO: 21-94MC28202.501
5. PROJECT NO (If applicable)

6. ISSUED BY — CODE

U.S. Department of Energy
Morgantown Energy Technology Center
P.O. Box 880, ATTN: Laura E. Brandt
3610 Collins Ferry Road
Morgantown, WV 26507-0880

7. ADMINISTERED BY (If other than Item 6) — CODE

8. NAME AND ADDRESS OF CONTRACTOR (No, street, county, State and ZIP Code)

[illegible] Engineers, Inc.
1[illegible] East Butler Road
P. O. Box 5156
Greenville SC 29606-5456

CODE | FACILITY CODE

(X) 9A. AMENDMENT OF SOLICITATION NO

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO: DE-AC21-92MC28202

10B. DATED (SEE ITEM 13): September 30, 1992

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(X) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

[illegible] C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
DEAR 952.235-70 Key Personnel and Public Law 95-91

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, [X] is required to sign this document and return 2 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

(SEE PAGE 2 FOR DESCRIPTION)

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
Randolph L. Kesling
Chief, Acquisition and Assistance Bran

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY (Signature of Contracting Officer)

16C. DATE SIGNED

344

STANDARD FORM 30 (REV 10-83)

6/28/94

| STANDARD FORM 36B JULY 1966 GENERAL SERVICES ADMINISTRATION FED. PROC. REG. (41 CFR) 1-16.101 | CONTINUATION SHEET | REF. NO. OF DOC BEING CONTINUED DE-AC21-92MC28202 M003 | PAGE 2 | OF 2 |
|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
CRS Sirrine Engineers, Inc.

The purpose of this modification is to change the key personnel and incorporate the advance waiver of patent rights.

Accordingly, the Contract is hereby modified as follows:

A. Part I, Section H, Article H.005, KEY PERSONNEL (APR 1986)

Delete the name "Larry House" from the Contractor's key personnel and substitute with "Don Carson".

B. Part II, Section I, Contract Clauses

PATENT RIGHTS - LONG FORM is hereby deleted in its entirety and the attached ADVANCE WAIVER OF PATENT RIGHTS is substituted in lieu thereof.

C. All other terms and conditions in the contract remain unchanged and in full force and effect.

END OF MODIFICATION M003

345

# ADVANCE WAIVER OF PATENT RIGHTS

(a) <u>Definitions.</u>

(1) "Subject Invention" means any invention or discovery of the Contractor conceived or first actually reduced to practice in the course of or under this contract, and includes any art, method, process, machine, manufacture, design, or composition of matter, or any new and useful improvement thereof, or any variety of plants, whether patented or unpatented under the Patent Laws of the United States of America or any foreign country.

(2) "Contract" means any contract, grant, agreement, understanding, or other arrangement, which includes research, development, or demonstration work, and includes any assignment or substitution of parties.

(3) "Government agency" includes an executive department, independent commission, board, office, agency, administration, authority, Government corporation, or other Government establishment of the Executive Branch of the Government of the United States of America.

(4) "To the point of practical application" means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine and under such conditions as to establish that the invention is being worked and that its benefits are reasonably accessible to the public.

(5) "Patent Counsel" means the DOE Patent Counsel assisting the procuring activity.

(b) <u>Allocation of principal rights.</u>

(1) <u>Assignment to the Government.</u> The Contractor agrees to assign to the Government the entire right, title, and interest throughout the world in and to each Subject Invention, except to the extent that rights are waived to and retained by the Contractor under paragraphs (b) (2) and (c) of this clause.

(2) <u>Greater rights determinations.</u> The Contractor or the employee-inventor with authorization of the Contractor may request greater rights than the domestic and foreign patent rights provided in paragraph (c) of this clause on identified inventions in accordance with 41 CFR 9-9.109-6. Such requests must be submitted to Patent Counsel (with notification by Patent Counsel to the Contracting Officer) at the time of the first disclosure pursuant to paragraph (e) (2) of this clause, or not later than 9 months after conception or first actual reduction to practice, whichever occurs first, or such longer period as may be authorized by Patent Counsel (with notification by Patent Counsel to the Contracting Officer) for good cause shown in writing by the Contractor.

(c) Rights to the Contractor.

(1) Minimum Contractor license. The Contractor reserves an irrevocable, nonexclusive, paid-up license in each patent application filed in any country on a Subject Invention and any resulting patent in which the Government acquires title. The license shall extend to the Contractor's domestic subsidiaries and affiliates, if any, within the corporate structure of which the Contractor is a part and shall include the right to grant sublicenses of the same scope to the extent the Contractor was legally obligated to do so at the time the contract was awarded. The license shall be transferable only with approval of DOE except when transferred to the successor of that part of the Contractor's business to which the invention pertains.

(2) Election to retain waived rights.

(i) Subject to the provisions of paragraph (c) (3) and paragraph (d) of this clause, with respect only to a Subject Invention reported in accordance with paragraph (e) (2) (i) of this clause and with the written report of which is included an election as to whether the Contractor will retain the rights in the invention waived herein, the Contractor reserves the entire domestic right, title and interest in any United States patent application on the Subject Invention filed and any resulting United States patent secured by the Contractor.

(ii) Subject to the provisions of paragraph (c) (3) and paragraph (d) of this clause, with respect only to a Subject Invention reported in accordance with paragraph (e) (2) (i) of this clause and with the written report of which is included an election as to whether the Contractor will retain the rights in the invention waived herein and a statement specifying those foreign countries in which such rights will be retained, and subject to DOE security regulations and requirements, the Contractor reserves the entire right, title and interest in any foreign patent application on the Subject Invention filed and any resulting foreign patent secured by the Contractor in those foreign countries specified.

(3) Terms and Conditions of Waived Rights.

(i) Subject to the rights granted in paragraph (c) (1) of this clause, the Contractor agrees to convey to the Government, upon request, the entire domestic right, title, and interest in any Subject Invention when the Contractor:

(A) Does not elect pursuant to paragraph (c) (2) (i) of this clause to retain such rights;

(B) Fails to have a United States patent application filed on the invention in accordance with paragraph (d) (1) of this clause, or decides not to continue prosecution of such application; or

(C) At any time, no longer desires to retain title.

(ii) Subject to the rights granted in paragraph (c) (1) of this clause, the Contractor agrees to convey to the Government, upon request, the entire right, title, and interest in any Subject Invention in any foreign country if the Contractor:

(A) Does not elect pursuant to paragraph (c) (2) (ii) of this clause to retain such rights in the country; or

(B) Fails to have a patent application filed in the country on the Subject Invention in accordance with paragraph (d) (3) of this clause, or decides not to continue prosecution or to pay any maintenance fees covering the invention. To avoid forfeiture of the patent application or patent, the Contractor shall notify the Patent Counsel not less than 60 days before the expiration period for any action required by the foreign Patent Office.

(iii) Conveyances requested pursuant to paragraphs (c) (3) (i) and (c) (3) (ii) of this clause shall be made by delivering to the Patent Counsel duly executed instruments and such other papers as are deemed necessary to vest in the Government the entire right, title, and interest in the invention to enable the Government to apply for and prosecute patent applications covering the invention in this or the foreign country, respectively, or otherwise establish its ownership of the invention.

(iv) For each invention in which the Contractor initially elects pursuant to (c) (2) (i) or (c) (2) (ii) of this clause not to retain the rights waived, the Contractor shall inform the Patent Counsel promptly in writing of the date and identity of any on sale, public use, or public disclosure of the invention which may constitute a statutory bar under 35 USC 102, which was authorized by or known to the Contractor, or any contemplated action of this nature.

(v) Government License

With respect to any Subject Invention in which the Contractor retains title, the Federal Government shall have a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States the Subject Invention throughout the world.

(vi) Reporting on Utilization of Subject Inventions

The Contractor agrees to submit on request periodic reports no more frequently than annually on the utilization of a Subject Invention or on efforts at obtaining such utilization that are being made by the Contractor or its licensees or assignees. Such reports shall include information regarding the status of development, date of first commercial sale or use, gross royalties received by the Contractor, and such other data and information as DOE may reasonably specify. The Contractor also agrees to provide additional reports as may be requested by DOE in connection with any march-in proceeding undertaken by DOE in accordance with paragraph (c) (3) (viii) of this clause. To the extent data or information supplied under this paragraph is considered

by the Contractor, its licensee or assignee to be privileged and confidential and is so marked, DOE agrees that, to the extent permitted by 35 USC 202 (c) (5), it will not disclose such information to persons outside the Government.

(vii) Preference for United States Industry

Notwithstanding any other provision of this clause, the Contractor agrees that it will not grant to any person the exclusive right to use or sell any Subject Invention in the United States unless such person agrees that any products embodying the Subject Invention or produced through the use of the Subject Invention will be manufactured substantially in the United States. However, in individual cases, the requirement for such an agreement may be waived by DOE upon a showing by the Contractor or its assignee that reasonable but unsuccessful efforts have been made to grant licenses on similar terms to potential licensees that would be likely to manufacture substantially in the United States or that under the circumstances domestic manufacture is not commercially feasible.

(viii) March-in Rights

The Contractor agrees that with respect to any Subject Invention in which it has acquired title, DOE has the right in accordance with the procedures in 37 CFR 401.14 to require the Contractor, an assignee or exclusive licensee of a Subject Invention to grant a nonexclusive, partially exclusive, or exclusive license in any field of use to a responsible applicant or applicants, upon terms that are reasonable under the circumstances, and if the Contractor, assignee, or exclusive licensee refuses such a request, DOE has the right to grant such a license itself if DOE determines that:

(1) Such action is necessary because the Contractor or assignee has not taken, or is not expected to take within a reasonable time, effective steps to achieve practical application of the Subject Invention in such field of use;

(2) Such action is necessary to alleviate health or safety needs which are not reasonably satisfied by the Contractor, assignee, or their licensees;

(3) Such action is necessary to meet requirements for public use specified by federal regulations and such requirements are not reasonably satisfied by the Contractor, assignee, or licensees; or

(4) Such action is necessary because the agreement required by paragraph (c) (3) (vii) of this clause has not been obtained or waived or because a licensee of the exclusive right to use or sell any Subject Invention in the United States is in breach of such agreement.

(4) Terminations.

(i) Any waiver or retention of rights by the Contractor under paragraphs (b) (2), (c) (1), or (c) (2) of this clause may be terminated at the discretion of the Secretary or his designee, in whole or in part, if the

request for waiver or retention of rights by the Contractor is found to contain false material statements or nondisclosure of material facts, and such were specifically relied upon in reaching the waiver determination or the agreement to the retention of rights by the Contractor.

(ii) Any waiver of the rights retained in accordance with paragraph (c) (2), as applied to particular inventions, may be terminated at the discretion of the Secretary or his designee, in whole or in part, if the Contractor fails to comply with the provisions set forth in paragraph (c) (3) and paragraph (d) of this clause, and such failure is determined by the Secretary or his designee to be material and detrimental to the interests of the United States and the general public.

(iii) Prior to terminating any waiver of rights under paragraph (c) (4) (i) or (c) (4) (ii) of this clause, the Contractor will be given written notice of the intention to terminate the waiver of rights, the extent of such proposed termination and the reasons therefor, and a period of 30 days, or such longer period as the Secretary or his designee shall determine for good cause shown in writing, to show cause why the waiver of rights should not be so terminated.

(iv) All terminations of waivers of rights under paragraph (c) (4) (ii) shall be subject to the rights granted in paragraph (c) (1) of this clause, and termination shall normally be partial in nature, requiring the Contractor to grant nonexclusive or partially exclusive licenses to responsible applicants upon terms reasonable under the circumstances.

(5) Effective Date of Waivers

The waiver of rights in a Subject Invention shall be effective on the following dates:

(i) For advance waivers of identified inventions, i.e., inventions conceived prior to the effective date of the contract, on the effective date of the contract even though the advance waiver may have been requested after that date;

(ii) For identified inventions under advance waivers, i.e., inventions conceived or first actually reduced to practice after the effective date of the contract, on the date the invention is reported with the election to retain the waived rights in that invention; and

(iii) For waivers of identified inventions (other than under an advance waiver), on the date of the letter notifying the requestor that the waiver has been granted.

(d) Filing of patent applications.

(1) With respect to each Subject Invention in which the Contractor elects to retain domestic rights pursuant to paragraph (c) (2) (i) of this

clause, the Contractor shall have a domestic patent application filed on the invention within 6 months after submission of the invention disclosure pursuant to paragraph (e) (2) (i) of this clause, or such longer period of time as may be approved by the Patent Counsel for good cause shown in writing by the Contractor. For each identified invention, the rights in which are waived to the Contractor, the Contractor shall have a domestic patent application filed on the invention within 6 months after the waiver has become effective. With respect to the invention, the Contractor shall promptly notify the Patent Counsel of any decision not to file an application.

(2) For each Subject Invention on which a domestic patent application is filed by the Contractor, the Contractor shall:

(i) Within 2 months after the filing or within 2 months after submission of the invention disclosure if the patent application previously has been filed, deliver to Patent Counsel a copy of the application as filed including the filing date and serial number;

(ii) Within 6 months after filing the application or within 6 months after submitting the invention disclosure if the application has been filed previously, deliver to the Patent Counsel a duly executed and approved instrument fully confirmatory of all rights to which the Government is entitled, and provide DOE an irrevocable power to inspect and make copies of the patent application filed;

(iii) Provide the Patent Counsel with a copy of the patent within 2 months after a patent is issued on the application;

(iv) Not less than 30 days before the expiration of the response period for any action required by the Patent and Trademark Off notify the Patent Counsel of any decision not to continue prosecution c application and deliver to the Patent Counsel executed instruments granting the Government a power of attorney; and

(v) Include the following statement in the second paragraph of the specification of the application and any patents issued on a Subject Invention, "The Government of the United States of America has rights in this invention pursuant to Contract No. ______________ (or Grant No. ____________) awarded by the U. S. Department of Energy."

(3) With respect to each Subject Invention in which the Contractor has elected pursuant to paragraph (c) (2) (ii) of this clause to retain the patent rights waived in specified foreign countries, or in which the Contractor has obtained a waiver of foreign rights on an identified invention:

(i) The Contractor shall file a patent application on the invention in each specified foreign country in accordance with applicable statutes and regulations and within one of the following periods:

(A) Eight months from the date of filing a corresponding United States application, or if such an application is not filed, six months from the date the invention is submitted in a disclosure pursuant to paragraph (e) (2) (i) of this clause;

(B) Six months from the date a license is granted by the Commissioner of Patents and Trademarks to file the foreign patent application where such filing has been prohibited by security reasons; or

(C) Such longer period as may be approved by the Patent Counsel for good cause shown in writing by the Contractor.

(ii) The Contractor shall notify the Patent Counsel promptly of each foreign application filed and upon written request shall furnish an English version of the application without additional compensation.

(e) <u>Invention identification, disclosures, and reports.</u>

(1) The Contractor shall establish and maintain active and effective procedures to ensure that Subject Inventions are promptly identified and timely disclosed. Those procedures shall include the maintenance of laboratory notebooks or equivalent records and any other records that are reasonably necessary to document the conception and/or the first actual reduction to practice of Subject Inventions, and records which show that the procedures for identifying and disclosing the inventions are followed. Upon request, the Contractor shall furnish the Contracting Officer a description of these procedures so that he may evaluate and determine their effectiveness.

(2) The Contractor shall furnish the Patent Counsel (with notification by Patent Counsel to the Contracting Officer) on a DOE-approved form:

(i) A written report containing full and complete technical information concerning each Subject Invention within 6 months after conception or first actual reduction to practice whichever occurs first in the course of or under this contract, but in any event prior to any on sale, public use or public disclosure of such invention known to the Contractor. The report shall identify the contract and inventor and shall be sufficiently complete in technical detail and appropriately illustrated by sketch or diagram to convey to one skilled in the art to which the invention pertains a clear understanding of the nature, purpose, operation, and to the extent known, the physical, chemical, biological, or electrical characteristics of the invention. The report should also include any election of foreign patent rights under paragraph (c) (2) (ii) of this clause and any election of rights under paragraph (c) (2) (i) of this clause. Any requests for greater rights shall be made within the period set forth in paragraph (b) (2) of this clause. When an invention is reported under this paragraph (e) (2) (i), it shall be presumed to have been made in the manner specified in Section (a) (1) and (2) of 42 USC 5908 unless the Contractor contends it was not so made in accordance with paragraph (g) (2) (ii) of this clause.

(ii) Upon request, but not more than annually, interim reports on a DOE-approved form listing Subject Inventions and subcontracts awarded containing a Patent Rights clause for that period and certifying that:

(A) The Contractor's procedures for identifying and disclosing Subject Inventions as required by this paragraph (e) have been followed throughout the reporting period;

(B) All Subject Inventions have been disclosed or that there are no such inventions;

(C) All subcontracts containing a Patent Rights clause have been reported or that no such subcontracts have been awarded; and

(iii) A final report on a DOE-approved form within 3 months after completion of the contract work listing all Subject Inventions and all subcontracts awarded containing a Patent Rights clause and certifying that:

(A) All Subject Inventions have been disclosed or that there were no such inventions; and

(B) All subcontracts containing a Patent Rights clause have been reported or that no such subcontracts have been awarded.

(3) The Contractor shall obtain patent agreements to effectuate the provisions of this clause from all persons in its employ who perform any part of the work under this contract except nontechnical personnel, such as clerical employees and manual laborers.

(4) The Contractor agrees that the Government may duplicate and disclose Subject Invention disclosures and all other reports and papers furnished or required to be furnished pursuant to this clause. If the Contractor is to file a foreign patent application on a Subject Invention, the Government agrees, upon written request, to use its best efforts to withhold publication of such invention disclosures until the expiration of the time period specified in paragraph (d) (1) of this clause, but in no event shall the Government or its employees be liable for any publication thereof.

(f) <u>Publication.</u>

It is recognized that during the course of the work under this contract, the Contractor or its employees may from time to time desire to release or publish information regarding scientific or technical developments conceived or first actually reduced to practice in the course of or under this contract. In order that public disclosure of such information will not adversely affect the patent interests of DOE or the Contractor, patent approval for release or publication shall be secured from Patent Counsel prior to any such release or publication.

(g) Forfeiture of rights in unreported Subject Inventions.

(1) The Contractor shall forfeit to the Government, at the request of the Secretary or his designee, all rights in any Subject Invention which the Contractor fails to report to Patent Counsel (with notification by Patent Counsel to the Contracting Officer) within six months after the time the Contractor:

(i) Files or causes to be filed a United States or foreign patent application thereon; or

(ii) Submits the final report required by paragraph (e) (2) (iii) of this clause, whichever is later.

(2) However, the Contractor shall not forfeit rights in a Subject Invention if, within the time specified in (1) (i) or (1) (ii) of this paragraph (g), the Contractor:

(i) Prepared a written decision based upon a review of the record that the invention was neither conceived nor first actually reduced to practice in the course of or under the contract and delivers the same to Patent Counsel (with notification by Patent Counsel to the Contracting Officer); or

(ii) Contending that the invention is not a Subject Invention the Contractor nevertheless discloses the invention and all facts pertinent to this contention to the Patent Counsel (with notification by Patent Counsel to the Contracting Officer); or

(iii) Establishes that the failure to disclose did not result from the Contractor's fault or negligence.

(3) Pending written assignment of the patent applications and patents on a Subject Invention determined by the Secretary or his designee to be forfeited (such determination to be a final decision under the Disputes Clause of this contract), the Contractor shall be deemed to hold the invention and the patent applications and patents pertaining thereto in trust for the Government. The forfeiture provision of this paragraph (g) shall be in addition to and shall not supersede other rights and remedies which the Government may have with respect to Subject Inventions.

(h) Examination of records relating to inventions.

(1) The Contracting Officer or his authorized representative, until the expiration of 3 years after final payment under this contract, shall have the right to examine any books (including laboratory notebooks), records, documents, and other supporting data of the Contractor which the Contracting Officer or his authorized representative reasonably deem pertinent to the discovery or identification of Subject Inventions or to determine compliance with the requirements of this clause.

(2) The Contracting Officer or his authorized representative shall have the right to examine all books (including laboratory notebooks), records and documents of the Contractor relating to the conception or first actual reduction to practice of inventions in the same field of technology as the work under this contract to determine whether any such inventions are Subject Inventions, if the Contractor refuses or fails to:

(i) Establish the procedures of paragraph (e) (1) of this clause; or

(ii) Maintain and follow such procedures; or

(iii) Correct or eliminate any material deficiency in the procedures within thirty (30) days after the Contracting Officer notifies the Contractor of such a deficiency.

(i) <u>Withholding of payment (not applicable to subcontracts).</u>

(1) Any time before final payment of the amount of this contract, the Contracting Officer may, if he deems such action warranted, withhold payment until a reserve not exceeding $50,000 or 5 percent of the amount of this contract, whichever is less, shall have been set aside if in his opinion the Contractor fails to:

(i) Establish, maintain and follow effective procedures for identifying and disclosing Subject Inventions pursuant to paragraph (e) (1) of this clause; or

(ii) Disclose any Subject Invention pursuant to paragraph (e) (2) (i) of this clause; or

(iii) Deliver the interim reports pursuant to paragraph (e) (2) (ii) of this clause; or

(iv) Provide the information regarding subcontracts pursuant to paragraph (j) (5) of this clause; or

(v) Convey to the Government in a DOE-approved form the title and/or rights of the Government in each Subject Invention as required by this clause.

(2) The reserve or balance shall be withheld until the Contracting Officer has determined that the Contractor has rectified whatever deficiencies exist and has delivered all reports, disclosures, and other information required by this clause.

(3) Final payment under this contract shall not be made by the Contracting Officer before the Contractor delivers to Patent Counsel all disclosures of Subject Inventions and other information required by (e) (2) (i) of this clause, the final report required by (e) (2) (iii) of this clause, and Patent Counsel has issued a patent clearance certification to the Contracting Officer.



6/28/94

(4) The Contracting Officer may, in his discretion, decrease or increase the sums withheld up to the maximum authorized above. If the Contractor is a nonprofit organization, the maximum amount that may be withheld under this paragraph shall not exceed $50,000 or 1 percent of the amount of this contract, whichever is less. No amount shall be withheld under this paragraph while the amount specified by this paragraph is being withheld under other provisions of the contract. The withholding of any amount or subsequent payment thereof shall not be construed as a waiver of any rights accruing to the Government under this contract.

(j) Subcontracts.

(1) For the purpose of this paragraph the term "Contractor" means the party awarding a subcontract and the term "Subcontractor" means the party being awarded a subcontract, regardless of tier.

(2) The Contractor will include the Patent Rights clause of DEAR 952.227-71 suitably modified to identify the parties in all subcontracts, regardless of tier, for experimental, developmental or research work to be performed by a small business or a domestic nonprofit organization. In all other subcontracts, regardless of tier, for experimental, developmental demonstration, or research work, the Contractor shall include the Patent Rights article of 41 CFR 9-9.107-5(a) or 41 CFR 9-9.107-6 as appropriate, modified to identify the parties.

(3) Except as may be otherwise provided in this clause, the Contractor shall not, in any subcontract or by using a subcontract as consideration therefor, acquire any rights in its Subcontractor's Subject Invention for the Contractor's own use (as distinguished from such rights as may be required solely to fulfill the Contractor's contract obligations to the Government in the performance of this contract).

(4) All invention disclosures, reports, instruments, and other information required to be furnished by the Subcontractor to DOE, under the provisions of a Patent Rights clause in any subcontract hereunder may, in the discretion of the Contracting Officer, be furnished to the Contractor for transmission to DOE.

(5) The Contractor shall promptly notify the Contracting Officer in writing upon the award of any subcontract containing a Patent Rights clause by identifying the Subcontractor, the work to be performed under the subcontract, and the dates of award, and estimated completion. Upon the request of the Contracting Officer the Contractor shall furnish him a copy of the subcontract.

(6) The Contractor shall identify all Subject Inventions of the Subcontractor of which it acquires knowledge in the performance of this contract and shall notify the Patent Counsel (with notification by Patent Counsel to the Contracting Officer) promptly upon the identification of the inventions.

(7) It is understood that the Government is a third party beneficiary of any subcontract clause granting rights to the Government in Subject Inventions, and the Contractor hereby assigns to the Government all rights that the Contractor would have to enforce the Subcontractor's obligations for the benefit of the Government with respect to Subject Inventions. The Contractor shall not be obligated to enforce the agreements of any Subcontractor hereunder relating to the obligations of the Subcontractor to the Government regarding Subject Inventions.

(k) Background Patents.

(1) "Background Patent" means a domestic patent covering invention or discovery which is not a Subject Invention and which is owned or controlled by the Contractor at any time through the completion of this contract:

(i) Which the Contractor, but not the Government, has the right to license to others without obligation to pay royalties thereon, and

(ii) Infringement of which cannot reasonably be avoided upon the practice of any specific process, method, machine, manufacture, or composition of matter (including relatively minor modifications thereof) which is a subject of the research, development, or demonstration work performed under this contract.

(2) The Contractor agrees to and does hereby grant to the Government a royalty-free, nonexclusive license under any Background Patent for purposes of practicing a subject of this contract by or for the Government in research, development, and demonstration work only.

(3) The Contractor also agrees that upon written application by DOE, it will grant to responsible parties for purposes of practicing a subject of this contract in the United States nonexclusive licenses under any Background Patent on terms that are reasonable under the circumstances. If, however, the Contractor believes that exclusive or partially exclusive rights are necessary to achieve expeditious commercial development or utilization, then a request may be made to DOE for DOE approval of such licensing by the Contractor.

(4) Notwithstanding the foregoing paragraph (k) (3), the Contractor shall not be obligated to license any Background Patent if the Contractor demonstrates to the satisfaction of the Secretary or his designee that the Contractor or its licensees are supplying the subject matter covered by said Background Patent in sufficient quantity and at reasonable prices to satisfy U.S. market needs, or have taken effective steps or within a reasonable time are expected to take effective steps to so supply the subject matter.

(l) Atomic Energy.

(1) No claim for pecuniary award or compensation under the provisions of the Atomic Energy Act of 1954, as amended, shall be asserted by the Contractor or its employees with respect to any invention or discovery made or conceived in the course of or under this contract.

(2) Except as otherwise authorized in writing by the Contracting Officer, the Contractor will obtain patent agreements to effectuate the provisions of paragraph (1) (1) of this clause from all persons who perform any part of the work under this contract, except nontechnical personnel, such as clerical employees and manual laborers.

(m) Limitation of rights.

Nothing contained in this Patent Rights clause shall be deemed to give the Government any rights with respect to any invention other than a subject invention except as set forth in the Patent Rights clause of this contract.

(n) U.S. Competitiveness

The Contractor, as recipient of a waiver of the Governments' rights in subject inventions including any inventions disclosed and claimed in U.S. Patent Applications Serial No. 07/814,102 filed December 26, 1991 for "Process for Fixed Bed Coal Gasification" including Serial No. 07/565,039 for "Process and Apparatus for Fixed Bed Coal Gasification", or any continuation or divisional application or foreign counterpart of each of them agrees that it will not assign or otherwise transfer title to or grant exclusive licenses for such waived inventions without the specific written approval of the Assistant Secretary for Fossil Energy or his designee.

358

# EXHIBIT "E"

# SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX

## INTRODUCTION

### A. PURPOSE

This document, "Scope of Supply and Cost of Responsibility Matrix," has been prepared to define the Scope of Work to be performed by the Contractors and to specify the different types of responsibility undertaken by the individual contractors, and by others.

Items listed in each section are representative and not intended to be complete and all inclusive.

### B. ORGANIZATION OF DOCUMENT

The document is divided into eleven sections as follows:

Engineering
Procurement
Equipment
Construction Management
Site Related Items
Construction
Manuals, Training, Check-Out, Start-Up and Testing
Risk and Contingencies
Warranties
Permits and Inspections
Miscellaneous

6/28/94

359

## SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX - Cont'd

### C. DEFINITIONS

"Design Engineering" (D) means:

1. The Engineering analyses and calculations and the preparation of design drawings and/or specifications in accordance with design criteria (DC) and basic engineering requirements, as necessary to procure, construct, erect and install a building, structure or system in accordance with prudent utility engineering practice. Design engineering includes observation of shop tests and technical review of Bills of Materials and shippable components lists.

2. The preparation of specifications and/or drawings necessary to permit an established and competent manufacturer to supply equipment or components suitable for the given application in accordance with accepted engineering practice.

"Erection" (E) means:

The receipt, unloading, and storage of materials at the Site, installation/construction, grouting in place, cleaning, construction testing and preparing for service the equipment, system, facility or structure indicated. "Erection" (E) includes provision of consumables, field engineering and field fabrication, appropriate personnel, construction equipment and tools and any other material such as grouting, etc., that is only necessary for erection purposes. It includes storage and maintenance through completion of Task 9. For field-erected equipment and components, the Scope of Supply of consumables is included under "Erection".

"Establish Requirements" (ER) means:

Establishing the functional, quantitative and schedule requirements and other criteria, as appropriate, for construction facilities and services.

**SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX** - Cont'd

"Procurement" (P) denotes:

Supply of the item or system. This includes responsibilities such as soliciting bids, commercial bid evaluation, procurement, scheduling, ordering, processing of vendor information, quality control, and expediting of goods and services to meet the contractual schedules shipping to destination. Note: Riley provides all procurement services for the project.

"Prepare and Issue" (PI) means:

Preparing, collecting and issuing the documents and drawings described.

"Provide for as Required" (PR) means:

Furnishing, where applicable, all necessary personnel, materials, structures, equipment, consumable supplies, services, storage, operation required for check-out and maintenance to accomplish and/or complete the indicated facility, function or service.

## D. MISCELLANEOUS

1. The use of the singular or plural in this document is not definitive or contractually binding.

2. Unless the motor is segregated, the scope of all pumps, fans, and similar apparatus includes their respective motor.

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| ENGINEERING<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Engineering | D | D* | | *The gasifier and its attachments and the HRSG and its burners and attachments ("Riley furnished equipment"). |
| Design | D | D* | | *Riley furnished equipment. |
| Architectural | D | | | |
| Record Drawings | D | D | | Riley red-line drawings in field. |
| Design Documentation | D | D* | | *Riley furnished equipment. |
| Engineered Equipment Specs. | PR | PR* | | *Riley furnished equipment. |
| Vendor Engineering | ER | PR | | |
| Vendor Service Representatives | ER | PR | | |
| Construction Specs. | D,PI | | | |
| Equipment Lists | PI | PI | | Riley provide input to JSE for Riley furnished equipment. |
| Environmental Consult. Design Data | PR | P | | |
| Spare Parts Recommendation | PR | PR* | | *Riley furnished equipment. |
| Engineered Pipe Hangers | D | | | |
| Engineering QA/QC | PR | PR* | | *Riley furnished equipment. |

## SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX

| PROCUREMENT<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| **Equipment Procurement** | | | | |
| Prepare Specifications and/or Drawings | PI | PI* | | *Riley furnished equipment. |
| Prepare General and Special Conditions | | PI | | |
| Review and Approve Before Bid | PR | | PR | |
| Prepare and Solicit Bids | | PR | | |
| Tabulate and Recommend | PR | PR | | JSE-Technical<br>Riley - Commercial |
| Negotiate Terms and Conditions of Purchase | | PR | | |
| Review and Approve | PR | | PR | |
| Prepare Requisition (If Required) | | PI | | |
| Place Verbal Order | | PR | | |
| Prepare Purchase Order | | PI | | |
| External Distribution of Purchase Order | | PR | | |
| Expedite Vendor Drawings | | PR | | |
| Expedite Equipment Delivery | | PR | | |
| Process Vendor Prints and Manuals | PR | PR | | |
| Procurement Status Reports | | PI | | |
| Expedi ting Status Reports | | PI | | |
| **Construction/Installation Subcontractors** | | | | |
| Prepare Specifications and/or Drawings | PI | | | |
| Prepare General and Special Conditions | | PI | | |
| Review and Approve Before Bid | PR | | PR | |
| Prepare and Solicit Bids | | PR | | |

*Riley provides all procurement services for all equipment, materials, sub-contracts and all other items purchased for the project.

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| **PROCUREMENT (Cont'd)** <br> **Activity** | **JSE** | **Riley** | **DOE** | **Remarks** |
|---|---|---|---|---|
| Tabulate and Recommend | PR | PR | | |
| Review and Approve | PR | | PR | |
| Negotiate Terms and Conditions of Purchase | | PR | | |
| Prepare Requisition (If Required) | | PI | | |
| Place Verbal Order | | PR | | |
| Prepare Subcontract | | PI | | |
| External Distribution of Sucontract | | PR | | |
| Expedite Subcontractor Drawings | | PR | | |
| Expedite Subcontractor Prints and Manuals | | PR | | |
| Subcontract Status Reports | | PI | | |
| Expediting Status Reports | | PI | | |
| **Material Procurement** | | | | |
| Prepare Specifications | PI | | | |
| Prepare General and Special Conditions | | PI | | |
| Review and Approve Before Bid | PR | | PR | |
| Prepare and Solicit Bids | | PR | | |
| Tabulate and Recommend | | PR | | |
| Review and Approve Before Bid | PR | | PR | |
| Negotiate Terms and Conditions of Purchase | | PR | | |
| Prepare Requisition (If Required) | | PI | | |
| Place Verbal Order | | PR | | |
| Prepare Purchase Order | | PI | | |



364

***SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX***

| **PROCUREMENT (Cont'd.)**<br>**Activity** | **JSE** | **Riley** | **DOE** | **Remarks** |
|---|---|---|---|---|
| External Distribution of Purchase Order | | PR | | |
| Expedite Supplier Drawings | | PR | | |
| Expedite Material Delivery | | PR | | |
| Process Supplier Prints and Manuals | PR | PR | | |
| Material Status Reports | | PI | | |
| Expediting Status Reports | | PI | | |
| **Material Take-Offs** | | PR | | |
| | | | | |
| **ENGINEERED EQUIPMENT PURCHASE AND EXPEDITE SERVICES** | | P | | |

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| **EQUIPMENT** Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Diesel Fire Pump | D | P,E | | |
| Electric Fire Pump | | | | |
| Fuel Handling System | D | P,E | | |
| Gasifier | | D,P,E | | |
| HRSG | | D,P,E | | |
| Auxiliaries | D | P,E | | |
| Ash Handling System | D | P,E | | |
| Service Air System | D | P,E | | |
| Instrument Air System | D | P,E | | |
| Boiler Water Treatment System | D | P,E | | |
| Cooling Water System | | | | |
| Cooling Piping System | D | P,E | | |
| Electric Power Distribution and Control | D | P,E | | |
| Flue Gas Handling | D | P,E | | |
| Potable Water System | D | P,E | | Tie-in to Ft. Martin. |
| Waste Water System | D | P,E | | |
| Lighting Transformers | D | P,E | | |
| Service Panels | D | P,E | | |
| Special Systems | D | P,E | | |
| Unit Heaters | D | P,E | | |
| Exhaust Fans | D | P,E | | |
| Dust Suppression System | D | P,E | | |
| Sump Pumps | D | P,E | | |
| Hoists | D | P,E | | |
| Unitary Roof Top | D | P,E | | |
| Stacks, Flare | D | P,E | | |
| Field Fabricated Tanks | D | P,E | | |
| Bridge Crane | D | P,E | | |
| Shop Fabricated Tanks | D | P,E | | |
| DCS System | D | P,E | | |
| Heat Tracing | D | P,E | | |
| Hot Water Heaters | D | P,E | | |
| Eye Wash/Showers | D | P,E | | |
| Water Fountains | D | P,E | | |

Note: The items of equipment listed in this Equipment Section are representative and not intended to be all inclusive.

## SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX

| EQUIPMENT (Cont'd.) Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Instruments | D | P,E | | |
| Fire Protection | D | P,E | | |
| UPS | D | P,E | | |
| Fire Suppression | D | P,E | | |
| Spare Parts | | | | |
| Start-Up | PI | PR | | |
| Permanent | PI | PI* | PR | *Riley furnished equipment. |
| Special Tools for Erection | | PR | | |
| Miscellaneous Equipment | D | P,E | | |
| Vendor Erection Assistant | | PR | | |
| Vendor Start-up Assistant | | PR | | |

367

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| **CONSTRUCTION MANAGEMENT**<br>**Activity** | **JSE** | **Riley** | **DOE** | **Remarks** |
|---|---|---|---|---|
| Staff | | PR | | |
| Field Expenses | | PR | | |
| Trailers | | PR | | |
| Medical & Safety | | PR | | |
| Security | | PR | | |
| Clean-Up | | PR | | |
| Sirrine Staff | | | | |
| Offices | ER | PR | | |
| Office Furniture | ER | PR | | |
| Electricity | ER | PR | | |
| HVAC | ER | PR | | |
| Telephone | ER | PR | | |
| FAX | ER | PR | | |
| Reproduction | ER | PR | | |
| Print Machine | ER | PR | | |
| Training, CO, SU, & Testing Staff | ER | PR | | |
| Office Trailer with Conference Room | ER | PR | | |
| Office Furniture | ER | PR | | |
| Electricity | ER | PR | | |
| HVAC | ER | PR | | |
| Telephone | ER | PR | | |
| Warehouse Facilities | | PR | | |
| Equipment<br>Receiving | * | PR | | |
| Inspecting | * | PR | | |
| Warehouse (Adequate Storage) | * | PR 368 | | Size as required. |

*JSE to provide property management system documents.

***SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX***

| **CONSTRUCTION MANAGEMENT** (Cont'd) Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Maintenance | * | PR | | |
| Vendor Contact | | PR | | |
| QA/QC | | PR | | Riley - Fab and Construct |
| Scheduling | | | | |
| Engineering | PR | PR* | | *Riley furnished equipment. |
| Procurement | | PR | | |
| Construction | | PR | | |
| Consolidated | PR | | | |

369

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| SITE RELATED COSTS<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Site Survey | ER | PR | | |
| Geotechnical | | | | |
| Soil Borings | ER | PR | | |
| Soils Report | ER | PR | | |
| Soils Resistivity | ER | PR | | |
| Construction Testing | | | | |
| Soils Compaction | ER | PR | | |
| Concrete | ER | PR | | |
| Structural Steel | ER | PR | | |
| Welding | ER | (ER*) PR | | *Riley furnished equipment. |
| NDT | RE | (ER*) PR | | *Riley furnished equipment. |

370

***SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX***

| **CONSTRUCTION** Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| | | | | |
| Demolition | D | PR | | |
| Site Work | D | PR | | |
| Pile/Caissons | D | PR | | |
| Railroad Crossing | PI | PR | PR* | *DOE Contract with Conrail for crossing. |
| Paving/Surfacing | D | PR | | |
| Utilities | D | PR | | |
| Fencing | D | PR | | |
| Seeding/Landscaping | D | PR | | |
| Concrete | D | PR | | |
| Masonry | D | PR | | |
| Metals | | | | |
| Structural Steel | D | PR | | |
| Metal Joists | D | PR | | |
| Metal Decking | D | PR | | |
| Miscellaneous Metals | D | PR | | |
| Rough and Finish Carpentry | D | PR | | |
| Moisture-Thermal Control | | | | |
| Waterproofing | D | PR | | |
| Insulation | D | PR | | |
| Siding | D | PR | | |
| Roofing and Sheetmetal | D | PR | | |
| Joint Sealers | D | PR | | |
| Doors, Windows, Glass | D | PR | | |
| Architectural Finishes | D | PR | | |
| Specialties | D | PR | | |
| Equipment | D | PR | | |
| Furnishings | D | PR | | |
| Special Construction | D | PR | | |
| Pre-Engineered Structures | PI | PR | | |

## SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX

| CONSTRUCTION (Cont'd)<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Conveying Systems | D | PR | | |
| Mechanical | | | | |
| Piping | D | PR | | |
| Valves | D | PR | | |
| MOV | D | PR | | |
| Control | D | PR | | |
| Manual 2" and Under | D | PR | | |
| Manual Over 2" | D | PR | | |
| Specialty | D | PR | | |
| Expansion Joints | D | PR | | |
| Pipe Routing 2 " & Under | D | PR | | |
| Engineered Pipe Hangers | D | PR | | |
| Pipe Hangers | | PR | | |
| Piping Insulation | D | PR | | |
| Plumbing | D | PR | | |
| Fire Extinguishing System | D | PR | | |
| HVAC | D | PR | | |
| Equipment Erection | D | PR | | |
| Equipment Insulation | D | PR | | |
| Refractory | | PR | | |
| Insulation and Lagging | | PR | | |
| Electrical | D | PR | | |
| I&C Installation | D | PR | | |
| Switchyard | D | PR | | |
| Transmission Line | D | PR | | |
| Bulk Materials | | PR | | |
| Construction Water | | PR | | |
| Scaffold | | PR | | |
| Small Tools | | PR | | |
| Consumables | | PR | | |
| Equipment Rental & Maint. | | PR | | |
| Hydrostatic Testing | ER, PI | PR | | |
| Systems Flushing & Hydro Waste | ER, PI | PR | | |
| Initial Lube Fill | ER, PI | PR | | |

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| CONSTRUCTION (Cont'd<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Steam Blows | PI | PI | PR | |
| Silencer | PI | PI | PR | |
| Block Valves | PI | PI | PR | |
| Pipe | PI | PI | PR | |
| Labor | | | PR | |
| Chemical Cleaning | | | | |
| Gasifier | | PI | PR | |
| HRSG/Boiler | | PI | PR | |
| Feedwater/Condensate Piping | PI | | PR | |
| Chemical Disposal | | | PR | |
| Meggar & Hipot Cable | PI | PR | | |
| Rotate Motors | | PR | | |
| Instrumentation Calibration | | | | |
| Bench | | PR | | |
| In-Line | | PR | PR | |
| Initial Charge of Lubricants | | PR | | |
| Fuses, Lamps, Filters and Other Similar Consumable | | PR | | |
| Initial Charge of Resins and Desiccants | | PR | PR | |
| Initial Chemicals | | | PR | |
| Start-Up Gases | | | | |
| CEM Test Gas | | | PR | |
| Gasifier/HRSG Layup Gas | | PR | | |
| Chemicals | | | | |
| Boiler Layup | | PR | | If Required |
| DI Water | | PR | | If Required |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX

| MANUALS, TRAINING, CHECK-OUT, START-UP, AND TESTING<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| **Manuals** | | | | |
| Vendor O&M Manuals | PI | PR* | | *Riley furnished Eq. |
| O&M Manuals | PI | PI* | | *Riley furnished Eq. |
| Start-up Procedure Manual | PI | PI* | | *Riley furnished Eq. |
| Integrated | PI | PI* | | *Riley furnished Eq. |
| **Training** | | | | *Riley furnished Eq. |
| Training Manuals | PI | PI* | | *Riley furnished Eq. |
| Training Instruction | PI | PI* | | *Riley furnished Eq. |
| Lesson Plans | PI | PI* | | *Riley furnished Eq. |
| Lesson Prep. | PR | PR* | | *Riley furnished Eq. |
| Video Recording | | PR | PR | |
| Training Space | | | | |
| Operator Training | PR | PR* | | *Riley furnished Eq. |
| **Check-Out** | | | | |
| Personnel | | PR | | |
| Travel Expense | | PR | | |
| **Check-Out Procedures** | PI | PI | | Riley - Gasifier and HRSG |
| **Check-Out and Turnover** | | PR | | As defined in the pre-op test plan. |
| **Relay Settings** | D | PR | | |
| **Start-Up Procedures** | PI | PI | | Riley - Gasifier and HRSG |
| **Start-Up of Systems and Plant** | | PR* | | Thru Task 9 |
| **Mechanical Testing Procedures** | PI | PI | | |
| **Test Equipment** | D | PR | | As required in pre-op test plan. |
| **Performance Test** | | | | Not Required |
| **Performance Test Results** | | | | Not Required |
| **Operation and Maintenance Personnel** | | | PR | |

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| MANUALS, TRAINING, CHECK-OUT, START-UP, AND TESTING (Cont'd.)<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Permanent Power, Water Lubricants, Chemicals and Other Consumables After Initial Charge | | | PR | |
| Witness Certification of Emissions Monitoring Equipment | D | | PR | |
| Permanent Power, Fuel, Water for Check-Out, Start-Up and Testing | | | PR | |

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| RISK<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Liquidated Damages for Late Engineering | | | | None |
| Liquidated Damages For Late Vendor Engineering | | | | None |
| Liquidated Damages for Late Equipment Delivery | | | | None |
| Liquidated Damages for Late Construction | | | | None |
| All Guarantees of Plant Performance | | | | None |
| Buy Down on Plant Under Performance | | | | None |
| Noise Abatement | | | | None |



376

***SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX***

| WARRANTIES<br>Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Issue Warranty Claim | | | PR | |
| Review Warranty Claim | PR | PR | | |
| Approve Warranty Claim | PR | PR | | |
| Perform Warranty Work | | | | Note 1 |

Note: Financial responsibility for fixes rest with party responsible for warranty problem.



377

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| **PERMITS/INSPECTIONS** Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Permits | | | | |
| Building | | | PR | Also APS |
| Zoning | | | PR | |
| Air | | | PR | |
| Water | | | PR | |
| Historical/Arch | | | PR | |
| Erosion Control | PI | PR | PR | |
| Spill Prevention | | | PR | |
| Wet Lands Permit | | | PR | |
| Water Diversion | | | PR | |
| Steam Encroachment | | | PR | |
| Temp. Sewage Disposal | | PR | | |
| Highway | | | PR | |
| Sewage | | | PR | |
| Potable Water | | | PR | |
| Construction Wastes | | PR | | |
| Certificate of Occupancy | | PR | | |
| Plant/Boiler Operation | | | PR | |
| Operating | | | PR | |
| Ash Disposal | | | PR | |
| Mining | | | | N/A |
| Emissions Monitoring Equip. | PI | | PR | |
| Utility Disconnect | | | | N/A |
| Explosives | | PR | | |
| Coal/Ash Vehicles | | | PR | |
| Contractor's Permit | | PR | | |
| Inspections | | | | |
| Electrical | | PR | PI | |
| Plumbing | | PR | PI | |
| Boiler | | PR | | |
| Fire Protection | | PR | PI | |
| Calibration of Emissions Monitoring Equipment | | | PR | |
| Calibration of Utility Metering | | | PR | |
| Gas Fitting | | PR | | |
| | | | | |

## *SCOPE OF SUPPLY AND COST RESPONSIBILITY MATRIX*

| **MISCELLANEOUS** Activity | JSE | Riley | DOE | Remarks |
|---|---|---|---|---|
| Project Labor Agreement | | PR | | |
| Bonds | | | | Not Required |
| Payment | | PR | | As Required |
| Performance | | PR | | As Required |
| Insurance | | | | |
| Workers Comp. | PR | PR | | Responsible Party |
| Employer Liability | PR | PR | | Responsible Party |
| Com. Gen'l. Liability (Bodily Injury) | PR | PR | | Responsible Party |
| Com. Auto Liability (Bodily Injury and Property Damage) | PR | PR | | Responsible Party |
| Excess Liability | | | | Not Required |
| Builder's Risk | | | | Not Required |
| Replacement Cost | | | | |
| Com.Opns. Coverage | | | | |
| Delay Open. Coverage | | | | |
| Taxes | | | | |
| Sales Tax | | | | No Sales Tax on Government Contracts. |
| Registration | | | | |
| Engineered Equipment | | | | |
| Constr. Commodities | | | | |
| Constr. Expendables | | | | |
| Master Schedule | PR | PR | | Riley provides input to JSE. |
| Monthly Progress Report | PR | PR | | Riley provides input to JSE. |
| Project Procedure Manual | PR | PR | | Riley provides input to JSE. |
| Customs Broker/Tax Cons | | PR | | Responsible Party |
| Net Tariffs | | | | Not Required |
| Contractor's License | | PR | | |
| | | | | |
| | | | | |

# COST SHARING SUBCONTRACT

Under U.S. Department of Energy
Prime Contract No. DE-AC21-92MC28202

Between

**CRS SIRRINE ENGINEERS, INC.**
a South Carolina Corporation
having a place of business at
1041 East Butler Road
Greenville, SC 20606

and

**PSI POWERSERVE**
a Division of Physical Sciences Inc.
a Massachusetts Corporation
having a place of business at
20 New England Business Center
Andover, MA 01810

| | | |
|---|---|---|
| A. | Scope of Work: | Support of Gasifier Product Improvement Facility |
| B. | Estimated Cost: | Nine Hundred Four Thousand, Six Hundred and Twenty Five ($904,625) Dollars |
| C. | Delivery: | Commence on November 22, 1992 and completed by September 4, 1996 |

CoFixFee

380

# TABLE OF CONTENTS


| Article | | Page |
|---|---|---|
| 1 | Superseding Effect | 1 |
| 2 | Statement of Work | 1 |
| 3 | Cost Sharing Arrangement | 1 |
| 4 | Delivery | 2 |
| 5 | Transportation Data and Shipping Instructions | 2 |
| 6 | Inspection and Acceptance | 2 |
| 7 | Quality Control Requirements | 3 |
| 8 | Limitation of Funds | 3 |
| 9 | Overtime Premiums | 6 |
| 10 | Patent Rights | 6 |
| 11 | Documents Incorporated by Reference | 7 |
| 12 | Order of Precedence | 7 |
| 13 | Notices and Correspondence | 8 |
| 14 | Small Business Status | 8 |
| | Signatures | 8 |

Exhibit "A" Scope of Work

Exhibit "B" General Conditions

Exhibit "C" Prime Contract Clauses Incorporated by Reference

Exhibit "D" PSI Technology Company Proposal 1171 (20-Sep-93)

Exhibit "E" Task 4 Update -10 August, 1993

Exhibit "F" Letter of October 22, 1993 which modifies Exhibits "D" and "E"

# COST SHARING SUBCONTRACT

Under U.S. Department of Energy Prime Contract No. DE-AC21-92MC28202

THIS AGREEMENT MADE AS OF THE 22 DAY OF NOVEMBER, 1992.

Between

**CRS SIRRINE ENGINEERS, INC.**
a South Carolina Corporation
having a place of business at
1041 East Butler Road
Greenville, SC 20606
hereinafter referred to as "BUYER"

and

**PSI POWERSERVE**
a Division of Physical Sciences Inc.
a Massachusetts Corporation
having a place of business at
20 New England Business Center
Andover, MA 01810
hereinafter referred to as "SELLER"

WITNESSETH THAT:

IN CONSIDERATION OF the promises, mutual covenants and agreements herein contained, the parties hereto agree as follows:

CoFixFee

# COST SHARING SUBCONTRACT

1. SUPERSEDING EFFECT

A. This Subcontract supersedes all written or oral agreements, if any, and constitutes the entire agreement between the parties hereto with respect to this Subcontract.

B. All work performed by the Seller, actions taken, and payments made, if any, under any other prior written or oral agreements, with respect to this Subcontract, shall be deemed to have been work performed, actions taken, or payments made under this Subcontract.

2. STATEMENT OF WORK

The Seller shall furnish all the services, equipment, and materials necessary to support the design, construction, and pre-operational testing of a Gasifier Product Improvement Facility ("GPIF") as specifically described in Exhibit "A", Scope of Work ("SOW"), and as otherwise may be necessary to assist the Buyer in meeting the goals of Phase I of Prime Contract No. DE-AC21-92MC28202 between Buyer and the U.S. Department of Energy (the "Prime Contract"). Phase I includes the completion of nine (9) tasks as described in Exhibit "A". Should the Project proceed to Phase II, a contract modification for the Phase II effort will be negotiated if mutually agreeable to the Buyer and the Seller.

3. COST SHARING ARRANGEMENT

(52.216-7 and FAR 52.216-8)

A. In keeping with the Prime Contract, this Subcontract requires a 20% Cost Share by the Seller.

The Seller and Buyer agree to share the cost of the effort for Phase I as follows:

| | Buyer (80%) | Seller (20%) | Total (100%) |
|---|---|---|---|
| Phase I | $723,700.00 | $180,925.00 | $ 904,625.00 |

The Seller agrees that its share of any Subcontract cost over run will be at a 20% share. The Seller's cost share is being provided by PSI Environmental.

A more detailed breakdown of the estimated cost on a task-for-task basis is provided in Exhibit "D" PSIT Proposal No. 1171, dated Sept. 20, 1993 and as modified by Exhibit "F."

4. DELIVERY

The items, services and deliverable data required by this Subcontract shall be delivered in accordance with the respective dates specified in the SOW or per the mutually agreed upon dates required to support the Project Schedule.

5. TRANSPORTATION DATA AND SHIPPING INSTRUCTIONS.

All items furnished under this Subcontract shall be delivered F.O.B. Job Site. All shipments shall be made in accordance with the Prime Contract.

6. INSPECTION AND ACCEPTANCE

A. All work delivered under this Subcontract shall be inspected and accepted in accordance with the Prime Contract. Final inspection and acceptance will be at the job site.

B. A copy of this Subcontract shall be furnished by Seller to the Government Quality Assurance Representative who normally services Seller's plant or to the nearest cognizant Government Inspection Office.





384

In the event the Inspection Office or Representative cannot be located, the Buyer's Project Director must be notified immediately by Seller.

C. In the event Government source inspection and/or acceptance is required, the Seller shall notify the designated Government representative who normally services Seller's plant concurrent with the advance notification to Buyer.

D. The above paragraphs are not to be construed as a limitation of the rights of Buyer and the obligations of the Seller as provided for in this Subcontract.

7. QUALITY CONTROL REQUIREMENTS

The Seller shall provide and maintain a quality control system in accordance with the Prime Contract.

8. LIMITATION OF FUNDS (52.232-22)

A. It is estimated that the cost to the Buyer for the performance of this Subcontract will not exceed the estimated cost of Nine Hundred Four Thousand, Six Hundred and Twenty Five Dollars ($904,625) as set forth in Article 3.A. The Seller shall use its best efforts to perform the work specified in the SOW and all obligations under this Subcontract within such estimated cost.

B. The amount presently available for payment and allotted to this Subcontract and the period of performance which it is estimated the allotted amount will cover are as follows:

1. Allotted Amount $ 500,000
2 Period of Performance December 31, 1993



CoFixFee

385

It is contemplated that from time to time additional funds will be allotted to the Subcontract up to the full estimated cost set forth in Article 3.A.1., inclusive of any fee. The Seller shall perform or have performed work on this Subcontract up to the point at which the total amount paid and payable by the Buyer pursuant to the terms of this Subcontract approximates but does not exceed the total amount actually allotted to this Subcontract.

C. If at any time the Seller has reason to believe that the costs which he expects to incur in the performance of this Subcontract in the next succeeding sixty (60) days, when added to all costs previously incurred, will exceed seventy-five percent (75%) of the total amount then allotted to the Subcontract the Seller shall notify the Buyer in writing to that effect. The notice shall state the estimated amount of additional funds required to continue performance for the period set forth in 8.B.2. above. Sixty (60) days prior to the end of the period specified in 8.B.2. the Seller will advise the Buyer in writing as to the estimated amount of additional funds, if any, that will be required for the timely performance of the work under the Subcontract or for such further period as may be specified in this Subcontract or otherwise agreed to by the parties. If, after such notification, additional funds are not allotted by the end of the period set forth in 8.B.2. or an agreed date substituted therefor, the Buyer will, upon written request by the Seller, terminate this Subcontract pursuant to the provisions of the Termination clause, FAR 52.249-6, on such date. If the Seller in the exercise of his reasonable judgment, estimates that the funds available will allow him to continue to discharge his obligations hereunder for a period extending beyond such date, he shall specify the

later date in his request and the Buyer in his discretion, may terminate this Subcontract on that later date.

D. Except as required by other provisions of the Subcontract specifically citing and stated to be an exception from this clause, the Buyer shall not be obligated to reimburse the Seller for costs incurred in excess of the total amount from time to time allotted to the Subcontract and the Seller shall not be obligated to continue performance under the Subcontract (including actions under the Termination clause) or otherwise to incur costs in excess of the amount allotted to the Subcontract, unless and until the Buyer has notified the Seller in writing that such allotted amount has been increased and has specified in such notice an increased amount constituting the total amount then allotted to the Subcontract. To the extent the amount allotted exceeds the estimated cost set forth in 3.A, such estimated cost shall be correspondingly increased. No notice, communication or representation in any other form or from any person other than the Buyer's Project Director shall affect the amount allotted to this Subcontract. In the absence of the specified notice, the Buyer shall not be obligated to reimburse the Seller for any costs in excess of the total amount then allotted to the Subcontract whether those excess costs were incurred during the course of the Subcontract or as a result of termination. When and to the extent that the amount allotted to the Subcontract has been increased, any costs incurred by the Seller in excess of the amount previously allotted shall be allowable to the same extent as if such costs had been incurred after such increase in the amount allotted; unless the Buyer issues a termination or other notice and directs that the increase is solely for the purpose of covering termination or other specified expenses.

E. Change orders issued pursuant to the "Changes" clause of this Subcontract shall not be considered an authorization to the Seller to exceed the amount allotted in paragraph B.1. of this clause in the absence of a statement in the change order, or other Subcontract modification, increasing the amount allotted.

F. Nothing in this clause shall affect the right of the Buyer to terminate this Subcontract. In the event this Subcontract is terminated, the Buyer and the Seller shall negotiate an equitable distribution of all property produced or purchased under the Subcontract based upon the share of costs incurred by each.

9. <u>OVERTIME PREMIUMS</u> (52.222-2)

Insert in the blank space in paragraph (a) of FAR 52.222-2: "None".

10. <u>PATENT RIGHTS</u>

In accordance with a Letter of Intent of November 25, 1992, executed by officers of both Parties (hereby incorporated by reference), patent rights are allocated as follows contingent on the Buyer being awarded a waiver of patents by the DOE pursuant to modification to the Prime Agreement.

(i) all inventions of Buyer employees shall accrue to Buyer.

(ii) all inventions of Seller employees shall accrue to Seller, except that Seller shall assign all rights of such inventions to Buyer if the invention is an improvement in coal processing technology as exemplified by the PyGas® process.

An "invention" shall encompass any patentable technology developed during the term of this contract and will not encompass any patents or intellectual property owned by either Party before commencement of this contract.

11. DOCUMENTS INCORPORATED BY REFERENCE

The following documents are hereby incorporated by reference:

A. Exhibit "A" entitled "Scope of Work for PSIT."

B. Exhibit "B" entitled "General Conditions."

C. Exhibit "C" entitled "Prime Contract Clauses Incorporated by Reference."

D. Exhibit "D" entitled PSI Technology Company No. 1171 dated Sept. 20, 1993.

E. Exhibit "E" entitled "Task 4 Update - 10 August, 1993.

F. Exhibit "F" Letter of October 22, 1993.

12. ORDER OF PRECEDENCE

The following order of precedence shall govern in the event of a conflict between the documents of this Subcontract.

A. Articles 1 through 13 of this Subcontract

B. Exhibit "B" - General Conditions

C. Exhibit "C" - Prime Contract Clauses Incorporated by Reference

D. Exhibit "F" - Letter of October 22, 1993

E. Exhibit "A" - Scope of Work

F. Exhibit "D" - PSIT Proposal 1171

# EXHIBIT A: SCOPE OF WORK FOR PSIT

PSI Technology Company shall furnish all the services and material necessary to support the design, construction and pre-operational testing of a gasifier product improvement facility (GPIF). Support shall be provided to the phase of the program devoted to design of the coal gasifier subsystem and GPIF infrastructure.

## TASKS TO BE PERFORMED

### Task 1. National Environmental Policy Act Documentation

The Contractor shall assist CRSS in preparation of a draft environmental report, which provides the information described in the CRSS Statement of Work, "Information Required for the National Environmental Policy Act (NEPA)". This report shall be submitted to DOE-METC by CRSS within sixty (60) days.

The PSIT role shall be to (I ) evaluate the test coals expected to be utilized in the GPIF facility (Appalachian Bituminous Coals), (2) predict toxic metal partitioning, (3) assess the import of toxics on the local environment, and (4) predict the $NO_x$ emissions and the fate of other criteria pollutants. A draft of the PSIT contribution to the report shall be submitted to CRSS ten days before the required submission to DOE.

### Task 2. Work Plan

The contractor shall input to CRSS a detailed work plan for the performance of the PSIT support activities. This work plan shall include a description of the detailed steps to:

1) Identify technical issues related to NOx precursor reduction, ash measurement and control (including alkali, toxics and clinkers).

2) Describe the instruments / diagnostics to be reviewed, evaluated and recommended for application to GPIF.

### Task 3. Permit Information

The contractor has no requirements under the Prime Contract task.

### Task 4. Conceptual Design

The contractor shall assist CRSS in the conceptual design of the gasifier subsystem and the infrastructure required for the hot gas cleanup subsystem. PSIT shall provide a conceptual design for process monitors and controls (for temperature, NH3, volatile alkali, toxics, tar cracking, burning, etc.). The monitors will provide input to the DCS being designed by CRSS. The contractor

will also design concepts to minimize the release of $NH_3$, tars, alkali, toxic metals and clinkers. The exact nature of the activities in Task 4 are described in more detail in Exhibit E which is a recently submitted status report.

Through its subcontractor, PSI Environmental Instruments PSIT shall develop electro-optical instrumentation for incorporation into the GPIF process monitoring and control system. Specific instrumentation shall be developed to provide continuous monitoring of temperature and ammonia production in the process. Two instruments shall be developed.

PSI Environmental's patented multi-wavelength, optical temperature monitor (OTM) incorporates features that permit accurate and reliable measurement of temperature in a high-temperature hostile environment. This device has been demonstrated in commercial pulverized coat combustion applications. In this task, PSI Environmental shall adapt its OTM to the pressurized GPIF environment and its specific geometry.

Monitoring is complicated by the presence of other molecules that interfere with the ammonia signal. PSI Environmental is developing a continuous emission monitor for ammonia that has the sensitivity to monitor ammonia in the range of conditions expected for GPIF. This technology is based on the use of frequency modulated, near-infrared diode lasers. In this task, PSI Environmental shall develop and test a continuous emission monitor for ammonia specifically configured to the GPIF.

**Task 5. Bench-scale Technical Concept Studies**

The contractor shall perform bench-scale technical studies required to clarify design issues and uncertainties surrounding the innovative gasifier concept. These activities are described in more detail in Exhibit E. The contractor shall not perform bench-scale technical concept studies without prior approval by CRSS.

The Scope of PSIT's role will include modeling the upper gasifier gas flow, evaluating work at METC, and performing additional studies defined in the work plan to address design uncertainties. One example of work under this task will be to perform alkali and toxics partitioning experiments.

**Task 6. Preliminary Construction Design**

Upon approval of the conceptual design, CRSS will prepare a detailed construction design of the GPIF infrastructure and gasifier subsystem. PSIT will support this activity by providing an instrumentation and data acquisition plan. The contractor shall specify instruments, where they will be located and how they will interfere with the digital control system (DCS). They will specify the instrumentation and data acquisition requirements for input to the piping and instrument drawings. In addition, the

contractor will provide burner and instrument designs including drawings, functional specifications and material requirements. A design review of the interfacing with the host utility (including the CEM system interface) will also be performed. Again more detail on this subject is discussed in Exhibit E.

Based on testing of prototype continuous temperature and ammonia monitors for the GPIF, final design modifications shall be made by PSI Environmental Instruments. These designs are to be incorporated into the instruments to be delivered. Two OTM's and one ammonia monitor are to be delivered for eventual installation at the gasification facility.

**Task 7. Site Preparation / Construction**

The contractor shall have limited participation in this phase. The main participation will be to attend one project coordination meeting.

**Task 8. Pre-Operational Test Plan**

The contractor shall prepare a burner shakedown plan. As part of this plan, mechanical integrity, start-up (interlocks and permissions) and range of operability shall be addressed.

The contractor will also prepare an instrument shakedown plan defining checkout, calibration, and modification procedures.

PSIT,will also prepare a plan to measure $NH_3$, alkali, and air toxics.

The goal will be verify all calibrations as well as quantify values of these toxics.

**Task 9. Pre-Operational Testing**

The contractor will have limited involvement in the testing phase. PSI will be available to answer questions that involve the monitoring and control systems which they design. No on-site involvement is planned.

TABLE OF CONTENTS

EXHIBIT "B"

GENERAL CONDITIONS


| Article | | Page |
|---|---|---|
| 1 | Applicable Law and Disputes.......... | 1 |
| 2 | Assignment of Claims................ | 3 |
| 3 | Bankruptcy.......................... | 4 |
| 4 | Buyer Furnished Property............ | 4 |
| 5 | Buyer's Right To Use Information Disclosed by Seller............... | 5 |
| 6 | Calendar Dates...................... | 5 |
| 7 | Changes............................. | 5 |
| 8 | Clause Headings..................... | 5 |
| 9 | Compliance with Federal, State and Local Laws............... | 6 |
| 10 | Confidential Relationship........... | 6 |
| 11 | False Claims and Indemnity.......... | 6 |
| 12 | Government Visits................... | 7 |
| 13 | Gratuities.......................... | 7 |
| 14 | Industrial Laws..................... | 8 |
| 15 | Invoicing and Payment............... | 8 |
| 16 | Modification of Subcontract........ | 9 |
| 17 | No Waiver of Conditions............. | 9 |
| 18 | Packaging........................... | 10 |
| 19 | Price Reduction for Defective cost or Pricing Data............... | 10 |
| 20 | Seller's Certification of Cost or Pricing Data................... | 11 |
| 21 | Subcontract Administration.......... | 12 |


393

1. APPLICABLE LAW AND DISPUTES

A. Any disputes arising under this Subcontract solely between the Buyer and Seller shall be governed by the law of the State of South Carolina. However, if the issue in dispute is not covered by South Carolina law or if there is a conflict between South Carolina law and the Federal law, i.e., decisions of the Federal courts, regulations and statutes, the South Carolina court shall apply the Federal law. Any litigation under this Subcontract, if commenced by Seller, shall be brought in a Court of competent jurisdiction in the State of South Carolina.

B. 1. If a decision on a question of fact is issued by the Contracting Officer under the Prime Contract "Disputes" clause and the decision relates to this Subcontract, said decision, if binding upon the Buyer, under the Prime Contract, shall also be binding upon Buyer and Seller with respect to this Subcontract. However, if Seller is affected by such decision, and if Buyer elects not to appeal such decision under the "Disputes" clause of the Prime Contract, Buyer shall notify the Seller promptly. After receipt of such notice by Seller, if Seller submits a timely request to Buyer to appeal such decision, Buyer shall file an appeal. If Buyer appeals such decision, whether at its election or at Seller's request, any decision upon such appeal, if binding upon the Buyer under the Prime Contract, shall be binding upon the Buyer and Seller as it relates to this Subcontract. Appeals under the "Disputes" clause of the Prime Contract do not preclude consideration of questions of law in connection with decision(s) referenced above.

2. For any claims to be submitted under B.1. above in excess of $50,000, the Seller shall certify to the Buyer, as to its portion of the claim that: (a) the claim is made in good faith, (b) the supporting data are accurate to

the best of the Seller's knowledge and belief, and (c) the amount requested accurately reflects the Subcontract adjustment for which the Seller believes the Government is liable.

3. If any such appeal is denied or otherwise decided adversely to Seller's interest, or if Seller is otherwise adversely affected by any decision made by any representative of the Government on any question of fact and/or law arising under the Prime Contract which is also related to this Subcontract, from which an appeal under the "Disputes" clause in the Prime Contract is not available, said decision, if binding upon Buyer under the Prime Contract, shall in turn be binding upon Buyer and Seller with respect to such question as it relates to this Subcontract; provided, however, if Seller is adversely affected by any such decision, and if Buyer elects not to bring suit against the Government with respect to such decision, Buyer shall notify Seller promptly. If Seller submits a timely request to Buyer to bring suit against the Government, Buyer shall start such suit. If Buyer brings suit against the Government with respect to any such decision, whether at its election or at Seller's request, a final judgment in any such suit, if binding upon Buyer under the Prime Contract shall in turn be binding upon Seller and Buyer under this Subcontract with respect to the question decided as it relates to this Subcontract.

4. If any such appeal or suit is taken or brought by Buyer, whether at its election or at Seller's request, Seller shall assist Buyer in its prosecution thereof in every reasonable manner and Seller shall be afforded reasonable opportunity to participate in the prosecution thereof to the extent Seller's interest may be affected. To the extent requested by Buyer, Seller shall prosecute for Buyer any appeal or suit taken or brought at Seller's

request and, in such event, Buyer shall assist Seller in every reasonable manner. All costs and expenses incurred by Seller and Buyer in prosecuting any appeal or suit taken or brought solely at Seller's request shall be paid by Seller. Where possible, Buyer shall in good faith consult with Seller concerning the presentation to the Contracting Officer or other cognizant representatives of the Government of the questions referred to in paragraphs 1. and 3. above to the extent they may affect Seller's Interest.

5. If as a result of any decision or judgment which is binding upon Seller and Buyer, Buyer is unable to obtain reimbursement from the Government under the Prime Contract for, or is required to refund or credit to the Government any amount with respect to any item of cost or fee for which Buyer has reimbursed Seller, Seller shall, on demand, promptly repay such amount to Buyer.

6. The rights and obligations herein shall survive completion of and final payment under this Subcontract.

C. Provided, however, the Seller shall not be bound by any such Contracting Officer's decision, Appeal Board's decision, or judgment if such is not determinative of an obligation imposed upon the Seller under this Subcontract, or any amendment hereto.

D. Pending the resolution of any dispute, the Seller shall proceed as directed by Buyer in writing.

2. <u>ASSIGNMENT OF CLAIMS</u> (52.232-23)

A. The Seller shall not assign this Subcontract in whole or in part. Any monies due or to become due hereunder may be assigned, provided that such assignment shall not be

binding upon Buyer until receipt of a copy of the assignment agreement is acknowledged and approved by the Buyer in writing.

B. Copies of this Subcontract or of any plans, specifications, or other similar documents relating to work under this Subcontract, if marked "Top Secret," "Secret" or "Confidential," shall not be furnished to any assignee of any claim arising under this Subcontract or to any other person not entitled to receive the same. However, a copy of any part or all of this Subcontract so marked may be furnished, or any information contained therein may be disclosed, to such assignee upon the prior written authorization of the Buyer.

3. BANKRUPTCY

In addition to the rights set forth in FAR 52.249-6, Buyer may terminate this Subcontract for default, in whole or in part, by written or telegraphic notice to Seller if:

(1) the Seller shall become insolvent or make a general assignment for the benefit of creditors; or

(2) a petition under any bankruptcy act or similar statute is filed by or against the Seller and not vacated within ten (10) days after it is filed.

4. BUYER FURNISHED PROPERTY

The rights and obligations of the Seller with respect to Buyer Furnished Property shall be the same as those which the Seller has with respect to Government Property under FAR 52.245-2, excluding Alternate I.

5. <u>BUYER'S RIGHT TO USE INFORMATION DISCLOSED BY SELLER</u>

Unless otherwise expressly set forth in this Subcontract, Buyer shall have the right to use, for any purpose, unpatented information concerning Seller's products, manufacturing methods or processes which Seller shall disclose to Buyer during the performance of this Subcontract if such information is disclosed without restriction on further disclosure or use.

6. <u>CALENDAR DATES</u>

All periods of days referred to in this Subcontract shall be measured in calendar days.

7. <u>CHANGES</u> (52.243-2)

Buyer's Engineering and Technical Personnel may, from time to time, render assistance or give technical advice to, or effect an exchange of information with Seller's personnel in a liaison effort concerning the items to be furnished hereunder. However, such exchange of information or advice shall not vest Seller with authority to change the items hereunder or the provisions of this Subcontract, nor shall any change in the items or provisions of this Subcontract be binding on Buyer unless incorporated as a change in accordance with FAR 52.243-2 entitled "Changes-Cost-Reimbursement," incorporated by reference in Exhibit "C".

8. <u>CLAUSE HEADINGS</u>

The headings and subheadings of clauses contained herein are used for convenience and ease of reference and do not limit the scope or intent of the clause.

9. <u>COMPLIANCE WITH FEDERAL, STATE AND LOCAL LAWS</u>

Seller will comply with all Federal, State, Municipal and local laws, rules and regulations that may be applicable to this Subcontract and, at the request of Buyer or the Government, Seller will furnish certificates to the effect that it has complied with said laws and regulations. Seller represents that it has complied and will continue to comply during the performance of this Subcontract with the provisions of the "Fair Labor Standards Act" of 1938, as amended, and the "Occupational Safety and Health Act" of 1970, and with the regulations and standards issued pursuant thereto.

10. <u>CONFIDENTIAL RELATIONSHIP</u>

Unless the written consent of the Buyer is first obtained, Seller shall not in any manner advertise or publish or release for publication any statement mentioning Buyer or the fact that Seller has furnished or contracted to furnish to Buyer items and/or services required by this Subcontract, or quote the opinion of any employees of Buyer. Seller shall not disclose any information relating to this Subcontract to any person not authorized by Buyer to receive it. Seller shall only use information supplied by Buyer to accomplish work covered by this Subcontract and for no other purposes. Upon completion, or termination of this Subcontract all information is to be returned to Buyer upon Buyer's written request.

11. <u>FALSE CLAIMS AND INDEMNITY</u>

The Seller shall indemnify the Buyer for any cost incurred and any payments made by the Buyer resulting from false claims submitted by the Seller under this Subcontract, any violation of the terms of this subcontract or applicable regulations or as a result of a Seller's misrepresentation of fact or fraud under appeals made by the Buyer or Seller under Article 1 entitled "Applicable Law and Disputes". The

Buyer shall notify the Seller, in writing, of any allegations of a false claim, misrepresentation of fact or fraud to which this indemnity applies.

12. <u>GOVERNMENT VISITS</u>

The Government and/or its designated representative(s) shall be permitted to visit the Seller with respect to this Subcontract only after arrangements have been made with the Buyer's Project Director. Visits of a routine nature, e.g., audit and inspection are not covered by this article.

13. <u>GRATUITIES</u> (52.203-3)

A. The Buyer may, by written notice to the Seller, terminate the right of the Seller to proceed under this Subcontract if it is found that gratuities, (in the form of entertainment, gifts, or otherwise), were offered or given by the Seller, or any agent or representative of the Seller to any officer or employee of the Government or the Buyer with a view toward securing this Subcontract or securing favorable treatment with respect to the awarding or amending, or the making of any determinations with respect to the performing of this Subcontract; provided, that the existence of the facts upon which the Buyer makes such findings shall be in issue and may be reviewed in any competent court.

B In the event this Subcontract is terminated as provided in paragraph A. hereof, the Buyer shall be entitled to pursue the same remedies against the Seller as it could pursue in the event of a breach of the Subcontract by the Seller.

C. The rights and remedies of the Buyer provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Subcontract.

14. INDUSTRIAL LAWS

The Seller, in all matters relating to this subcontract, shall be acting as an independent contractor. Neither the Seller nor any of the persons furnishing materials or performing work or services which are required by this Subcontract are employees of the Buyer within the meaning of or the application of any Federal or State Unemployment Insurance Law or other Social Security or any Workmen's Compensation, Industrial Accident Law or other Industrial or Labor Law. The Seller, at its own expense, shall comply with such laws, and assume all obligations imposed by any one or more of such laws with respect to this Subcontract.

15. INVOICING AND PAYMENT

A. Seller shall comply with the terms of Paragraph G.003c of the Prime Contract in preparing its invoices to Buyer.

B. Seller shall provide the Buyer a Status Report and a Cost Management Report on a monthly basis. Other invoice backup will be available for DOE audit but will not be provided to the Buyer.

B. All invoices shall be forwarded to Buyer at:

1041 E. Butler Road
P.O. Box 5456
Greenville, SC 20606-5456
Attention: Accounts Payable.

C. With the final invoice there shall be submitted the following:

1. A certification that invoices of all suppliers and subcontractors have been paid.

2. If applicable, three (3) completed copies of Royalty Report (DD Form 783) and Final Patent Report (DD Form 882) or equivalent forms.

3. A release discharging Buyer and the Government of and from any liabilities, obligations and claims arising out of or under this Subcontract.

16. MODIFICATION OF SUBCONTRACT

This Subcontract contains all the agreements between the parties and no course of dealing or usage of the trade shall be applicable unless expressly incorporated in this Subcontract. The terms and conditions contained in this Subcontract may not be added to, modified, superseded or otherwise altered except by a written modification signed by the Buyer's Project Director and delivered by Buyer to Seller. Each shipment received by Buyer from Seller shall be deemed to be only upon the terms and conditions contained in this Subcontract notwithstanding any terms and conditions that may be contained in any invoice or other form of Seller, and notwithstanding Buyer's act of accepting or paying for any shipment or similar act of Buyer.

17. NO WAIVER OF CONDITIONS

Failure of Buyer to insist on strict performance shall not constitute a waiver of any of the provisions of this Subcontract or waiver of any other default of Seller.

18. <u>PACKAGING</u>

Unless otherwise specified in this Subcontract, the items required by the SOW shall be packed, pursuant to the Prime Contract, so as to assure safe arrival at destination in an undamaged condition under proper handling. Interior and exterior containers shall be marked with the Subcontract number.

19. <u>PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA</u>
(52.215-22/52.215--23)

A. If the Contracting Officer under Buyer's Prime Contract determines that any price including profit or fee, negotiated in connection with such Prime Contract, or any cost reimbursable under such Prime Contract was increased by any significant sums because Seller, or any subcontractor of the Seller, pursuant to the clauses of this Subcontract furnished incomplete or inaccurate cost or pricing data or data not current as certified in the Seller's Certificate of current Cost or Pricing Data and if such Prime contract price, including profit or fee, or any cost reimbursable under such Prime Contract, shall be reduced by reason thereof; then, in such event, the price negotiated in connection with this Subcontract, including profit or fee or any cost reimbursable hereunder, shall be reduced accordingly and this Subcontract shall be modified in writing to reflect such reduction, and any amount paid Seller by Buyer in excess of the amount due Seller under this Subcontract after said reduction is made shall be promptly paid by Seller to Buyer upon demand.

B. In the event of price reduction pursuant to paragraph A. above, Seller shall be bound by the determination of the Contracting officer, provided that Buyer shall have promptly notified Seller of the decision of the contracting officer reducing Buyer's Prime Contract price; and, if

timely requested by Seller, Buyer shall have appealed such decision in accordance with the "Applicable Law and Disputes" clause of this Subcontract and shall have taken such further action as may be required under that clause and this clause.

C. Excluded from such reduction, however, shall be the Buyer's burden and profit applied to defective cost and pricing data of Seller and its subcontractors and suppliers.

D. The terms of Paragraphs A, B and C shall be applicable to any modifications of this subcontract.

20. SELLER'S CERTIFICATION OF COST OR PRICING DATA

A. If the amount of this Subcontract was expected to exceed $100,000 when entered into, the Seller has submitted, actually or by specific identification in writing, cost or pricing data.

B. Prior to the pricing of any Subcontract modification which involves aggregate increases and/or decreases in costs plus applicable profits expected to exceed $100,000, the Seller shall submit, actually or by specific identification in writing, cost or pricing data.

C. The submissions referenced in A. and B. above are not required where the price is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, or prices set by law or regulations.

D. With respect to A. above, the Seller has certified, and with respect to B. above, the Seller shall certify, in substantially the same form prescribed in Subsection 15.804--4 of FAR, that to the best of Seller's

knowledge and belief, the cost and pricing data submitted under A. and B. above is accurate, complete and current as of the date of agreement on the negotiated price of this Subcontract or Subcontract change or modification.

21. <u>SUBCONTRACT ADMINISTRATION</u>

Notwithstanding any other provisions of this Subcontract or any document referenced herein, the Buyer's Project Director is the only individual authorized to make the changes in or redirect the work required by this Subcontract. Where Buyer's approval is required under the terms of this Subcontract, it shall be construed to mean the approval of the Buyer's Project Director. In the event the Seller effects any change at the direction of any other person, the change will be considered as having been made without authority and an adjustment will not be made in the Subcontract estimated cost or fee or delivery schedule as a result thereof. No agreement or understanding will be binding on Buyer unless made in writing and signed by the Buyer's Project Director.

The Buyer's initial Project Director is Larry House.

EXHIBIT "C"

PRIME CONTRACT CLAUSES INCORPORATED BY REFERENCE

PRIME CONTRACT CLAUSES INCORPORATED BY REFERENCE

(A) The clauses of the Federal Acquisition Regulations (FAR) and of the Department of Energy FAR Supplement set forth in Part II - Section I of the Prime Contract are hereby incorporated by reference in this Subcontract. The obligations of the Contractor to the Government as provided in said clauses shall be deemed to be the obligations of the Seller to the Buyer. However, whenever said clauses include a requirement for the settlement of disputes between the parties in accordance with the "Disputes" clause, the dispute shall be disposed of in accordance with Article 1 entitled "Applicable Law and Disputes" of the General Conditions, Exhibit "B".

(B) Wherever necessary to make the context of the clauses set forth in this Exhibit "C" applicable to this Subcontract, the term "Contractor" shall mean Seller, the term "Contract" shall mean this Subcontract, and the term "Government", "Contracting Officer" and equivalent phrases shall mean Buyer, except the terms "Government" and "Contracting Officer" do not change: (1) In the phrases "Government Property", "Government-Furnished Property", "Government-Owned Property", "Government Equipment" and "Government-Owned Equipment", (2) When a right, act, authorization or obligation can be granted or performed only by the Government or the prime contract Contracting officer or his duly authorized representative, (3) When access to proprietary financial information or other proprietary data is required, and (4) When title to property is to be transferred directly to the Government.

13. NOTICES AND CORRESPONDENCE

All notices and correspondence shall be sent by either party to the other in all matters dealing with this Subcontract to the following addresses:

A. To the Buyer: CRS Sirrine Engineers, Inc.
P.O. Box 5456
1041 East Butler Road
Greenville, SC 29606-5456
Attn: Larry House

B. To the Seller: PSI Technology Company
A Division of Physical Sciences, Inc.
20 New England Business Center
Andover, MA 01810
Attn: Randy B. Ewing

14. SMALL BUSINESS STATUS

Seller represents and warrants to Buyer that Seller is a small business concern as defined by applicable federal laws and regulations.

IN WITNESS WHEREOF, the parties hereto have executed this Subcontract as of the day and year first above written.

CRS SIRRINE ENGINEERS, INC.

Attest:

Vickie Bowman
Secretary

By: Larry S. House

PSI PowerServe
A Division of
PHYSICAL SCIENCES, INC.

Attest:

Carlene B. White
Secretary

By: Anthony N. [illegible]

 407

CoFixFee

EXHIBIT " D "

PSIT Proposal No. 1171

20 September 1993

PSI Technology Company

# CERTIFICATE OF CURRENT COST OR PRICING DATA

This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 15.801 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.804-2) submitted either actually or by specific identification in writing, to the contracting officer or the contracting officer's representative in support of PSIT Proposal No. 1171 are accurate, complete, and current as of 20 September 1993. This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.

FIRM: PSI Technology Company
A Division of Physical Sciences Inc.

NAME: Anthony N. Pirri

TITLE: President

SIGNATURE: Anthony N. Pirri

Date of Execution: 20 September 1993

A Division of Physical Sciences Inc.
20 New England Business Center Andover, MA 01810 Tel. (508)689-0003 Fax. (508)689-3232

PSIT NO. 1171 20-Sep-93

TITLE: Gasifier Process Improvement Facility

| Total All Tasks<br>COST ELEMENTS | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|
| Principal Research Scientist 1 | 135 | 18,034 |
| Principal Research Scientist 3 | 433 | 48,785 |
| Principal Research Scientist 4 | 1,307 | 131,595 |
| Principal Research Scientist 5 | 680 | 58,487 |
| Senior Instrumentation Specialist | 716 | 68,776 |
| Principal Scientist/Engineer 1 | 216 | 17,585 |
| Senior Scientist/Engineer 1 | 752 | 45,436 |
| Scientist/Engineer | 722 | 32,757 |
| A) BURDENED COSTS | | |
| 1. LABOR | 4,961 | 421,455 |
| 2. LAB CHARGE | | 4,510 |
| 3. TRAVEL | | 30,219 |
| 4. MATERIALS | | 49,894 |
| 5. COMPUTER | 20 | 346 |
| 6. SUBCONTRACTS/CONSULTANTS | | 372,400 |
| 7. FACILITIES CAPITAL COST OF MONEY | | 1,218 |
| TOTAL ESTIMATED COSTS: | | $880,042 |
| B) FEE/PROFIT (excludes FCCOM) | | $57,959 |
| C) TOTAL COST PLUS FIXED FEE | | $938,001 |
| D) COST SHARE (via PSI Environmental Corporation) | | ($187,601) |
| C) TOTAL COST TO SPONSOR | | $750,400 |

PSI fiscal year is from 1 July through 30 Jun

410

PSIT NO. 1171 — 20-Sep-93

TITLE: Gasifier Process Improvement Facility

Total PSI Technology Company

| COST ELEMENTS | | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|---|
| Principal Research Scientist 1 | | 135 | 18,034 |
| Principal Research Scientist 3 | | 433 | 48,785 |
| Principal Research Scientist 4 | | 1,307 | 131,595 |
| Principal Research Scientist 5 | | 680 | 58,487 |
| Senior Instrumentation Specialist | | 716 | 68,776 |
| Principal Scientist/Engineer 1 | | 216 | 17,585 |
| Senior Scientist/Engineer 1 | | 752 | 45,436 |
| Scientist/Engineer | | 722 | 32,757 |
| A) BURDENED COSTS | | | |
| 1. LABOR | | 4,961 | 421,455 |
| 2. LAB CHARGE | | | 4,510 |
| 3. TRAVEL | | | 30,219 |
| 4. MATERIALS | | | 49,894 |
| 5. COMPUTER | | 20 | 346 |
| 6. SUBCONTRACTS/CONSULTANTS | | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | | 1,165 |
| TOTAL ESTIMATED COSTS: | | | $507,589 |
| B) FEE/PROFIT (excludes FCCOM) | 10.0% | | $50,422 |
| C) TOTAL COST PLUS FIXED FEE | | | $558,011 |
| D) COST SHARE (via PSI Environmental Corporation) | | | $0 |
| C) TOTAL COST TO SPONSOR | | | $558,011 |

PSI fiscal year is from 1 July through 30 Jun

411

PSIT NO. 1171 | 20-Sep-93

TITLE: Gasifier Process Improvement Facility

Task 1: Nepa Report

| COST ELEMENTS | | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|---|
| Principal Research Scientist 1 | | 9 | 1,155 |
| Principal Research Scientist 3 | | 18 | 1,935 |
| Principal Research Scientist 4 | | 140 | 13,460 |
| Principal Research Scientist 5 | | 80 | 6,566 |
| Senior Instrumentation Specialist | | 0 | 0 |
| Principal Scientist/Engineer 1 | | 0 | 0 |
| Senior Scientist/Engineer 1 | | 0 | 0 |
| Scientist/Engineer | | 0 | 0 |
| A) BURDENED COSTS | | | |
| 1. LABOR | | 247 | 23,116 |
| 2. LAB CHARGE | | | 0 |
| 3. TRAVEL | | | 0 |
| 4. MATERIALS | | | 0 |
| 5. COMPUTER | | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | | 38 |
| TOTAL ESTIMATED COSTS: | | | $23,154 |
| B) FEE/PROFIT (excludes FCCOM) | 10.0% | | $2,312 |
| C) TOTAL COST PLUS FIXED FEE | | | $25,466 |
| D) COST SHARE (via PSI Environmental Corporation) | | | $0 |
| C) TOTAL COST TO SPONSOR | | | $25,466 |

PSI fiscal year is from 1 July through 30 Jun

412

PSIT NO. 1171 20-Sep-93

TITLE: Gasifier Process Improvement Facility

Task 2: Work Plan

| COST ELEMENTS | | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|---|
| Principal Research Scientist 1 | | 18 | 2,310 |
| Principal Research Scientist 3 | | 45 | 4,838 |
| Principal Research Scientist 4 | | 80 | 7,691 |
| Principal Research Scientist 5 | | 80 | 6,566 |
| Senior Instrumentation Specialist | | 16 | 1,467 |
| Principal Scientist/Engineer 1 | | 0 | 0 |
| Senior Scientist/Engineer 1 | | 0 | 0 |
| Scientist/Engineer | | 0 | 0 |
| A) BURDENED COSTS | | | |
| 1. LABOR | | 239 | 22,872 |
| 2. LAB CHARGE | | | 0 |
| 3. TRAVEL | | | 6,062 |
| 4. MATERIALS | | | 0 |
| 5. COMPUTER | | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | | 42 |
| TOTAL ESTIMATED COSTS: | | | $28,976 |
| B) FEE/PROFIT (excludes FCCOM) | 10.0% | | $2,894 |
| C) TOTAL COST PLUS FIXED FEE | | | $31,870 |
| D) COST SHARE (via PSI Environmental Corporation) | | | $0 |
| C) TOTAL COST TO SPONSOR | | | $31,870 |

PSI fiscal year is from 1 July through 30 Jun

413

PSIT NO. 1171 | 20-Sep-93

TITLE: Gasifier Process Improvement Facility

| Task 4: Conceptual Design<br>COST ELEMENTS | | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|---|
| Principal Research Scientist 1 | | 36 | 4,651 |
| Principal Research Scientist 3 | | 90 | 9,754 |
| Principal Research Scientist 4 | | 280 | 27,139 |
| Principal Research Scientist 5 | | 72 | 5,950 |
| Senior Instrumentation Specialist | | 280 | 25,884 |
| Principal Scientist/Engineer 1 | | 112 | 8,835 |
| Senior Scientist/Engineer 1 | | 72 | 4,116 |
| Scientist/Engineer | | 80 | 3,423 |
| A) BURDENED COSTS | | | |
| 1. LABOR | | 1,022 | 89,752 |
| 2. LAB CHARGE | | | 0 |
| 3. TRAVEL | | | 10,299 |
| 4. MATERIALS | | | 45,892 |
| 5. COMPUTER | | 20 | 346 |
| 6. SUBCONTRACTS/CONSULTANTS | | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | | 182 |
| TOTAL ESTIMATED COSTS: | | | $146,471 |
| B) FEE/PROFIT (excludes FCCOM) | 10.0% | | $14,556 |
| C) TOTAL COST PLUS FIXED FEE | | | $161,027 |
| D) COST SHARE (via PSI Environmental Corporation) | | | $0 |
| C) TOTAL COST TO SPONSOR | | | $161,027 |

PSI fiscal year is from 1 July through 30 Jun

414

PSIT NO. 1171 — 20-Sep-93

TITLE: Gasifier Process Improvement Facility

Task 5: Technical Concepts Studies

| COST ELEMENTS | | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|---|
| Principal Research Scientist 1 | | 36 | 4,929 |
| Principal Research Scientist 3 | | 190 | 21,794 |
| Principal Research Scientist 4 | | 325 | 33,353 |
| Principal Research Scientist 5 | | 360 | 31,527 |
| Senior Instrumentation Specialist | | 80 | 7,827 |
| Principal Scientist/Engineer 1 | | 40 | 3,340 |
| Senior Scientist/Engineer 1 | | 560 | 33,931 |
| Scientist/Engineer | | 280 | 12,677 |
| A) BURDENED COSTS | | | |
| 1. LABOR | | 1,871 | 149,378 |
| 2. LAB CHARGE | | | 4,510 |
| 3. TRAVEL | | | 0 |
| 4. MATERIALS | | | 4,002 |
| 5. COMPUTER | | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | | 662 |
| TOTAL ESTIMATED COSTS: | | | $158,552 |
| B) FEE/PROFIT (excludes FCCOM) | 10.0% | | $15,710 |
| C) TOTAL COST PLUS FIXED FEE | | | $174,262 |
| D) COST SHARE (via PSI Environmental Corporation) | | | $0 |
| C) TOTAL COST TO SPONSOR | | | $174,262 |

PSI fiscal year is from 1 July through 30 Jun

415

PSIT NO. 1171 20-Sep-93

TITLE: Gasifier Process Improvement Facility

Task 6: Detail Design

| COST ELEMENTS | | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|---|
| Principal Research Scientist 1 | | 18 | 2,464 |
| Principal Research Scientist 3 | | 45 | 5,176 |
| Principal Research Scientist 4 | | 280 | 28,724 |
| Principal Research Scientist 5 | | 8 | 701 |
| Senior Instrumentation Specialist | | 200 | 19,567 |
| Principal Scientist/Engineer 1 | | 32 | 2,673 |
| Senior Scientist/Engineer 1 | | 40 | 2,423 |
| Scientist/Engineer | | 120 | 5,433 |
| A) BURDENED COSTS | | | |
| 1. LABOR | | 743 | 67,161 |
| 2. LAB CHARGE | | | 0 |
| 3. TRAVEL | | | 0 |
| 4. MATERIALS | | | 0 |
| 5. COMPUTER | | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | | 116 |
| TOTAL ESTIMATED COSTS: | | | $67,277 |
| B) FEE/PROFIT (excludes FCCOM) | 10.0% | | $6,682 |
| C) TOTAL COST PLUS FIXED FEE | | | $73,959 |
| D) COST SHARE (via PSI Environmental Corporation) | | | $0 |
| C) TOTAL COST TO SPONSOR | | | $73,959 |

PSI fiscal year is from 1 July through 30 Jun

PSIT NO. 1171 20-Sep-93

TITLE: Gasifier Process Improvement Facility

| Task 7: Site Preparation/Construction<br>COST ELEMENTS | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|
| Principal Research Scientist 1 | 0 | 0 |
| Principal Research Scientist 3 | 0 | 0 |
| Principal Research Scientist 4 | 62 | 6,516 |
| Principal Research Scientist 5 | 0 | 0 |
| Senior Instrumentation Specialist | 0 | 0 |
| Principal Scientist/Engineer 1 | 0 | 0 |
| Senior Scientist/Engineer 1 | 0 | 0 |
| Scientist/Engineer | 62 | 2,875 |
| A) BURDENED COSTS | | |
| 1. LABOR | 124 | 9,391 |
| 2. LAB CHARGE | | 0 |
| 3. TRAVEL | | 7,953 |
| 4. MATERIALS | | 0 |
| 5. COMPUTER | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | 17 |
| TOTAL ESTIMATED COSTS: | | $17,361 |
| B) FEE/PROFIT (excludes FCCOM) 10.0% | | $1,725 |
| C) TOTAL COST PLUS FIXED FEE | | $19,086 |
| D) COST SHARE (via PSI Environmental Corporation) | | $0 |
| C) TOTAL COST TO SPONSOR | | $19,086 |

PSI fiscal year is from 1 July through 30 Jun

417

PSIT NO. 1171 20-Sep-93

TITLE: Gasifier Process Improvement Facility

| Task 8: Pre-Op Test Plan<br>COST ELEMENTS | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|
| Principal Research Scientist 1 | 18 | 2,525 |
| Principal Research Scientist 3 | 45 | 5,288 |
| Principal Research Scientist 4 | 80 | 8,407 |
| Principal Research Scientist 5 | 80 | 7,177 |
| Senior Instrumentation Specialist | 80 | 8,018 |
| Principal Scientist/Engineer 1 | 32 | 2,737 |
| Senior Scientist/Engineer 1 | 80 | 4,966 |
| Scientist/Engineer | 120 | 5,566 |
| A) BURDENED COSTS | | |
| 1. LABOR | 535 | 44,684 |
| 2. LAB CHARGE | | 0 |
| 3. TRAVEL | | 3,159 |
| 4. MATERIALS | | 0 |
| 5. COMPUTER | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | 81 |
| TOTAL ESTIMATED COSTS: | | $47,924 |
| B) FEE/PROFIT (excludes FCCOM) 10.0% | | $4,760 |
| C) TOTAL COST PLUS FIXED FEE | | $52,684 |
| D) COST SHARE (via PSI Environmental Corporation) | | $0 |
| C) TOTAL COST TO SPONSOR | | $52,684 |

PSI fiscal year is from 1 July through 30 Jun

PSIT NO. 1171 20-Sep-93

TITLE: Gasifier Process Improvement Facility

Task 9: Pre-Op Testing

| COST ELEMENTS | | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|---|
| Principal Research Scientist 1 | | 0 | 0 |
| Principal Research Scientist 3 | | 0 | 0 |
| Principal Research Scientist 4 | | 60 | 6,305 |
| Principal Research Scientist 5 | | 0 | 0 |
| Senior Instrumentation Specialist | | 60 | 6,013 |
| Principal Scientist/Engineer 1 | | 0 | 0 |
| Senior Scientist/Engineer 1 | | 0 | 0 |
| Scientist/Engineer | | 60 | 2,783 |
| A) BURDENED COSTS | | | |
| 1. LABOR | | 180 | 15,101 |
| 2. LAB CHARGE | | | 0 |
| 3. TRAVEL | | | 2,746 |
| 4. MATERIALS | | | 0 |
| 5. COMPUTER | | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | | 27 |
| TOTAL ESTIMATED COSTS: | | | $17,874 |
| B) FEE/PROFIT (excludes FCCOM) | 10.0% | | $1,783 |
| C) TOTAL COST PLUS FIXED FEE | | | $19,657 |
| D) COST SHARE (via PSI Environmental Corporation) | | | $0 |
| C) TOTAL COST TO SPONSOR | | | $19,657 |

PSI fiscal year is from 1 July through 30 Jun

PSIT NO. 1171 20-Sep-93

TITLE: Gasifier Process Improvement Facility

PSI Environmental Instruments Corporation

| COST ELEMENTS | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|
| Principal Research Scientist 1 | 0 | 0 |
| Principal Research Scientist 3 | 0 | 0 |
| Principal Research Scientist 4 | 0 | 0 |
| Principal Research Scientist 5 | 0 | 0 |
| Senior Instrumentation Specialist | 0 | 0 |
| Principal Scientist/Engineer 1 | 0 | 0 |
| Senior Scientist/Engineer 1 | 0 | 0 |
| Scientist/Engineer | 0 | 0 |
| A) BURDENED COSTS | | |
| 1. LABOR | 0 | 0 |
| 2. LAB CHARGE | | 0 |
| 3. TRAVEL | | 0 |
| 4. MATERIALS | | 0 |
| 5. COMPUTER | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | 372,400 |
| 7. FACILITIES CAPITAL COST OF MONEY | | 53 |
| TOTAL ESTIMATED COSTS: | | $372,453 |
| B) FEE/PROFIT (excludes FCCOM) 2.0% | | $7,537 |
| C) TOTAL COST PLUS FIXED FEE | | $379,990 |
| D) COST SHARE (via PSI Environmental Corporation) | | ($187,601) |
| C) TOTAL COST TO SPONSOR | | $192,389 |

PSI fiscal year is from 1 July through 30 Jun

420

PSI Environmental Instruments Corporation 20-Sep-93

TITLE: Gasifier Process Improvement Facility

| Total to PSI Technology Company<br>COST ELEMENTS | GRAND TOTAL HOURS | GRAND TOTAL $$$$$ |
|---|---|---|
| President | 0 | 0 |
| Director, Product Development | 890 | 79,579 |
| Lead Product Development Engineer | 1,270 | 84,273 |
| Mechanical Engineer or Something or other | 1,270 | 76,171 |
| Manufacturing Engineer | 120 | 6,150 |
| Product Development Engineer | 743 | 37,554 |
| A) BURDENED COSTS | | |
| 1. LABOR | 4,293 | 283,727 |
| 2. LAB CHARGE | | 0 |
| 3. TRAVEL | | 3,422 |
| 4. MATERIALS | | 35,000 |
| 5. COMPUTER | 0 | 0 |
| 6. SUBCONTRACTS/CONSULTANTS | | 0 |
| 7. FACILITIES CAPITAL COST OF MONEY | | 0 |
| TOTAL ESTIMATED COSTS: | | $322,149 |
| B) FEE/PROFIT (excludes FCCOM) 0.0% | | $0 |
| C) TOTAL COST PLUS FIXED FEE | | $322,149 |
| D) COST SHARE | | ($161,075) |
| C) TOTAL COST TO SPONSOR | | $161,074 |

EIC fiscal year is from 1 July through 30 Jun

EXHIBIT "E"
TASK 4 UPDATE - 10 AUGUST, 1993

Purpose of Report

The role of PowerServe in the GPIF design involves four GPIF subsystems:

- Alkali and Trace Metal Control
- Clinker Control
- Tars and $NH_3$ Control
- Monitoring and Instrumentation for the gasifier.

The activities of PowerServe in Tasks 4 to 6 are:

Task 4

- Provide subsystem functional descriptions and cost estimates
- Assist Riley and CRSS with control philosophy and conceptual design
- Provide input into gasifier design
- Define design deficiencies and plan of action

Task 5

- Conduct technical concept studies to address the GPIF design and operational issues for the PowerServe subsystems
- Develop and test in-situ monitors and extractive systems

Task 6

- Provide procurement and installation specifications for subsystems based on Task 5 results
- Assist with gasifier and control system detailed design
- Contribute to quality assurance plan

This report summarizes the work performed in Task 4 relevant to the gasifier cost estimate. In the case of the first three subsystems (Alkali/Trace Metals, Clinker, Tars and $NH_3$ Control), the information in this report defines the constraints the control subsystems will have on the overall design. A significant amount of information is required in these developmental areas before the design is finalized. The required information includes data from Task 5 studies which cannot be planned until we receive the preliminary design of the gasifier subsystem. These information deficiencies are pointed out in each section, and plans to acquire and use the information given.

Each section begins with a description of the design problem to be addressed and a general description of the approach taken in Task 4. Then there is a description of how the subsystem design will affect the overall gasifier cost.

Design Input of Alkali and Trace Metal Control

The objective of the alkali and trace metal work is to design the GPIF facility with the ability to measure alkali and trace metal concentrations and to ensure that the flexibility exists to test alkali control schemes developed by PowerServe, METC, or CRSS.

The PyGas design is unique in its ability to capture alkali and trace metals. Most gasification systems will cool the gas to condense alkali and remove the resulting particulate with candle or cross flow filters. In the GPIF facility, the majority of the alkali are released in the pyrolyzer and upper gasifier. In the downward flowing bed, the temperature is ideal for capture of these species due to contact and reaction with aluminosilicates in the ash or with limestone. The possibility exists to increase this capture by recycling ash or adding sorbents to the coal feed stream.

Thus, the control system envisaged involves injecting sorbent into the bed via the coal feed or the limestone feed system. The main design features that will affect the amount of alkalis and trace metals captured are,

- the amount of sorbent
- the sorbent surface area and adsorption activity
- the contact time available in the upper bed region
- the concentration of water vapor and HCl in the gases
- temperature profile in upper bed.

Previous research has shown the ability of clays and other minerals found in coal to capture alkali and trace metals. However, not enough work exists at conditions similar to those expected to be found in the GPIF facility. Therefore, there is a significant amount of work required in Task 5 to gather data on this system, including:

- Determination of the alkali and trace metal emissions during gasification
- Determination of the effect of operating conditions on emissions and capture
- Determination of the rate and capacity of char, ash, recycled bottom ash, and clay as sorbents for emissions control
- Use of the rate and capacity data to define the temperature, residence time, and sorbent concentration requirements to control alkalis and trace metals in the co-flowing bed region

The overall control approach relies on a definition of gasifier design and operating conditions required to minimize emissions, combined with the addition of sorbents, if necessary.

The gasifier design objectives addressed in Task 4 were:

- Determine the amount of sorbent to be added
- Determine the effect of sorbent addition on the solids handling equipment
- Develop a strategy to utilize the data generated in the Task 5 studies
- Make preliminary estimates of the design constraints on the co-flow region with respect to alkali and trace metal control.

**Sorbent Feed Rate:** Because the tests in Task 5 are designed to define the kinetics of the reaction of alkalis and trace metals under GPIF conditions, it is not possible to set a design specification of the maximum amount of sorbent required with absolute certainty. However, preliminary estimates suggest that sorbent addition rate of 1,200 lb/hr or 10% of the coal feed rate should be adequate. The details of these estimates will be presented in the Conceptual Design report.

This estimate of 1,200 lb/hr is based on preliminary calculations of the amount of adsorption in the co-flow bed using kinetic data from Westinghouse. We recommend designing a maximum feed rate of 1,200 lb/hr and testing at 0, 600, and 1,200 lb/hr. Data gained from these tests combined with the results of Task 5 will show the feasibility of alkali adsorption in the gasifier and lead to further improvements in the gasifier design and operation.

Given the information PowerServe has about the solids handling equipment, the addition of 10% mass flow should be acceptable. This flow rate is well below the maximum of the limestone feeding system which will be used periodically and should be within the excess capacity in this design. However, more detailed information about the solids handling system design and capacity limits are necessary to determine the maximum amount of sorbent feeding possible.

**Sorbent Feeding Method:** The second area of interest is the method for feeding the extra sorbent. The feeding method will depend on the sorbent chosen, but provisions should be made for recycling bottom ash as well.

If bottom ash from the gasifier is used, the ash must be recovered from the filter cake on the drum filter. This filter cake could be transported with a front end loader and mixed with the coal before it is loaded onto the charge hopper and introduced into the GPIF facility. A system to meter and mix the sorbent and coal will be required. Also, the design of the crusher and drier system must be reviewed to determine if this system can handle the added capacity of solids and moisture and if the size and hardness of the recycled ash will present problems.

Sorbents such as clay would be added into the limestone feeding system. If the sorbent is added by itself, it would be fed in the same manner as the limestone, through a pneumatic transport line to the limestone storage hopper. If the sorbent is added with limestone, the mixture will be prepared off-site, and transported pneumatically into the system as a mixture. In this case the design of the limestone feeding system must be reviewed to assure that it has the capacity and the ability to handle materials of different density and particle size than the limestone.

**Upper Gasifier Design:** The second area of impact is in the design of the downward flowing char bed in the upper gasifier. While there are many constraints on the design of this bed, one critical constraint may be the capture of alkali and trace metal species. The release of these species will occur mainly in the pyrolyzer.

Vapor phase alkali species react with silicates or aluminosilicates by reactions such as:

$$2NaCl + Al_2O_3 \cdot 2SiO_2 + H_2O \rightarrow Na_2O \cdot Al_2O_3 \cdot 2SiO_2 + HCl$$

Other metal species can react with the aluminosilicates (clays) and limestone in similar ways. The capture of these elements is controlled by the following parameters:

- Sorbent loading, activity and surface area
- Upper gasifier bed residence time
- Water vapor concentration
- Chlorine content of the coal
- Temperature.

The goal of the Task 5 activities is to define the conditions required for alkali and trace metal control. Therefore, the design requirements for the upper bed cannot be set at this time. In the preliminary design report, a methodology for utilizing the data generated in Task 5 will be given, along with the data deficiencies at present. The conclusion, at present, is that the capture of alkali and trace metals will increase as the residence time in this portion of the bed increases. Therefore, the bed height should be maximized and the gas velocity minimized to increase capture.

In the absence of conclusive rate information, the approach taken for the preliminary design is to ensure adequate capacity for up to 10% additional feed material and ensure that residence time in the upper gasifier bed is maximized with respect to other design constraints. This approach will ensure the flexibility of the system to study control of alkali and trace metal emissions while minimizing the restrictions on the design until the necessary data is created.

Design Impacts of Clinker Control

Clinker formation results from sintering of ash particles at temperatures found in the gasifier fixed bed combustion zone. The sintering can result in two problems. First, large agglomerates of ash particles can form which are difficult to pass through the ash grate. A more difficult problem is the formation of large agglomerates on the gasifier walls. In the GPIF reactor, the agglomerates could bind either to the outer gasifier surface or the pyrolyzer tube.

The main ways to control this problem are :

- control the maximum bed temperature (add steam to the blast air)
- control the distribution of air and steam flow through the bed
- limit the coal choice due to ash properties
- minimize limestone and sorbent addition
- select gasifier shell and pyrolyzer tube materials that do not react with ash
- provide mechanical means to dislodge clinkers.

The approach to designing the clinker control subsystem involves experimental work to understand clinker formation and adhesion as a function of:

- temperature
- ash particle properties and interaction between ash particles
- limestone and sorbent addition
- gasifier materials of construction.

The results of this study will be combined with a sintering model to predict the effect of coal choice, additives, gasifier design, and operation on the tendency for clinker formation and adhesion.

The overall control approach is to define gasifier design and operating conditions required to minimize clinker formation and adhesion with respect to the coal and additives being utilized.

The Task 5 studies are necessary to state the adjustments necessary to the lower bed design to prevent clinker formation.

Design Impacts of Tar and $NH_3$ Control

Previous fixed-bed gasification experience indicates that tars and $NH_3$ emissions could pose significant problems to the success of GPIF. If tars are emitted from the gasifier in

significant quantities, restrictions in flow can occur where the tars condense; this condensation can occur throughout the gas handling equipment resulting in gasifier downtime. $NH_3$ is produced during gasification where significant amounts of steam are added. It is expected that high concentrations of $NH_3$ will emerge from the pyrolyzer section, and if left untreated could result in high concentrations of $NO_x$ when the gas is combusted.

The control of tars and $NH_3$ will be accomplished in the upper dome of the gasifier by injection air through a "reburner". The conceptual design allow for the addition of enough air to increase the gas temperature from 1600°F at the pyrolyzer exit to 2300°F at the top of the fixed bed.

There are two main mechanisms for tar destruction, cracking and oxidation. Both of these reactions can be accomplished by air injection. Some fraction of the tars will be oxidized and the rest will be cracked by the high temperatures resulting from the oxidation of the tars and other gases. In order to ensure total tar destruction, all the tars emerging from the pyrolyzer must be mixed with the air and hot combustion products and given enough time to react. Thus, complete mixing and maintaining sufficient residence time are the main goals of the reburner/upper gasifier dome design; the main constraints are reburner reliability, ease of operation, safety, and cost.

The second area addressed by the reburner is the reduction of $NH_3$ generated in the pyrolyzer. Under the average conditions present in the gasifier, $NH_3$ is a relatively stable compound. However, addition of air can be optimized to minimize $NH_3$ leaving the gasifier. Injection of air in the upper gasifier will reduce $NH_3$ to $N_2$ by two main reaction paths. The first step in the process is the formation of NO; while the second step is the reaction of NO with $NH_3$ to form $N_2$. While there are a large number of actual reactions occurring on the atomic level, the overall reaction path can be listed as.

$$4NH_3 + 5O_2 \rightarrow 4NO + 6H_2O$$

$$4NH_3 + 6NO \rightarrow 5N_2 + 6H_2O$$

Therefore the upper gasifier air injection results in the creation of sufficient NO to react with the $NH_3$ present and then allow the reduction reaction to occur.

While the overall approach to tar and $NH_3$ reduction is clear, a significant amount of information is necessary to finalize the design. The overall approach includes work in Task 4 and 5. In Task 4, the desired conditions in the upper gasifier have been considered, resulting in number of conceptual designs. In Task 5, the different designs will be considered in detail regarding the different mixing patterns created. Also, work will be performed to better understand the effect of temperature, pressure, and residence time on the extent and rate of both $NH_3$ and tar destruction in the upper dome

The work in Task 4 has resulted in three design alternatives which are shown schematically in Figures 1 to 3. The design details of these alternatives will be presented in the Conceptual Design Report.

Option 1 is the mixing of the pyrolysis gases with the air right at the pyrolyzer exit, which involves designing an air-cooled annulus within the pyrolyzer tube to convey the air. Option 2 is injection of the air through one port located directly above the pyrolyzer exit. Option 3 involves injection of the air through three or four locations on the gasifier roof to create a vortex in the upper gasifier.

The choice of the best injection system will require consideration of a number of conflicting requirements:

- tar emissions
- $NH_3$ emissions
- simple, reliable design
- structural integrity
- impact on flexibility of gasifier operation
- cost impact.




Figure 1. GPIF pyrolyzer exit design - Option 1 - annular injection.




Figure 2. GPIF pyrolyzer exit design - Option 2 - top injection.




Figure 3. GPIF pyrolyzer exit design - Option 3 - vortex injection.

Each of the design options has advantages and disadvantages. Option 1 provides direct contact of the injected air with all of the pyrolysis gas. Mixing is rapid, since the gases are contacted with the reburn air right at the pyrolyzer exit. Also, conveying the reburn air through the pyrolyzer annulus will preheat the air and will improve the stability of the reburn flame. Extracting heat from the fixed bed side of the pyrolyzer may even be advantageous in choice of materials of construction. A heat transfer analysis should be performed to estimate the cooling effect of the reburn air on the pyrolyzer tube. Since the tube will see temperatures as high as 2300°F on the outside and 1600°F on the inside, cooling will be required if the pyrolyzer is to be fabricated from metal instead of a structural refractory. Also, injection of air through the pyrolyzer would eliminate one or more penetrations through the pressure vessel. Each penetration is expected to be expensive to build and seal. The main disadvantages are the potential for plugging the air jets due to intimate contact with coal, the possibility of overheating the pyrolyzer exit due to the combustion of gases by the reburner, and the general increase in complexity of the design.

Options 2 and 3 are really variations on one design, injection through the upper dome. The reason for evaluating two options is to determine which design creates the best and most flexible mixing patterns. The options differ in the number of furnace intrusions, injectors and flame detectors required, and the complexity of the control system.

At this stage, the impact of the reburner design on the gasifier cost estimate depends on how many injector concepts we want to test. However, enough information exists to quantify this estimate. PowerServe proposes to design the GPIF with two reburn systems. Considering the difficulty in accurately modelling the behavior of these reburners, the best path to insure success is to create flexibility in the GPIF design. Therefore, the systems will each be designed with the ability to vary inputs such as jet velocity, swirl, and injection angle. The concept is to allow for variations in the rate and degree of mixing which will affect the conversion of tars and $NH_3$. Additionally, the best path for this prototype facility will be to allow for the testing of two burner concepts with very different mixing patterns.

**Option 1** is the most complicated design task because of the interface between the design of the pyrolyzer, being performed by Riley, and the design of the air reburner being performed by PowerServe. This design option will affect the gasifier design in a number of ways:

- Pyrolyzer materials of construction
- Injector tip(s)
- Distance between pyrolyzer exit and dome, i.e., pyrolyzer length
- Increase from one to two pyrolyzer tubes to convey the reburn air.

The exact impact of change in pyrolyzer materials cannot be made until a detailed heat transfer analysis is performed. An initial analysis has been performed and will be reported in the Conceptual Design report. However, more information about the gasifier

conceptual design will be needed as a basis for the final heat transfer analysis to be made in Task 6, detailed design.

The injector tip designs will have minimum impact on the gasifier cost with each tip being in the $5,000 to $10,000 range. Option 1 is the design which affected the length of the pyrolyzer least because the mixing is occurring at the pyrolyzer exit. Other designs may involve lengthening the pyrolyzer (or reducing the dome height) to ensure proper mixing.

It is easier to estimate the cost impacts of **Options 2 and 3**. The main issues are:

- The number and size of furnace intrusions
- The injectors themselves
- Distance between pyrolyzer exit and dome, i.e., pyrolyzer length.

In the case of Option 2, one furnace intrusion will be necessary; Option 3 requires three or four intrusions. The injectors will be simple, with water cooled injector tubes and nozzle tips being the main items. The cost of these injectors is estimated at $10,000 each. The effect on the pyrolyzer length will be determined in the Task 4 mixing studies.

## Design Impact of GPIF Instrumentation

Accurate and reliable process monitoring and control of the GPIF facility is of critical importance. The test gasifier facility will be equipped with a state-of-the-art control and instrumentation system which will include advanced measurement techniques to monitor temperature profiles, gas composition, and other parameters of the process.

PSI PowerServe (formerly PSI Technology) is responsible for the instrumentation needed to assess gasifier performance. PSI PowerServe will design and develop, or select and specify, all specialized instrumentation for monitoring the PyGAS reactor. Our goal is to provide all the measurements required for successful commercial development of the PyGas system. A list of the all the instrumentation around the gasifier is contained in Table 1. Figure 4 presents these monitoring devices. Most are standard pressure, temperature and flow instruments on inlet and outlet streams which should require no development work. However, there are a number of measurement tasks which will be more difficult. These tasks are related to the fact that GPIF is a pilot-scale facility, and one of the tasks is to fully evaluate the performance of this first version of the PYGAS process. It is expected that latter units will not have the same level of monitoring equipment necessary.

This document contains a functional description and cost estimate of the above instrumentation subsystems. The discussion in this report concerns the non-standard and difficult tasks. Both levels of instruments are shown in Figure 4.

Table 1. GPIF Instrument List

| Tag No. | Description | Quantity | Cost/ Instrument | Total Cost |
|---|---|---|---|---|
| AT-001 | $NH_3$/HCN analyzer | 1 | *Included | *Included |
| AT-002 | Extraction probes | 3 | $10,000 | $30,000 |
| AT-003 | Particle impactor for PSD | 1 | $10,000 | $10,000 |
| AT-004 | Alkali and trace metal trap | 2 | $15,000 | $30,000 |
| AT-05 | Gas conditioning system CO, $H_2$, $CH_4$, $H_2S$ analyzers<br>Data acquisition system and cabinet | 1 | $150,000 | $150,000 |
| AT-006 | HHV monitor | 1 | $20,000 | $20,000 |
| TT-001 | Vertical temperature probe | 10 | $2,000 | $20,000 |
| TT-002 | Horizontal temperature probe | 12 | $1,000 | $12,000 |
| TT-003 | Optical pyrometer | 2 | *Included | *Included |
| TT-004 | Miscellaneous thermocouples | 1 | Various | $5,000 |
| TP-001 | Pressurized optical pyrometer port | 5 | $2,000 | $10,000 |
| TR-001 | Data logger for temperature data | 1 | $30,000 | $30,000 |
| PT-001 | Upper dome pressure | 1 | $2,000 | $2,000 |
| PT-002 | Miscellaneous pressure transducers | 14 | $1,000 | $14,000 |
| LT001 | Gasifier bed level - microwave technology | 1 | $5,000 | $5,000 |
| FT-001 | Flow transducer | 13 | Various | $21,300 |
| *Part of PSI proposal subcontract; all other costs are responsibility of CRSS. | | | | |

The issues to be discussed in detail are:

- Gas and particulate sample extraction system
- Optical sampling port
- Gas analysis system
- Alkali and trace metal analysis system
- Continuous gas temperature monitoring in the upper gasifier
- Reactor bed temperature profile monitoring




Figure 4. Monitoring and control devices around GPIF.

- Gasifier pressure measurement
- Gasifier bed level measurement.

Gas and solids will be sampled at two points: after the cyclone located downstream of the gasifier and in the upper gasifier region. The expected conditions after the cyclone and pressure let down are:

- Maximum temperature of 1100°F
- Gas pressure of 20 to 30 psi
- Very low particle and tar loadings under normal conditions.

Sampling will also be performed in the upper dome; this will give information about the operation of the various stages of the gasifier: the pyrolyzer, the upper dome, and the fixed bed. The expected conditions in the dome are much more difficult:

- Maximum temperature of 2500°F
- Operating gas pressure of 200 to 600 psi
- Moderately high particle and tar loadings.

Both systems will utilize the same sampling probe design. This extraction probe will transfer the gas and particles to either a sample collection device, a remote monitor setup, or analysis equipment located adjacent to the gasifier. Sampling will occur continuously for some species and on an intermediate basis for others.

In addition to withstanding the temperatures and pressures cited, the extraction system must not allow deposition of tars or particles inside the sample line or react with anything in the gas stream. The extraction probe conceptual design is similar to designs PSI PowerServe has used for other experimental devices, and PowerServe will provide the design for these probes. Each probe is water-cooled, made of 316-stainless steel and lined with a porous metal tube through which nitrogen passes into the gas stream. The purge would reduce the sample gas temperature but maintain the high pressure and prevent deposition on the probe walls. Care must be taken to use minimum dilution of the gases so that the concentrations do not fall below minimum detection limits for each gas. Different lengths of probes will be made to alter the sampling location within the gasifier. The differences in temperature found at the two sample locations will be compensated for by the amount of nitrogen addition in the extraction probe, so that the gas temperature exiting the probe is constant.

After the extraction probe, there would be a number of sampling lines for gas conditioning prior to the gas analysis systems. The design will depend on the sampling location, and the specifics of these systems will be discussed later in this report when the analysis technique is addressed.

Optical Access Ports

The gasifier will also contain optical access ports to utilize the two optical temperature monitors (GASTEMP™) being provided by PSI Environmental Instruments. The design of each port should be such that the end of the port containing the window and associated elements can be connected to the gas sampling ports. In this way, we can obtain maximum flexibility with minimum pressure vessel intrusions. About ten furnace intrusions will be necessary to accommodate the locations for GASTEMP™ and gas sampling, five in the upper gasifier dome and five in gasifier outer shell (before the gas exits). End pieces will be designed for these ports including optical access windows, extraction probes, and blank end caps to block off the ports not being used at any particular time.

The optical access assembly provides a 2 in. diam clear opening and bolts to standard ANSI flanges. Standard sizes up to 8 in. diam are available from vendors for other applications. It can be equipped with an optional "spray ring" which is used to keep the window clean. This ring can be steam, air, or nitrogen fed for use in the gasifier. (Morgantown Energy Technology Center personnel will give advice based on their patented process for window cleaning.) Materials of construction should be 316-stainless steel for corrosion resistance with either quartz or sapphire windows for high temperature and pressure. The ports should also be water-cooled in order to maintain the high pressure rating of the steel at elevated temperatures. The standard GASTEMP™ rail-type mounting system can be used with a clamping ring attached to the optical port flange to stabilize the instrument's sight tube if necessary. Additionally, valves may be attached to the ports to allow cleaning while the gasifier is on line.

Gas, Particle, Tar, Alkali, and Trace Metal Sample Conditioning, Capture, and Analysis

The gas, particulate, tar, alkali and trace metal analysis systems all have interdependent requirements, and therefore must be discussed together. Gas and particle sampling will occur at two points, the upper dome and after the cyclone. The extraction system will be very similar at both locations, and a conceptual design was presented previously. The next step after the temperature reduction will be the reduction of pressure to the level necessary for the sample conditioning and analysis system.

At present, a conceptual design for the system exists which is detailed enough to give an overall view of the system requirements and cost. However, this area represents the largest cost component of the instrumentation under the PowerServe scope. Vendors are still being contacted, and consideration is being given to a number of major issues, including purchasing components from one or more vendors or purchasing the whole system from one vendor, complete with instrument housing, data acquisition, control system, and a manual. The overall system approach is preferred if the price, reliability, accuracy, and precision necessary can be guaranteed.

A schematic of the overall system which will be applied to sampling and analysis at both locations is shown in Figure 5. The most important difference in the two locations




Figure 5. Conceptual gas and particle sampling and analysis train.

from a sample analysis standpoint will be the concentration of particulate and tar in the upper dome. Two strategies are being considered for dealing with tars so that clean gases can be analyzed for CO, $H_2$, $CH_4$, $H_2S$, HCN, and $NH_3$:

- immediately quench and remove the tars and particulate before gas analysis
- capture the particulate in a cyclone and filter system and keep the gas temperature above 600°F to keep the tars from condensing until after gas analysis

The latter system has been offered by a vendor experienced in instrumentation for gasifiers, and, if it can be proven to work, should be a very attractive alternative.

As stated, the alkali and trace metals will be measured in a batch mode. Two systems are being considered for capturing tars, particulate and vapor species close to the gasifier. The first option is a modification of EPA Method 29 to be capable of running under the reactor pressure. The second is a modification of a novel Hazardous Element Sampling Train (HEST) being developed by Chester Environmental Companies for the EPA and EPRI. Once again, we have to adapt the system to the temperatures and pressures of GPIF, but the system consists of a cyclone followed by carbon impregnated filters to capture the finer material. The HEST system is preferred for a number of reasons, including ease of operation, accuracy, cost, and the fact that the system can be more readily adapted to measuring $NH_3$. The $NH_3$ monitor will require a clean sample that is at 450° to 500°F, and bubbling the sample through impingers will remove the $NH_3$.

The information generated from the on-site gas analysis equipment should be sent to a central data acquisition system for monitoring, manipulating, and storing experimental data output. This system should be capable of providing updated reports on the gas composition,

gas temperature, and bed temperature systems along with other key data points concerning gasifier operation so that this system function can be manipulated independently from the gasifier operation.

Particulate will be sampled and size-segregated in a particle impactor system to create samples which will be analyzed to show the dependence of trace metals and alkali content on particle size. This information will be used to understand the behavior of these elements and to predict the efficiency of emission control equipment for removing alkali and trace elements from the gas.

Temperature Measurement

For gas temperature measurements, the PSI GASTEMP™ will be used. This instrument is developed for high temperature applications in coal-fired combustors. Two regions will be continuously monitored, the upper dome and the outer shell/gasifier exit.

Pyrolyzer and gasifier bed temperature profiles will be monitored using vertical and horizontal ceramic temperature probes (CTP) (Figure 6). In the conceptual design, we have proposed ten vertical ceramic probes, inserted from the gasifier top and extending through the gasifier. The horizontal probes will extend 3 to 6 in. into the bed; four probes will be located on three levels to get a full picture of the gasifier temperature profile.




Figure 6. GPIF temperature profile monitoring system.

EXHIBIT "F"

LETTER OF OCTOBER 22, 1993

PowerServe
A DIVISION OF PHYSICAL SCIENCES INC

October 22, 1993
PSIT No. 1171

CRS Sirrine Engineers, Inc.
Power Division
1041 Butler Road
Greenville, SC 29606-5456

Attention: Mr. Larry S. House, Project Director

Subject: Gasification Product Improvement Facility (GPIF) PSIT Subcontract No. 1171

Dear Mr. House:

PSI Technology Company (PSIT) is pleased to confirm the conclusion of negotiations of its subcontract as follows:

| | |
|---|---|
| Total Estimated Cost and Fee: | $904,625 |
| Cost Share: | (180,925) |
| Total Cost to Sponsor: | $723,700 |

The following changes shall be made to the resultant subcontract as discussed 21 October 1993 at METC with M. Morgan (PSI), L. Brandt and R. Johnson (METC), and L. House (CRS) and outlined in METC letter (unsigned) dated October 19, 1993:

1) PSI agrees to delete subtasks 5.1 and 5.2, concerning bench scale experiments on alkali and trace metal capture, entirely and has reduced costs appropriately.

2) It is understood that subtask 5.4, concerning mathematical modelling of the gasifier air injector, shall remain unchanged and shall continue to remain a part of PSI's work scope and subcontract.

3) PSI has revised the description of Task 5 in Exhibit A, to exclude the statement "evaluating work at METC."

In addition to the above, please note that PSI had outlined in its 20 September 1993 submission a reduction/revision to the work scope of subtasks 5.1 and 5.2 and the deletion of subtask 5.3 (bench scale studies of clinker formation) as well as a reduction to tasks 7 and 9 (on site activities) of the PSI work scope.

20 New England Business Center, Andover, MA 01810
Telephone: (508) 689-0003 CompuServe: [76300, 2167] Facsimile: (508) 689-3232

440

Printed on Recycled Paper

The combined revisions/reductions (20 September 1993 and item 1 above) result in an overall cost reduction to the PSI subcontract of $83,379, before cost share. PSI believes that further reductions could jeopardize the success of the GPIF program. In fact PSI believes that after consent and subsequent execution of the PSI subcontract the deletion of work in task 5 should be revisited for possible inclusion at a later date.

A revised Certificate of Current Cost or Pricing Data is provided herewith which supersedes any others.

I trust that these changes can be incorporated quickly so that METC can approve (consent) and CRS can finally award PSI the long past due subcontract. If you have any questions or require additional information, please feel free to contact the undersigned or Dr. Mark E. Morgan.

Sincerely,

Randy B. Ewing

Randy B. Ewing
Contracts Administrator

Enclosure: as stated above

g:1171-4

PSI PowerServe
A DIVISION OF PHYSICAL SCIENCES INC

# CERTIFICATE OF CURRENT COST OR PRICING DATA

This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 15.801 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.804-2) submitted either actually or by specific identification in writing, to the contracting officer or the contracting officer's representative in support of **PSIT Proposal No. 1171** are accurate, complete, and current as of **22 October 1993**. This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.

FIRM: PSI PowerServe
A Division of Physical Sciences Inc.

NAME: Stephen A. Johnson

TITLE: Vice President & General Manager

SIGNATURE: Stephen A Johnson

Date of Execution: 22 October 1993

442

20 New England Business Center, Andover, MA 01810
Telephone: (508) 689-0003 CompuServe: [76300, 2167] Facsimile: (508) 689-3232

Printed on Recycled Paper

CERTIFICATE OF FILING

I hereby certify that on October 2, 2006, a copy of the foregoing "DEFENDANT'S SUPPLEMENTAL APPENDIX" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

S/ James W. Poirier